U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 13, 2010

~~REQUEST FOR TREATMENT AS A SEALED SUBMISSION~~  Unsealed

**BY E-MAIL**

The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    **United States v. James Cromitie, et al.,**
             09 Cr. 558 (CM)

Dear Judge McMahon:

      The Government respectfully submits the following in light of the issues raised by the non-appearance and other behavior of Laguerre Payen in the previous 24 hours.

FACTUAL BACKGROUND

**A.    The Defendant's Prior Conduct at the Time of His Arrest and in Court**

      The defendant was arrested on May 20, 2009. At the time of his arrest, Payen did not initially respond to background questions or questions about his physical condition, or to an offer of water. (3545-15). Instead, Payen muttered to himself, "Jesus, Jesus. Jesus helps everybody. Jesus said he would take care of everybody." Later, however, after Payen was told that he would not be asked about the crime for which he was charged, Payen answered questions about his background and described the medications he took. (3545-14; 3545-15).

      The next morning, at Bellevue Hospital (where Payen was referred for an initial psychiatric evaluation), when agents again attempted to Mirandize Payen, he said he did not understand, but when assured he would not be asked about the charges, he then answered pedigree questions with a fair degree of specificity. In fact, Payen began giving unsolicited information about his background, including exculpatory statements, such as that he had bad luck in hanging around with "the wrong people." (3545-15).

      While he was monitored that morning by a Bellevue staff member, Philomena Baptist,

The Honorable Colleen McMahon
September 13, 2010
Page 2

Payen asked if she was Muslim and, upon learning that she was from Pakistan, a Muslim country, replied, "We are brother and sister. Good, you can help me." (3501-111). Payen suggested to Baptist that the Government was trying to kill him, and told Baptist, "If you help me, we have people all over and they will help you." On the other hand, Payen told Baptist that she should not tell anyone about their conversation because, "I have people out there," which Baptist interpreted as a veiled threat. (3501-111).

Payen was presented before a magistrate judge in the afternoon of May 21, 2009. During that presentment, and after a fairly laborious colloquy, Payen acknowledged that he understood his rights. (Tr. at 2-13). At that time, the defendant complained that he could neither read nor write in English. (Tr. at 8 (May 21, 2009)). A search of his apartment had revealed notes of names and telephone numbers in English, however, as well as various literature, including basic religious texts, written in English. (3545-25 and 3545-26). The defendant, who was born in Haiti and speaks some French, was also apparently learning Arabic, as reflected by handwritten notes and literature seized from his residence, and his prayers in fluent Arabic while he was at Bellevue. (GXs 550.1-550.11; 3501-111).

Payen appeared at a number of conferences, represented by counsel, throughout the rest of 2009. During calls to his girlfriend from the MCC, principally during January 2010, Payen was lucid, if unhappy about his predicament. Thirty-eight calls are contained on a CD that will be provided tomorrow morning for the Court's convenience. (Bates-stamped 4585). To take but one example, Payen and his girlfriend had the following interaction:

| | |
|---|---|
| Payen: | You, Ok? |
| UF: | Yeah, why? |
| Payen: | Just want to know. |
| UF: | Why? |
| Payen: | Huh? |
| UF: | Why? |
| Payen: | I just wanted to know. |
| UF: | Why, are you ok? |
| Payen: | I'm alright. As long as you alright, I'm alright, to tell you the truth. |

(Jan. 16, 2010 21:39:34, at 5:50).

On February 5, 2010, the Court adjourned a conference held for the purpose of appointing new counsel for Payen, finding that "Mr. Payen [is] simply too ill for us to do anything useful or meaningful today." (Tr. at 7 (Feb. 5, 2010)). At the rescheduled conference held the following week, however, the Court found that "everybody who was sitting here knew that Mr. Payen was putting on an act and was faking it." (Tr. at 8 (Feb. 9, 2010)). According to information provided by officials at the MCC and the Marshals' service, during the February 5 conference, Payen acted as if he were vomiting into a trash basket, but was instead merely pretending to do so. (Tr. at 8 (Feb. 9, 2010)). As soon as he returned to the MCC that day, "he was interacting normally with other people, cooking, doing laundry." (*Id.*) The Court warned Payen, "[N]ow that he has a track record of faking, we'll always be suspicious that he's putting on an act." (*Id.* at 9).

