# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Leonard F. Joy
*Executive Director*

*Southern District of New York*
John J. Byrnes
*Attorney-in-Charge*

September 20, 2010

Hon. Colleen McMahon
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re: **United States v. James Cromitie, et al.**
     **09 Cr. 558 (CM)**

Your Honor:

Shahed Hussain's testimony during the first three days of cross-examination very strongly suggests that he has lied and/or is now lying about matters that go to the heart of his credibility and his motives for testifying against the defendants in this case. Mr. Hussain has made blatantly contradictory and often preposterous statements about, inter alia, his immigration status, his dealings with the United States Probation Office; his financial circumstances, his bankruptcy filing, and his very identity.

At a minimum, Mr. Hussain's contempt for the truth compels at least two results:

A. **The Government Must Investigate and Correct Suspected Perjury of Mr. Hussain**

The government must independently investigate Mr. Hussain's likely perjury and correct any misstatements before this jury. Napue v. Illinois, 360 U.S. 264, 270 (1959) ("the district attorney has the responsibility and duty to correct what he knows to be false and to elicit the truth"); Perkins v. LeFevre, 642 F.2d 37 (2d Cir. 1981)("Due process requires not only that the prosecutor avoid soliciting false testimony, but that he not conceal it, and that he not allow it to go uncorrected when it has occurred"); Morris v. Ylst, 447 F.3d 735, 744 (9th Cir. 2006), citing Northern Mariana Islands v. Bowie, 243 F.3d 1109, 1118 (9th Cir. 2001) (when a prosecutor suspects perjury, the prosecutor must at least investigate because "[t]he duty to act is not

discharged by attempting to press ahead without a diligent and good faith attempt to resolve it").

The government's obligation to investigate and perjured testimony flows from the due process clause. "The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost." Drake v. Portundo, 553 F.3d 230, 240-41 (2d Cir. 2009). A prosecutor violates this fundamental precept when he allows false testimony to go uncorrected to the jury. False testimony includes testimony relating to credibility:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is any way relevant to the case, the district attorney has the responsibility to correct what he knows to be false and elicit the truth.

Napue v. Illinois, 360 U.S. 264, 269-70, citing People v. Savides, 1 N.Y. 2d 554, 557.

The government's full compliance with its duty to investigate and correct suspected perjury is especially important in this case. First, Mr. Hussain is by far the most important prosecution witness. Indeed, he is the only government witness who claims to have any first-hand knowledge about the crimes alleged against the defendants. Although there are many video and audio recordings, Mr. Hussain had numerous unrecorded meetings and conversations with the defendants. The first four months of Mr. Hussain's interactions with Mr. Cromitie were not recorded at all. Moreover, the government has specifically placed Mr. Hussain's credibility in issue. On direct examination, the government questioned Mr. Hussain at length about his asylum application, his financial circumstances, his conviction in Albany, and his prior role as a co-operating witness. Most of Mr. Hussain's perjury implicates those areas.

Particularly given that the government bears the burden of proof on entrapment, a fair assessment of Mr. Hussain's credibility is central to this case. Failure to correct perjured testimony would vitiate any subsequent conviction. See Drake v. Portundo, supra ( where prosecutor allows false testimony to go to the jury uncorrected, conviction will be reversed unless evidence is so overwhelming that there is no "reasonable likelihood" that false testimony could have "affected the judgment of the jury"); Dubose v. LeFevere, 619 F.2d 973. 979 (2d Cir. 1980)(granting habeas relief where uncorrected false statements "went to the credibility of the State's key witness, without whom it had virtually no case"); United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975)(if it is established that the prosecution knowingly allowed false testimony to go to the jury, reversal is "virtually automatic")

For much the same reasons as argued above, it is also essential that the government provide the additional documents and information requested below. The requested information is required because it will provide further evidence to impeach Mr. Hussain's fabrications and demonstrate his lack of credibility. See Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150, 154 (1972)(suppression of material evidence encompasses matters going only to credibility when the reliability of a given witness may well be determinative of guilt or innocence.)