The defendant has appeared without incident at a number of pretrial conferences since then. Trial in this matter began with jury selection on or about August 17, 2010, and the defendant has appeared on 10 trial days over more than a three-week period without incident. During that time, he has communicated with trial counsel, including when he has required a break in the proceedings so that he could use the restroom.

On September 8, 2010, the Government filed a motion *in limine* to admit Payen's prior conviction for attempted assault, in connection with his shooting of two teenagers with a BB gun in 2002. Years ago, at Payen's plea allocution in that case, the County Court Judge remarked that the defendant had "gone through a number of different examinations with various physicians, psychiatrists, psychologists, and he's been found to be competent, and . . . he's also been found to be responsible." *People* v. *Payen*, Indictment 469-02, tr. at 14 (N.Y. Rockland County Court Feb. 10, 2004). As a result of those evaluations, however, Payen secured a plea bargain that "offered him a much lower plea than that offense could have carried with it." *Id.* at 15; *see also id.* at 15 ("[H]e has extenuating mitigating factors in his background due to psychiatric and psychological involvement — not, I shouldn't say psychiatric — but perhaps a history of treatment for various things.").

### B. The Prior 24 Hours

Early this morning — the first Court appearance after the Government filed its motion *in limine* — the Court and the Government received word from the Marshals service and the Bureau of Prisons that Payen had been disciplined Sunday night, September 12, because he had let another inmate use his phone calling code, and he was sent to the Special Housing Unit. This morning, he refused to leave his cell and did not respond verbally or otherwise to instructions. Accordingly, the Court issued a "force order," and Payen was forcibly removed from his cell. (He was neither resistant nor compliant, but simply did not move when told.) He was carried to

The Honorable Colleen McMahon
September 13, 2010
Page 4

the cellblock adjoining the courtroom, where his counsel spoke with him and described him as non-responsive.

Following today's proceedings, the Court ordered the Bureau of Prisons to perform a preliminary evaluation of Payen (as opposed to a more comprehensive competency evaluation, *see* 18 U.S.C. § 4241). Order (Sept. 13, 2010). Payen, however, refused to communicate with psychologists and instead began banging his head against the wall. He was placed on suicide watch.

The Government has requested, and expects to receive by tomorrow morning, medical records of Payen's mental health treatment at the MCC. We have been advised that many of the psychologists who have observed Payen throughout his detention suggested well before yesterday that malingering cannot be ruled out as an explanation for his symptoms.

### C. Payen's Prior Interactions With a Prison Inmate and His Immigration Proceeding

Following Payen's arrest in May 2009, the Government was contacted by an inmate out of state who claimed to have information about Payen (whom he recognized from news reports concerning this case) (the "Inmate"). The FBI interviewed the Inmate (who was detained on criminal charges and an immigration detainer, and who later sought to receive a benefit for providing information about Payen), and the results of that interview are provided in the attached 302 Bates-stamped 4582-4584. In or about April 2008, the Inmate and Payen were both detained at Lackawanna County Jail. Payen and the Inmate both discussed their pending immigration matters, and Payen advised the Inmate how to act mentally ill, in order to gain an advantage in resisting deportation. Payen was scheduled to receive psychiatric treatment twice a month, and when a corrections officer escorted Payen to his appointment, Payen would purposely walk in the wrong direction and act incoherent, resulting in the officer needing to physically guide him. Payen also pretended to take medication, but did not, and said that was "part of the act." (4582-83).

During their incarceration, Payen was disciplined for an unknown infraction and responded by smearing feces on his body and cell walls and "acting crazy." (4582). When another inmate complained about having to clean up the mess, Payen threatened him: "You know what my name, Laguerre, stands for? Laguerre means 'the war.'" (4582).

Payen's order of removal was deferred in or about September 2008 (after various legal proceedings, including an appeal to the United States Court of Appeals for the Third Circuit). Consistent with the strategy that Payen described to Dutton, the deferral of removal was based principally on findings that Payen was mentally ill, that he would probably not receive medication in a Haitian prison (where he would probably be detained after deportation), and that, without medication, his misbehavior could lead to torture. *See In re Laguerre Payen*, A 42 149

The Honorable Colleen McMahon
September 13, 2010
Page 5

125 (Immigration Court, York, PA July 10, 2006).