Finally, the Court suggested this afternoon that it might be inclined not to make the government supply certain materials, such as Mr. Hussain's tax returns, because such information would only further help establish that he lied about collateral matters. To the extent that the defense is prohibited from obtaining or introducing extrinsic evidence of Mr. Hussain's perjury, the government has an enhanced obligation to ensure that it corrects Mr. Hussain's false statements. For example, if the government knows that Mr. Hussain's tax returns are inconsistent with his testimony, it would be a shocking violation of due process for the government to oppose turning over the tax returns while allowing the perjury to remain uncorrected. Nor, can the government simply not look at evidence in its possession or available to it from Hussain and then pretend there is no problem. See United States v. Wallach, 935 F.2d 445, 457 (reversing conviction where government failed to correct testimony of key witness that he had stopped gambling; "[w]e fear that given the importance of Guariglia's testimony to the case, the prosecutors may have consciously avoided recognizing the obvious–that is, that Guariglia was not telling the truth").

This letter is filed to place the government on notice of some of the principal matters on which we believe Mr. Hussain has thus far perjured himself and which the government has a duty to investigate and correct. We are not, of course, suggesting that the government is relieved of the obligation to investigate and correct additional testimony that it suspects or knows to be false. The letter also identifies the specific materials which we are requesting under Brady and Giglio as a result of Mr. Hussain's testimony to date.

The testimony to date shows that Mr. Hussain has probably lied here and/or in the past about at least the following topics.

1. **Illegal entry into the United States and application for political asylum status**.

    a. **Likely Perjury**

    Mr. Hussain's trial testimony and various documents, including his May 19, 2003 Presentence Report, his 2006 testimony in Albany, New York (GX 3502-9) and a 1996 application for a Getty Dealership are grossly inconsistent with his sworn December 29, 1994 application for political asylum and his February 2, 1995 interview with the I.N.S. Mr. Hussain has provided irreconcilable accounts about (a) the time of his entry into the United States, (2) the criminal charges that purportedly were lodged against him in Pakistan before he came to the United States, (3) his economic circumstances when he left Pakistan for the United States, (4) the time and manner in which he incurred the scar on his wrist that he exhibited to the jury, (5) his claim that in 1994 and 1995 he feared persecution, including torture and death, from the Pakistani Government based on his political affiliations.

    b. **Requested Brady Materials**

    The government has supplied the defense with Mr. Hussain's December 29, 1994 application for political asylum and the I.N.S. examiner's notes from a February 2, 1995 interview of Mr. Hussain. GX 3502- 135 and 136. However, on cross-examination, Mr.

Hussain disclosed, for the first time, that he had a second interview at J.F.K. airport that took place some six or seven months after his February 2, 1995 interview. T.1230. At this second interview, Mr. Hussain asserts that he gave his lawyer additional documents which may have been furnished the I.N.S. in support of his application. T. 1261.

We request that we be furnished with Mr. Hussain's entire immigration file, including any documents submitted by him in connection with his application for political asylum. We also request that we be furnished with any proffer notes or other notes from Mr. Hussain's co-operation with the Albany F.B.I. and United States Attorney's Office which reflect anything Mr. Hussain may have said about his immigration circumstances.

2. **Financial circumstances**.

a. **Likely Perjury**

Mr. Hussain's testimony on cross-examination about his current and past financial circumstances is squarely contradicted by previous documents and his testimony on direct examination.

Prior to this trial and on direct examination at this trial, Mr. Hussain has repeatedly declared himself to be a struggling businessman with few assets and little income.

When questioned by Mr. Raskin about his financial status, Mr. Hussain stated that he had received only $52,000 from the F.B.I. for his work as a paid informant over the past 3 ½ years. The only other source of income Mr. Hussain claimed to have had over that period of time was a motel he owns in Saratoga, New York. Mr. Hussain asserted that he had not made a profit from the motel in the last three years. T.659.

During his 2006 testimony in Albany, Mr. Hussain stated that it was "true" that he was "not a wealthy man." GX 3502-9, page 816.

In his May 19, 2003, Presentence Report, Mr. Hussain claimed to have assets totaling $186,450 and debts amounting to $179,700. Mr. Hussain did not claim to have any foreign assets to the Probation Office. In the same report, Mr. Hussain stated that he and his wife had reported joint income of about $4,700 in 2000 and about $16,000 in 2001.