## APPLICABLE LAW

### A. A Defendant's Competence to Stand Trial May Be Evaluated Without A Formal Hearing

The standard for determining whether a defendant is competent to stand trial is a familiar one. "The defendant must have (1) 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and (2) 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995) (quoting *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam)). "It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986). Rather, to support a finding of incompetency, "[t]he mental illness must deprive the defendant of the ability to consult with his lawyer 'with a reasonable degree of rational understanding' and to understand the proceedings against him rationally as well as factually." *Nichols*, 56 F.3d at 412 (quoting *Dusky*, 362 U.S. at 402). In determining competency, the district court may properly rely on a number of factors, including medical opinions and the district court's observation of the defendant's comportment. *Nichols*, 56 F.3d at 411; *United States v. Hemsi*, 901 F.2d 293, 295-96 (2d Cir. 1990); *see also Drope v. Missouri*, 420 U.S. 162, 180 (1975) (evidence relevant to competency includes not only medical opinion but also the defendant's "irrational behavior" and "his demeanor at trial"); *United States v. Oliver*, 626 F.2d 254, 258-59 (2d Cir.1980) (district court properly relied in part on its own observations in assessing defendant's mental capacity to stand trial); *United States v. Sullivan*, 406 F.2d 180, 185 (2d Cir. 1969) (same); *McFadden v. United States*, 814 F.2d 144, 147 (3d Cir.1987) (relying on defendant's conduct at competency hearing).

The Second Circuit has consistently approved of a District Court's reliance on its own observations in making determinations about a defendant's competency to stand trial. For example, in *United States v. Oliver*, the Second Circuit found no abuse of discretion in the District Court's finding that a defendant was competent to stand trial. 626 F.2d at 258-59. The Court of Appeals noted that the District Court had "ample opportunity to observe him and directly questioned him." The Circuit pointed out that the trial court "justifiably relied on his extended observations of Oliver in deciding that he had sufficient mental capacity to stand trial." *Id.* at 259.

Under Section 4241, courts are required to hold a competency hearing only when there is "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). In the absence of "reasonable cause," courts have no obligation to hold a

competency hearing. *See, e.g., Nichols*, 56 F.3d at 414 ("In deciding that an evidentiary hearing is unnecessary, a court may rely not only on psychiatrists' reports indicating competency but also on its own observations of the defendant"); *Chichakly v. United States*, 926 F.2d 624, 631-32 (7th Cir. 1991) (no need for competency hearing, despite defendant's past depression and mental and emotional problems, where court saw no evidence of incompetency and defense counsel did not request hearing). And because "[t]he necessity for a competency hearing varies in each case, depending upon a number of factors concerning defendant's behavior and inferences which might be drawn from psychiatrists' reports," *United States ex. rel. Mireles v. Greer*, 736 F.2d 1160, 1165 (7th Cir. 1984), the "[d]etermination of whether there is 'reasonable cause' to believe a defendant may be incompetent rests in the discretion of the district court." *Vamos*, 797 F.2d at 1150 (employing abuse of discretion standard in reviewing district court's decision not to order a competency hearing); *United States v. Oliver*, 626 F.2d 254, 258 (2d Cir. 1980) (same).