On August 21, 2003, Mr. Hussain filed a petition for Chapter 13 bankruptcy. In his petition, he claimed to have assets amounting to little more than his heavily mortgaged house and a few old cars. He swore that he did not have any money in a bank account and that he had a monthly income of $4,300.

When Mr. Hussain was sentenced on October 27, 2006, Judge Hurd found that "based on your financial resources, projected earnings, and other income, as well as your financial

obligations, you do not have the ability to pay a fine." GX 3502-6, pages 7-8.[1]

Mr. Hussain provided an entirely different account of his financial circumstances on cross-examination. He now claims to have a "trust fund" in Pakistan from which he received over $250,000 in 2009 and 2010 alone. Mr. Hussain swears that money is periodically transferred from a Pakistani bank to his son's bank account, but that "it's my money." T. 1478.

On cross-examination, Mr. Hussain further stated that he received "over $200,000" from the same trust fund in 2003, T. 1511, and agreed that he had "hundreds of thousands of dollars available to [him] just by picking up the phone..." T. 1515. He testified that this money was always available to him, "So it doesn't matter if my father is dead or my brother is dead. I just have to pick up a call–and call them up, and they would help me." T.1519.

Mr. Hussain also testified that the $500,000 he has thus far received from his trust fund could be confirmed by looking at his bank records, T.1520. He also, however, announced that he has not had a bank account since 2007. Id.

Mr. Hussain further acknowledged that while in Tennessee in 2005 or 2006, he was the part owner of a chain of supermarkets in Tennessee that earned a "couple of million" dollars a year. T.1354. He further claimed that as far back as 1996 he owned at least $100,000 worth of stock in his family business in Pakistan. T.1347

b. **Requested Brady Materials**

Mr. Hussain has either previously lied about his financial circumstances or he is now lying about his financial circumstances (or both). We request that the government obtain Mr. Hussain's bank records and furnish us with any other information in their possession regarding Mr. Hussain's past and present financial status. We also request that the government furnish us with any information Mr. Hussain may have provided about his financial circumstances to the F.B.I. or the United States Attorneys' Office for the Northern and Southern Districts of New York.

3. **Bankruptcy Fraud**

On cross-examination by Ms. Brody, Mr. Hussain admitted that he failed to disclose the fact that he had $100,000 in stocks in his sworn bankruptcy petition and that the omission was a misrepresentation. T. 1349. Mr. Hussain has now also testified that in 2003, the same year in which he declared bankruptcy, he received $200,000 from a trust fund in Pakistan. T.1511. This amount alone, which Mr. Hussain also failed to disclose in any of his bankruptcy filings,

---

[1] In 2006, Mr. Hussain sold his home for $450,000 (the same one he valued at $125,000 in his bankruptcy petition) and purchased a motel in Saratoga. Between 2005 and 2006 our investigation shows that Mr. Hussain also purchased a 2002 Cadillac Escalade, a 2000 B.M.W. 740 IL Sedan, a 1996 Mercedes-Benz Sedan, a 1999 Chevrolet Tahoe, and a 1996 Dodge Cargo Van.

exceeds the total amount of debts listed in his bankruptcy petition.

### b. Requested Brady Materials

During Ms. Brody's cross-examination of Mr. Hussain, Assistant United States Attorney David Raskin, outside the presence of the jury, stated that Ms. Brody's questioning about Mr. Hussain's "lack of disclosure about foreign assets in bankruptcy court" was an "unfair line of questioning" because there was a "ruling from the bankruptcy judge that such a disclosure was not necessary." T. 1416.

Mr. Raskin has subsequently acknowledged that there was no ruling by the bankruptcy court that Mr. Hussain did not have to disclose his foreign assets and that he relied on something Mr. Hussain told him. We request that we be told the time and circumstances when Mr. Hussain falsely informed Mr. Raskin of that ruling. We also request that the government identify any other misrepresentations Mr. Hussain may have made to any government prosecutors or agents about his bankruptcy proceeding.