*Nichols* is particularly instructive. There, the defendant resisted cooperating with both his attorney and court-appointed mental health professionals. 56 F.3d at 406-07. Nevertheless, the District Court initially denied his attorney's request for a competency hearing, based on a preliminary report by a psychologist who had examined the defendant on a number of occasions before trial (before he stopped cooperating) that the defendant was competent to stand trial. *Id.* at 407. When, after jury selection, the defendant refused to attend the proceedings, the district court found that he made a knowing and voluntary waiver to attend trial. *Id.* Only after that point, the Court held a formal competency hearing, at which he found the defendant competent to stand trial, based on the preliminary report and the defendant's in-court demeanor. *Id.* at 408. On appeal, the defendant complained that the finding of competence was invalid, because the defendant litigated his competence after trial, and the district court did not make a final finding of competence until years later. He also contended that it was impermissibly retrospective, because the defendant was not even found initially competent until *after* he had waived his right to appear at trial. *Id.* at 413-14. The Second Circuit found that the district court's initial competency determination was not deficient, merely because no hearing was held, and cited precedent where the court "upheld the district court's decision not to order a psychiatric examination and subsequent hearing based solely on the judge's direct observation and questioning of the defendant, despite evidence of the defendant's low intelligence, prior history of heavy drug use, lapses of memory and unresponsiveness." *Id.* at 414. An "automatic adjournment" was not required "every time the district court inquires further into competency," based on some aspect of the record, because "[s]uch a rule would allow a manipulative defendant . . . to bring the trial to a halt at his whim." *Id.* at 415. Where a district court desires not to allow a defendant "to dictate the timing of the trial," and believes, based on its observations, that the defendant will be found competent, it may take a "calculated risk" to move forward with the trial (understanding that, if the defendant is found incompetent during trial, a mistrial may result). *Id.* at 415 (citing *Brown v. Doe*, 2 F.3d 1236, 1247 (2d Cir. 1993)).

Although the Court has yet to hear from an MCC psychologist, the Government

The Honorable Colleen McMahon
September 13, 2010
Page 7

respectfully notes that Payen's current behavior follows on the heels of (1) an infraction on Sunday, September 12, 2010, for which he was disciplined by being sent to the SHU (and there is evidence that prior disciplinary actions by prison officials led Payen to act out) and (2) a motion by the Government to admit a prior conviction in a case where Payen obtained a significantly reduced sentenced in light of psychological evaluations. Payen has also appeared without incident during three weeks of trial, and has a history of malingering in this case, from the time of his arrest, during his presentment, and even before this very Court. Accordingly, in light of additional information, the Court might well determine that there is no reasonable cause to hold a competency hearing, under Section 4241, because the defendant has an established record of fakery, and because the Court has had the benefit of observing the Payen throughout this case over more than a year and during trial and can find him competent based on that record.

### B.   A Defendant's Right to Be Present During Trial Is Alienable

It may be that the Court finds Payen competent to stand trial tomorrow, even if Payen refuses to cooperate during tomorrow's proceedings and remains passive (or even if he attempts to disrupt them). Under those circumstances, Payen would, of course, have a right to be present at trial, but he may attempt to disrupt the trial. Accordingly, the Government also takes this opportunity to note the Court's well-established authority to remove a disruptive defendant from the courtroom, should the need present itself, and to control the proceedings in this manner.

Although a defendant has a Sixth Amendment right to be present in the courtroom during his trial, "if he knowingly insists on misbehaving at trial to such an extent that his conduct is unduly disruptive, the trial judge ordinarily has the power to have him removed from the courtroom and to continue the trial in his absence until he promises to behave properly." *United States* v. *Hemsi*, 901 F.2d 293, 296 (2d Cir. 1990) (citing *Illinois* v. *Allen*, 397 U.S. 337, 343 (1970)). Significant deference is owed "to the decision of the judge in whose hands the actual responsibility for courtroom conduct is placed." *Foster* v. *Wainwright*, 686 F.2d 1382, 1388 (11th Cir. 1982). The Supreme Court has held "that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Illinois* v. *Allen*, 397 U.S. 337, 343 (1970). As the Court in *Allen* stated:

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.

The Honorable Colleen McMahon
September 13, 2010
Page 8

> No one formula for maintaining the appropriate courtroom
> atmosphere will be best in all situations.

*Id.* at 343-44. The removal of a defendant from the courtroom, the Court also made clear, was among the permissible options available to a trial judge faced with such circumstances. *Id.* Accordingly, due process does not require a defendant's "presence when that presence would be useless." *Snyder* v. *Massachusetts*, 291 U.S. 97, 106 (1934). Should the Court find that Payen is competent, and should Payen still refuse to control himself, or behave inappropriately during trial, the Court would be well within the above authority in ordering his removal.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
David Raskin
Jason P. W. Halperin
Adam S. Hickey
Assistant United States Attorneys
(212) 637-2635, (914) 993-1933, (212) 637-1039

Attachments

cc: Sam Braverman, Esq. (by e-mail)