### 4. Alleged F.B.I. Retention of Counsel for Mr. Hussain

### a. Likely Perjury

Mr. Hussain attempted to explain the failure to correct the many "mistakes" in his Presentence Report by claiming that he did not meet Mr. Ackerman, the lawyer who represented him at his October 27, 2006 sentencing until that very day. Mr. Hussain also claimed that Mr. Ackerman was retained by the F.B.I., that he "did not hire him," and that he did not meet his lawyer until the date of sentencing. T. 1265-66.

The docket sheet for Mr. Hussain's case reflects that Mr. Ackerman entered an appearance for Mr. Hussain in August of 200–27 months before sentencing. Mr. Ackerman was not assigned under the C.J.A. Act. Moreover, as brought out on cross-examination, Mr. Ackerman told Judge Hurd that he had represented Mr. Hussain for two years and had reviewed both the P.S.R. and the addendum with him and that "we did everything at my office." See GX 3502-6, pages 2-3.

### b. Requested Brady Materials

We request that the government inform us as to whether the F.B.I. or any other governmental agency retained Mr. Ackerman as Mr. Hussain's criminal defense lawyer or for any other purpose. If this did happen, we request that the government tell us the amount of money paid Mr. Ackerman and the time and circumstances under which he was retained.

### 5. Gift of 40,000 in cash from Former Pakistani Prime Minister Benazir Bhutto

### a. Likely Perjury

Mr. Hussain testified that in 2002, former Pakistani Prime Minister Benazir Bhutto gave him $40,000 in cash to buy a Mercedes-Benz for his 17-year old son. This morning, Mr. Hussain changed his testimony and now claims that this meeting and gift of cash took place in 2005–which would be squarely in the middle of his bankruptcy proceedings when he was claiming he could not satisfy his creditors.

### b. Requested Brady Material

On its face, Mr. Hussain's story about meeting Benazir Bhutto at the Ritz-Carlton and receiving $40,000 is extremely improbable. We request the government to inform us of any information or documentation it is aware of regarding the alleged gift. We specifically request the bank records which Mr. Hussain claims would support his story. We also request any documentation the government has which would show that Mr. Hussain, his wife, or his sons registered a Mercedes-Benz in 2005 or 2006.

### 6. Personal History

### a. Likely Perjury

Mr. Hussain has provided inconsistent dates regarding the deaths of his mother and father. In his asylum application, Mr. Hussain claimed his mother had "died." In his Presentence Report, Mr. Hussain stated that his mother died in 1994. PSR, page 7. At trial, Mr. Hussain repeatedly insisted that his mother died on October 8, 1998.

In his Presentence Report, Mr. Hussain claimed that his father died of a stroke in 1998. PSR, page 7. At trial, Mr. Hussain insisted that his father was alive when he was interviewed by the Probation Office in 2003 and that his father actually passed away on June 14, 2003.

Mr. Hussain has also provided inconsistent accounts about his business activities in Pakistan. On his asylum application, he claims to have been employed as a "sales executive" for a trading company between 1987 and 1994. However, he told the Probation Office that while in Pakistan he owned a chain of six restaurants that were "demolished" by the Pakistani government because of his political affiliation.

### b. Requested Brady Material

We request the government furnish us with any prior statements of Mr. Hussain, made to any government agent, reflecting the dates his mother and father died. We also request the government furnish us with any statements he may have made regarding his business activities in Pakistan prior to coming to the United States.

### 7. Taxes

On direct examination, Mr. Hussain testified that he has paid taxes on the money he has received from the F.B.I. in connection with his work on this case. T.659.

       Given Mr. Hussain's recent disclosures about receiving more than $500,000 from a foreign trust fund; $40,000 in cash from Benazir Bhutto; and his generally extraordinarily vague and contradictory accounts of his financial affairs, we have a very strong good-faith basis to believe that Mr. Hussain has also committed and is committing tax fraud. We request that we be furnished with Mr. Hussain's tax returns from 2000-2009. We also request that the government furnish us with any other information it is aware of regarding Mr. Hussain's commission of tax fraud.

                                         Respectfully submitted,

                                         Mark B. Gombiner
                                         Attorney for Onta Williams

cc: A.U.S.A. David Raskin