UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
UNITED STATES OF AMERICA           :           09 Cr. 558  (CM)
                                   :
          -against-                :
                                   :
JAMES CROMITIE, DAVID WILLIAMS,    :
ONTA WILLIAMS, and LAGUERRE        :
PAYEN,                             :
                                   :
                    Defendants.    :
-----------------------------------------------------x


# DEFENDANTS' RENEWED MOTION TO DISMISS
# FOR OUTRAGEOUS GOVERNMENT CONDUCT


Vincent L. Briccetti, Esq.
BRICCETTI, CALHOUN & LAWRENCE, LLP
81 Main Street, Suite 450
White Plains, NY 10601
(914) 946-5900

*ATTORNEYS FOR DEFENDANT*
*JAMES CROMITIE*

<u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

A.     The Government's Exploitation of Cromitie's Religious Beliefs
<u>Constituted Psychological Coercion</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.     <u>The Government Manufactured the Crime and Coaxed It To Fruition</u>. . . . . . . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

TABLE OF AUTHORITIES

Page

United States v. Alexandro, 675 F.2d 34 (2d Cir.),
    cert. denied, 459 U.S. 835 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Archer, 486 F.2d 670 (2d Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Ascencio, 873 F.2d 639 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Chin, 934 F.2d 393 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Corcione, 592 F.2d 111 (2d Cir.),
    cert. denied, 440 U.S. 975 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Cuervelo, 1992 WL 30673, at *2 (S.D.N.Y. 1992). . . . . . . . . . . . . . . . . . . 3

United States v. Cuervelo, 949 F.2d 559 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

United States v. Duggan, 743 F.2d 59 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Dyman, 739 F.2d 762 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Kelly, 707 F.2d 1460 (D.C. Cir.),
    cert. denied, 464 U.S. 908 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Nunez-Rios, 622 F.2d 1093 (2d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Rahman, 189 F.3d 88 (2d Cir. 1999),
    cert. denied, 528 U.S. 1094 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 19, 23

United States v. Romano, 706 F.2d 370 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Russell, 411 U.S. 423 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

United States v. Schmidt, 105 F.3d 82 (2d Cir.),
    cert. denied, 522 U.S. 846 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

United States v. Twigg, 588 F.2d 373 (3d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Wallace, 85 F.3d 1063 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Williams, 705 F.2d 603 (2d Cir.),
    cert. denied, 464 U.S. 1007 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20, 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA     :           09 Cr. 558  (CM)
 :
         -against-         :
 :
JAMES CROMITIE, DAVID WILLIAMS,  :
ONTA WILLIAMS, and LAGUERRE     :
PAYEN,                            :
 :
                Defendants.  :
-------------------------------------------------------x

## DEFENDANTS' RENEWED MOTION TO DISMISS
## FOR OUTRAGEOUS GOVERNMENT CONDUCT

The indictment in this case should be dismissed because the government created the criminal then manufactured the crime.  The evidence at trial disclosed Shahed Hussain's cynical, but successful, effort to turn James Cromitie from an angry and disaffected man into a man motivated by money and spiritual reward to participate in a terrorist plot.  Once Hussain finally prevailed, the government designed, funded, supplied, engineered, and directed every detail of a highly dramatic and frightening – but entirely fake – terrorist plot, leading to the prosecution and conviction of Cromitie and his late-recruited compatriots.

The unprecedented degree of government over-involvement in the offenses of conviction constitutes the rare instance in which "the conduct of law enforcement agents is so outrageous that due process principles [should] absolutely bar the Government from invoking judicial processes to obtain a conviction."  United States v. Russell, 411 U.S. 423, 431-32 (1976).  In its Decision and Order denying defendants' pretrial motion to dismiss for outrageous government conduct, this Court observed that "the Second Circuit has repeatedly acknowledged

that . . . a claim [to dismiss an indictment for outrageous government conduct] not only exists but could, in principle, prevail."  (Decision and Order Deciding Defendants' Pretrial Motions ("Decision"), at 2 (May 18, 2010) (citing United States v. Rahman, 189 F.3d 88 (2d Cir. 1999), cert. denied, 528 U.S. 1094 (2000), and other cases).  Such a claim could succeed "if the government "literally manufactured the crimes with which [the defendants] are now charged." (Decision, at 5).  However, dismissal would not be warranted if a defendant was predisposed to commit the charged crime and the government merely supplied the means to commit it. (Decision, at 3).  After reviewing the pretrial contentions of both parties, and noting that many of the disputed facts would be further developed at trial,  the Court decided to "let the jury go first." (Decision, at 9).

The Court made clear that even if the defendants were convicted at trial, their motion to dismiss for outrageous government conduct might still be granted.  The Court stated that although the Second Circuit had not yet upheld the dismissal of an indictment on these grounds, the Circuit's "outrageous governmental misconduct jurisprudence does not include a fact pattern quite like this one."  (Decision, at 10).  Thus, "[i]f the evidence in this case were to reveal that Cromitie did nothing more than spew vile and hateful invective against Jews and the United States (which, like it or not, is constitutionally protected activity), and the Government responded by setting a criminal scheme in motion and coaxing it to fruition, the court will have to a take a fresh look at defendants' argument."  (Decision, at 10-11).

The trial is now over.  The credible evidence – particularly the many hours of tape-recorded conversations – demonstrates that the government, acting through its paid informant, Hussain, employed psychological coercion, including both the invocation of religion and

promises of extravagant wealth, to persuade Cromitie to join Hussain's fictitious terrorist group, then set the criminal scheme in motion and coaxed it to fruition with government-supplied bombs, missiles, plans, targets, storage facilities, transportation and the like.  The government[1] did all this after Hussain met Cromitie at the Newburgh mosque, and after "Cromitie did nothing more than spew vile and hateful invective against Jews and the United States" and make vague threats about wanting to "do something to America."

Defendants' pretrial view of the facts has been vindicated, and the motion to dismiss should now be granted.[2]

_____

[1] Hussain and the government are one and the same.  Hussain was a paid informant for the FBI, working under Special Agent Robert Fuller's close monitoring and supervision.  Agent Fuller instructed Hussain on all his activities and de-briefed him immediately after each encounter with the defendants.  (Tr. 140-41, 148-49, 155-58).  Agent Fuller also reviewed every tape shortly after each meeting.  (Tr. 162-63).

[2] The motion to dismiss presents a question of law for the Court to determine with defendants bearing the burden of demonstrating, by a preponderance of the evidence, that the indictment was the product of outrageous government misconduct.  See United States v. Nunez-Rios, 622 F.2d 1093, 1098 (2d Cir. 1980) (defense of outrageous misconduct is question of law and is properly decided by the court and not the jury); United States v. Cuervelo, 1992 WL 30673, at *2 (S.D.N.Y. 1992).  The Court may conduct a hearing on the motion, even after the trial.  Such a hearing is favored because it "allows for a searching inquiry into the particulars of the investigative process employed by the government . . . and permits factual determinations to be made by the district judge." United States v. Cuervelo, 949 F.2d 559, 567 (2d Cir. 1991).  The Court may grant the motion to dismiss despite the jury's rejection of defendants' entrapment defense.  United States v. Rahman, 189 F.3d at 131 (defense of outrageous misconduct may prevail even where defendants were not entrapped).

-3-

<u>STATEMENT OF FACTS</u>

From almost the moment they met, Shahed Hussain, with the government's knowledge and approval, sought to convert James Cromitie from an angry man into a terrorist with a "reward in two ways" strategy.  As Cromitie recalled for Hussain and the other defendants in a tape-recorded meeting on May 1, 2009, without objection or contradiction from Hussain, "when [Hussain] met me ten months ago, he said, 'Hak, I got a plan.  You gonna make some money out of it.'  And then he said, 'But that's not what I want you to do.  I don't want you to do it for the plan.'  He wants to go to heaven with Allah on his tongue.  So do I.  So that's why he said, don't do it just for the money.  But do it, also say, in the name of Allah."  (GX 123-E3-T, at 1-2; Tr. 1950-52).

Hussain – whose testimony the Court has already deemed to contain a "substantial number of inconsistencies" (Tr. 2011)[3] – denied telling Cromitie at their first meeting that he had a plan and that Cromitie was going to make some money out of it.  (Tr. 1951).  Instead, Hussain testified that Cromitie approached Hussain on June 13, 2008, and asked whether Hussain had seen the killings of "mushriks," meaning non-Muslims or infidels, in Afghanistan and Pakistan. Hussain also testified that Cromitie said he wanted to go to Afghanistan and die like a martyr, that he wanted to go to Paradise, and that he wanted to do something to America.  (Tr. 682). That conversation was not taped.  (Tr. 1539).

---

[3]  The Court also observed that the FBI's "detailed debriefing notes do not reflect many significant things that Mr. Hussain claims to have told them," and that "[t]he critical conversations in which Mr. Cromitie ostensibly came up with the idea to do jihad are conveniently not on any tape or video recording."  (Tr. 2011).  And: "I can tell you that I'm skeptical about some things that [Hussain] has said, but I am not the trier of fact."  (Tr. 2015).

According to Hussain, at their next meeting on June 23, 2008, at the Newburgh house, Cromitie said he hated Jews and American soldiers, and that he would kill President Bush 700 times because he was the Antichrist.  (Tr. 686).  This conversation was also not taped, even though videotaping equipment was already installed in the house, and Hussain had used it on prior occasions.  (Tr. 1592, 2907).  When he was debriefed immediately after the meeting, Hussain did not tell the FBI that Cromitie had expressed hatred towards Jews and Americans (Tr. 1590, 2903-05; GX 3502-12), casting obvious doubt on his testimony on this point.   Instead, Hussain reported that Cromitie wanted to "straighten out," and that he was "trying to be a good Muslim by praying five times a day and asks Imam WAHHAJ for Islamic guidance."  (Tr. 687-88; GX 3502-12).

Over the next several months, Hussain shamelessly exploited Cromitie's desire for "Islamic guidance" as a means for inciting Cromitie to join his fake terrorist conspiracy.  At their next meeting on July 3, 2008, also at the Newburgh house and not taped, Hussain said he told Cromitie that he was a member of an Islamic terrorist organization in Pakistan called Jaish-e-Mohammed ("JEM").  According to Hussain, Cromitie wanted to join JEM and go to Pakistan with Hussain to attend a JEM conference.  (Tr. 690-91).

During these meetings, and in the meetings that followed, Hussain played the role of a rich Pakistani businessman (which in fact he was), with extensive knowledge of Islamic teachings.  (Tr. 1543-46).  Hussain had had four years of training in Islamic studies (in addition to an MBA), and had studied terrorist organizations and tactics.  (Tr. 670-73, 1541-48, 2936).  Cromitie was an impoverished ex-convict.  (Tr. 1736).

Their first tape-recorded meeting took place on October 12, 2008, in Suffern, New York. (GX 101; Tr. 695). Before the meeting, Agent Fuller instructed Hussain to "try to obtain the same information provided from Cromitie during the discussions during the five previous unrecorded meetings." Fuller told Hussain to be "passive," so that he could "listen[] to the information from Cromitie to determine his beliefs, his background, and other information." (Tr. 177).

Cromitie's recorded statements at the October 12 meeting (and on October 19 and October 29) contradict everything Hussain claimed Cromitie had said about Jews and America and wanting to join a terrorist organization during their five previous unrecorded meetings. Rather than coming across as a dedicated adherent of jihadist violence, Cromitie's initial comments revealed himself to be an angry, resentful and even hateful man, but one unfamiliar with the concepts of jihad while striving to find a way to deal with his anger through Islam.

On October 12, Hussain, not Cromitie, brought up the subject of "things happening" in Pakistan. Cromitie did not even know what Hussain was talking about: "What do you mean?" When Hussain informed Cromitie that mushriks were killing Muslims there, Cromitie responded, "But what do we do? If you and me was to die today trying to do something . . . it's not gonna change anything." Cromitie said nothing about having previously (supposedly) told Hussain that he wanted to go to Afghanistan and die like a martyr, or that he hated Jews and Americans, or that he wanted to join JEM. (GX 101-E1).

At that point, Hussain confidently declared that the hadiths – the teachings of the Prophet Mohammed – permitted or even required Muslims to commit violence against the non-believers. (GX 101-E1; Tr. 1597-99). Hussain ranted about what the mushriks were doing to Muslims. In

-6-

response, Cromitie told Hussain that when he wore his Muslim clothing some Jewish people looked at him like they would like to kill him.  Hussain inquired whether that made Cromitie angry, to which Cromitie responded, "It doesn't make me angry . . . it just makes me want to jump up and kill one of them."  After telling Hussain a story about an unpleasant encounter with a Jewish man, Cromitie observed that his faith as a Muslim let him deal with such slights.  "But I'm Muslim, insha'Allah, Allah will take care of it."  (GX 101-E2).

Hussain promptly set Cromitie straight – just being angry at Jews was not enough; but killing for Allah was desirable: "[I]f you really have to do something, you have to do something in jihad," and "you cannot . . . kill" a person solely out of anger.  But, he lectured, killing for the sake of Allah is permissible, even required.  (GX 101-E2; Tr. 1597).

Hussain illustrated his point by bringing up the recent terrorist bombing of a Marriott hotel in Pakistan which, according to Hussain, was full of non-believers.  Hussain claimed his "brothers" did the bombing to "send a message," and that they were "doing good, wonderful jobs and I'm very happy with that."  According to Hussain, such terrorist acts would assure a Muslim's reception into Paradise.  (GX 101, Defense Clip 391; Tr. 1601-03).

In short, the evidence showed that Cromitie initially believed his faith in Allah would take care of his anger and frustration about Jews and their alleged obnoxious behavior.  Hussain – posing as a religious wise man – "corrected" him and proclaimed that the true, religiously-mandated approach was to kill non-believers, not out of anger, but for the glory of Allah.

Hussain persisted in drilling this inflammatory construction of Islam into Cromitie. When Cromitie complained that Jewish people looked down on him when they realized he was a

Muslim, Hussain told him that as a Muslim, he should die for a cause, "not just because" he was angry over such insults.  (GX 101-E3, E4).

Hussain illustrated this point by professing that the Prophet Mohammed said that "to eat under the shadow of a Jew is like eating your mother's meat," and that "every evil in the world is because of the Jews."  (GX 101, Defense Clip 326A; Tr. 1610-11).  Hussain continued, "if evil goes too high, then Allah makes ways to drop them.  I think that evil is reaching too high at a point, where you, me, all these brothers, have to come up with a solution to take the evil down.  That's how, it's the hadith."  (GX 101-E5).

At their next meeting, on October 19, Cromitie again complained about how some Jewish people treated him because of his faith.  Hussain promptly responded that according to the Prophet Mohammed, the Jews "are responsible for all the evils in the world" and that they should be "eliminated."  (GX 102-E1; Tr. 1613).  Cromitie's response: "They aren't responsible for that. I don't wanna go that far with him."  (GX 102, Defense Clip 396).[4]

In the same meeting, Cromitie informed Hussain that he did not want to go to Afghanistan, after Hussain asked if he ever thought about traveling there.  (GX 102-E3).  This, of course, was directly contrary to Hussain's claim that Cromitie said on June 13 he wanted to go to Afghanistan to die like a martyr.  Hussain also asked Cromitie if he ever thought of doing something for the sake of Allah, to which Cromitie responded, "Like what?"  (GX 102-T; Tr. 1617).  Moments later, Hussain said he had done many things in Pakistan for the cause of Allah, and that it was a Muslim brother's dream to do such things for the cause because when a Muslim

---

[4]  The government's transcript is wrong.  It says that Cromitie said, "They are responsible for that."  (GX 102-E1-T).

dies, Allah will ask him "what have you done for me?"  Hussain also offered to spend money to help Cromitie do something for the cause of Allah.  (GX 102, Defense Clip 326C; Tr. 1618-19).  Finally, Hussain emphatically warned Cromitie that he had to "follow the cause of Allah," and that Allah would "reward [him] in Jannat-ul-firdous," or Paradise. (GX 102-E5).

On October 29, their next meeting, Hussain demanded of Cromitie: "Brother, tell me, I want to  know.  If Allah . . . asked for, for you to go, to go to the jihad, would you say Allahu akbar?"  (GX 103-E1).  Cromitie was evasive.  He said he would have to investigate the matter, and that maybe he would and maybe he wouldn't.  (Tr. 1627-29).  This is directly contrary to what Hussain claimed Cromitie had said months earlier, in June and July, namely, that he wanted to go to Afghanistan and die like a martyr, that he wanted to go to Paradise, that he wanted to do something to America, and that wanted to join Jaish-e-Mohammed and go to Pakistan with Hussain.

At their next several meetings, Hussain pressed Cromitie to introduce him to some of Cromitie's supposedly like-minded "brothers," which Cromitie did not do, and to attend an Islamic conference in Philadelphia, which Cromitie did agree to do.  Hussain – not Cromitie – introduced the subject of "mushriks in the Holy Land" and said there could be no peace until they left.  When Cromitie asked, "But what about peace in other places?", Hussain sternly replied, "the peace in other places can wait."  (GX 107-E1).  Hussain repeatedly raised the subject of jihad, and repeatedly urged Cromitie to join him in committing violence for the cause of Islam.  (Tr. 1661-63).  On November 14, Hussain told Cromitie he could get guns, missiles, and rockets for the jihad he wanted Cromitie to join.  (GX 107-E2; Tr. 1663-64).

From late October through December 2008, Hussain and Cromitie met at least ten times. During those meetings, Hussain repeatedly and explicitly asked Cromitie to make a plan, pick a target, find recruits, get guns, and conduct surveillance. (GX 104-E2, 105A-E3, 106 (Defense Clips 331, 332, 333, 334, 335), 108-E2, 108-E3, 109-E2, 109-E3, 110-E1, 112-E1, 112-E2, 112-E3, 113-E1, 113-E2). Although, during this period, Cromitie did say he was interested in engaging in some jihadist act, and did make numerous hateful remarks, he never produced any like-minded "brothers" or came up with any concrete ideas or plans for any terrorist plot. (Tr. 1695-96, 2909-10). Indeed, on December 10, Hussain pointedly reminded Cromitie that he had not done any of the things he was supposed to do – pick a target, decide what equipment would be needed, come up with code words, and recruit other participants. (GX 112-E1; Tr. 1702-04). Hussain: "[Y]ou've not started the first step, brother. Come on." Cromitie: "Maybe it's not my mission then. Maybe my mission hasn't come yet." (GX 112-E3; Tr. 1705).

The government, at that point, upped the ante. Rather than attempt to motivate Cromitie solely with the reward of Paradise – which had failed so far to get Cromitie to do anything – the government, through Hussain, began to offer money and things of great value. On December 10 (or 17), Hussain promised to give Cromitie his BMW, but only after he had completed a mission. (Tr. 893-94, 988). On December 17, Hussain also offered money, what he acknowledged was the second part of a two-part reward – Paradise and cash. (Tr. 1708-09).

Indeed, on April 5, 2009, Hussain reminded Cromitie of an earlier offer "to make [Cromitie] $250,000." (GX 239).[5] Hussain testified, falsely, that this comment was a code word

---

[5] Hussain did not know this call was being recorded. (Tr. 1793-96).

for the "operation."  (Tr. 850, 1036, 1797, 2513-14).[6]  Of course that was a lie, one of the

multitude he told during the trial.  The earlier offer of $250,000 is not recorded, because Hussain

and/or the FBI chose not to record it.  But there is no question the earlier offer was made,

because Hussain said so on April 5.  Hussain also acknowledged that on several occasions he

"suggested" to Cromitie that he would "get a lot of money" for participating in the plot.  (Tr. 892,

1869-70).

The explicit offer of cash for jihad was taped for the first time on February 23, 2009.

This was the first meeting between Hussain and Cromitie after Hussain returned from a two-

month mission to Pakistan and London on behalf of the FBI.  During that time, the FBI told

security officials at Stewart Airport that Cromitie was unlikely to commit a criminal act without

the support of Hussain.  (Tr. 436-37; GX 3501-188).  That was certainly true, as Cromitie

confirmed to Hussain on February 23: "I ain't do nothing. . . . [S]ince you been gone, I been, like,

okay I guess everything's down the drain now. . . .  I just dropped everything."  (GX 114-E1).

Hussain's response: "My people . . . Jaish-e-Mohammed is willing to do anything to get

some operation done here.  Now, if you're willing to do it, masha'Allah, you will be rewarded in

both ways."  (GX 114-E1).  At trial, Hussain explained exactly what he meant, and what

Cromitie understood he meant: "Rewarded in two ways means that one reward is for Allah's wa

tala, you can do for a cause and you go to Paradise.  The other reward that I used, the terrorist

organization, is the reward of money, of financial money.  If you're doing a terrorist act or you're

doing an attack, then a prize – the terrorist organization gives the financial reward to the guys or

to the families to do the act."  (Tr. 822).  When asked whether "at this point, there's no more

---

[6]  Hussain also said it was a "bad code," whatever that means.  (Tr. 2513-14).

dancing around about money, you're saying you're going to get money if you do this, correct, and paradise, too?", Hussain answered, "Correct." (Tr. 1735; 2911-12).

The government's cash offer, combined with the Paradise Hussain said would await Cromitie after death, had the desired effect. Cromitie says: "Okay. Fuck it. I don't care. Ah, man. Maqsood, you got me."[7] Hussain sealed the deal by slapping hands with Cromitie and letting out a delighted giggle. (GX 114-E2; Defense Clip 394; Tr. 1745-46).

Thereafter, money was indisputably at the heart of Hussain's plot. On February 24, there are multiple references to the cash Hussain was offering to pay not only Cromitie, but also any "lookouts" he might be able to recruit. (GX 115; Defense Clips 357, 358, 395; Tr. 1756-60). For the next six weeks, Cromitie went to great lengths to avoid seeing or even talking to Hussain, then called Hussain on April 5 to say he was broke and needed to make some money.[8] Hussain's response was plain: "I told you, I can make you $250,000, but you don't want it brother. What can I tell you?" (GX 239).

---

[7] The government's transcript leaves out the words, "Fuck it." (GX 114-E2-T).

[8] Cromitie had been fired from his low-wage job at Wal-Mart on March 7. (DX 101; Tr. 3043). He tried unsuccessfully to get his job back. (Tr. 3045-47). Any doubt about Cromitie's true motivation was dispelled by the testimony of defense witness Jose Sanchez. Sanchez testified that Cromitie sold him a brand new digital camera for $50 or $60 in March 2009, which was during this hiatus period. (Tr. 3054-55; GX 120). The camera was the one Hussain bought for Cromitie on February 24 (Tr. 3056; GX 422), with which Cromitie was supposed to take surveillance photographs. (Tr. 1854-55). Obviously, at least until Hussain re-offered the $250,000, Cromitie was more interested in the $50 than he was in doing jihad.

On April 7, Hussain relentlessly badgered an obviously reluctant Cromitie to get back involved.[9]  In addition to complaining that Cromitie's foot-dragging had put Hussain's life at risk, and even making veiled threats of physical harm against Cromitie (GX 116-E1; Tr. 1825-33, 2174-75), Hussain promised an all-expense paid two-week vacation to Puerto Rico for Cromitie and his family, but only after the operation was complete.  (GX 240; Tr. 2177-79).  Cromitie agreed to go forward.

On April 16, Hussain reiterated the offer of an all expense paid post-mission vacation to someplace warm and sunny, then promised Cromitie enough cash to do "whatever you want to do." (GX 118-E1).  He also told Cromitie he would have enough money to buy a "brand new car, brother."  (GX 118, Defense Clip 370).  And he even offered to buy Cromitie (whose only skill was barbering) a barbershop for $60-70,000.  (GX 118-E1; Tr. 890, 1857).  During the same meeting, Hussain turned down Cromitie's offer to "take care of" David Williams out of the cash Cromitie would get, saying he (Hussain) would "give him separate money."  (GX 118-E2; Tr. 2192-93).  Hussain wrapped up the April 16 meeting by telling Cromitie he had plenty of money to pay Cromitie and any lookouts he could recruit to participate in the mission.  Cromitie, as he and the other defendants did on many occasions, pretended he was not in it for the money, but ultimately made the following obvious observation: "Oh, they pay us to do this. . . . [G]ive the brother something [for] doing that mission."  (GX 118-E3).

_____

[9]  During this meeting, Cromitie again said he did not want to be a martyr, contrary to what Hussain testified Cromitie said at their first meeting in June 2008.  (GX 116-E3).

On April 19, Hussain continued the theme of paying Cromitie and the others for their participation.  When Cromitie complained that he was broke, and needed "a couple of dollars" to buy groceries, Hussain said: "[M]y brothers are very pleased, and they will make you the happiest man on planet earth. . . . [M]y brother will make you the happiest man on Earth, brother."  (GX 245; Tr. 1894-95).

On April 23, when Hussain told Cromitie and David Williams the mission was about Allah, Cromitie said, "Right.  But they givin' us money, anyway."  (GX 129-E1).

On April 28, Hussain repeatedly reminded Cromitie that there was plenty of money to pay the lookouts for their efforts.  (GX 121-E1, E-4).  And he did not object when Cromitie told Onta Williams that once the mission was over, he (Onta Williams) would get a brand new Mercedes-Benz.  (Tr. 951).

Also on April 28, Hussain told all four defendants that the Prophet Mohammed said there was nothing wrong with committing violence in the name of Allah, a reprise of the lectures he had given in October to Mr. Cromitie.  (GX 121A-E1; Tr. 1929-30).  Later that day, he told Laguerre Payen that if he did his job as a lookout, Allah would take care of him.  (GX 121B-E1).[10]

On May 1 (as noted above), Cromitie told Hussain and the other defendants that "when [Hussain] met me ten months ago, he said, 'Hak, I got a plan.  You gonna make some money out of it.'  And then he said, 'But that's not what I want you to do.  I don't want you to do it for the

---

[10]   The same day, Hussain told Agent Fuller that his meeting with the defendants had been "perfect, out of a movie script."  (GX 121B, Defense Clip 381).  Hussain testified that what he meant by that was that all four defendants were playing the roles scripted for them.  (Tr. 1934-36).

plan.'  He wants to go to heaven with Allah on his tongue.  So do I.  So that's why he said, don't

do it just for the money.  But do it, also say, in the name of Allah."  (GX 123-E3-T, at 1-2; Tr.

1950-52).[11]  Later that day, Hussain told Cromitie he had "very good news"; he was "going to

Florida to pick up the money."  Cromitie literally squealed with joy.  (GX 265).  Cromitie then

called Laguerre Payen and Onta Williams and, in a sing-song voice, told them the good news. To

Payen: "The cash rolled in.  You feel me?  That made you – that made you laugh, didn't it?  That

made you smile and everything, right?"  (GX 266.1; Defense Clip 309).  To Onta Williams: "I

got some good news though.  The cash came through. . . .  I was just happy to hear that brother

calling."  (GX 267; Defense Clip 310).

     In the same May 1 call from Hussain to Cromitie, Hussain told Cromitie:  "[Y]ou're

getting your car brother.  The Beamer."  Cromitie: "You know when you promise me something,

I believe you."  Hussain: "Masha'Allah.  You should, brother, believe me because I'm your

brother.  I'm your true brother."  (GX 265; Tr. 1958-59).

---

     [11]  At trial, the government made much of statements made by Cromitie on November 29,
2008, regarding this first meeting with Hussain, when Cromitie said that he had approached
Hussain in the mosque parking lot and asked whether Hussain had seen what "they did to my
people over there . . . in Afghanistan. . . .  And you knew I wanted to get back.  You knew I did.
And I would.  I will."  Cromitie also said that Hussain did not "have to give [him] a damn dime.
You my brother.  You show me love from day one, and it wasn't because of something like that."
(GX 109-E3).  These statements are not inconsistent with what Cromitie said on May 1.  Read
together, it appears that at the first meeting Hussain said he had a plan to do something in the
name of Allah for which Cromitie would be paid, and that Cromitie said he was not just
interested in the money.  Thereafter, Cromitie failed to do anything to further any plan, and even
dropped completely out of sight – until Hussain got him to rejoin the plot by offering him large
sums of money and things of great value.

On May 6, Cromitie told Hussain that he and the other defendants had money problems and hoped they might get some of their promised cash reward up front.  Hussain said he could help them financially.  (GX 124A-E3; Tr. 1998-99).  That day, he gave small amounts of cash to each defendant.  (GX 3502-77).  On many other occasions, Hussain gave the defendants spending money and paid for their meals and other personal expenses, such as rent, food, cell phone cards, and cab fare.  (GX 491A, 491B, 3502-87; DX 22; Tr. 901-03, 1021-22, 2056-59).

The defendants' money problems came up again on May 8.  In a recorded phone call, Cromitie told Onta Williams that he was going to tell Hussain that "we about to do something for you and here you is giving niggas 20 dollars here and feeding niggas here and shit like that Hak, give us something, you know you can give us half of what we asking for if that's the case. . . . I'm going to say listen, brothers ain't doing nothing, hak, and we ain't doing nothing 'til, until them brothers got paid, until [the] brothers get what they supposed to get, Hak. . . . .  I only think it's right man.  Cause I told the brother, me and um, me and, um, me and Budda was talking about, and, you know, I was like yeah.  Motherfucking right.  We got to get something man, we need half of something . . . ."  (GX 271).  Later that day, Cromitie told Hussain that none of the defendants had been paid for the work they'd done so far for Hussain, and that Hussain should give them some of the money he promised.  Hussain's response was that "everyone should be rewarded for the things they do . . . [e]ither by Allah subhana wa tala, or by the organization that does these things."  (GX 125A-E5; Defense Clip 315/316; Tr. 2006-07).

During the May 8 meeting, Hussain introduced the subject of religious holy war yet again.  He decided to "do a dua" (an Islamic prayer) for the operation, then initiated and led the defendants in a chant of Allahu akbar.  (GX 125A-E3; Tr. 1015, 2004-05).

-16-

On May 15, in an unrecorded meeting, Hussain says he told Cromitie and Payen that he would put their money in commercial mailboxes at the UPS Store in Newburgh, that he would give them the keys on the day of the operation, and that they could get their money after the operation was done.  (Tr. 1032-33, 2069).  On May 19, in another unrecorded meeting, Hussain claimed he told the defendants they would each get $5,000 after the operation was over.  (Tr. 892-93, 1035-36, 2079-80).  And on May 20, shortly before arriving in Riverdale, Hussain handed out the four UPS mailbox keys.  (GX 128, Defense Clip 390; Tr. 2105-06).

<u>ARGUMENT</u>

The indictment should be dismissed because the government's activities crossed the line between monitoring and investigating potential criminal activity and manufacturing a crime.  Even when the potential crime is terrorism, due process and fundamental fairness prohibit the government from creating a criminal and a crime.   The trial evidence shows that the government did just that.

It was Hussain – acting under the FBI's close supervision and control – who instigated Cromitie to become involved in a plot designed to kill Jews and American soldiers for the cause of Allah, not the other way around.  Playing the role of a rich and exotic foreigner, and using his knowledge of Islamic teachings and terrorist tactics, Hussain skillfully turned Cromitie from an angry and disaffected ex-convict into someone willing to participate in a jihadist act.  Cromitie may well have been a loud-mouthed bigot, but he had never engaged in any activity even remotely similar to the crimes charged; he had no pre-existing plans to commit such acts; and he did not have the resources, skills, or funds with which to commit them.  Even after meeting

-17-

Hussain, and despite constant prodding and encouragement from Hussain, Cromitie did nothing on his own to further the plot.

It was Hussain, with help from his government handlers, who devised the plan; identified the targets; supplied all the "instrumentalities" of the crime (the fake bombs, inert Stinger missiles, Newburgh "safe" house, two storage facilities, rental cars, cameras, and cell phones); provided the transportation (none of the defendants even had a driver's license); repeatedly suggested the use of code words (and supplied the pencils and paper to write them down); printed out maps; trained the defendants as to how to use the weapons; assembled the fake bombs when Cromitie was unable to follow his instructions; and paid for every expense of the operation, including meals, rent, groceries, and the personal expenses of the four impoverished defendants.

And when Cromitie wavered and procrastinated – and then dropped completely out of sight – the government, through Hussain, offered him huge financial rewards in addition to spiritual rewards, by explicitly promising Cromitie "a lot of money," a BMW, a brand new car, a barbershop, an all expense paid two-week vacation to Puerto Rico, and $250,000 cash, all in a cynical attempt to persuade Cromitie to remain involved in the plot, then get back involved after he had broken off all contact with Hussain.

In sum, the evidence at trial showed that the government "conceived the . . . crime as well as supplied the defendants with the means to accomplish it."  (Decision, at 10).  Since "Cromitie did nothing more than spew vile and hateful invective against Jews and the United States (which, like it or not, is constitutionally protected activity), and the Government responded by setting a criminal scheme in motion and coaxing it to fruition" (Decision, at 10-11), this Court must dismiss the indictment based on outrageous government conduct.

A.      The Government's Exploitation of Cromitie's Religious Beliefs
        <u>Constituted Psychological Coercion</u>

The most pernicious and unusual aspect of the government's investigation was its

shameless exploitation of Cromitie's religious inclinations as a vehicle for persuading him to

become a member of Hussain's terrorist sting operation so that he could be charged with a crime.

As detailed above, Hussain invoked his supposed status as a Pakistani religious sage to get

Cromitie to trust him.  Even more outrageously, Hussain repeatedly employed religion to

convince Cromitie that hatred of Jews was an essential precept of Islam; that one's sacred duty as

a Muslim was to engage in acts of violence against Jews and Americans; and that, if Cromitie did

so, he would attain Paradise as a result.  Hussain directed these comments against a poorly

educated ex-convict who was searching for "Islamic guidance," and who had expressed the hope

that Allah would "take care of" his feelings of anger towards Jews.

When the government hoists the banner of religion as a device for shaping a person's

beliefs and inciting him to commit violence, due process is surely offended.  "The paradigmatic

examples of conscience-shocking conduct are egregious invasions of individual rights."  <u>United

States v. Rahman</u>, 189 F.3d 88, 13 (2d Cir. 1999), <u>cert. denied</u>, 528 U.S. 1094 (2000).  The

Second Circuit has specifically recognized that psychological coercion may "rise[] to the level of

outrageousness that would constitute a violation of the Due Process Clause."  <u>United States v.

Chin</u>, 934 F.2d 393, 399 n.4 (2d Cir. 1991).  <u>Accord</u>, <u>United States v. Kelly</u>, 707 F.2d 1460, 1477

(D.C. Cir.) ("psychological coercion" may constitute outrageous government conduct in violation

of the Due Process Clause), <u>cert. denied</u>, 464 U.S. 908 (1983); <u>United States v. Williams</u>, 705

F.2d 603, 620 (2d Cir.) (Senator's claim that informant violated due process by using

psychological coercion to get him to accept bribes rejected because alleged coercion "involved neither pressure nor persistent exploitation of personal weakness, as might occur if an agent preys upon an addict's needs for narcotics"), cert. denied, 464 U.S. 1007 (1983).

Here, Hussain exploited Cromitie's yearning for religious salvation and quest for "Islamic guidance" just as effectively as the needs of the drug addict hypothesized in Williams.   Intruding into Cromitie's religious beliefs as part of a campaign to get him to commit a crime was surely an "egregious invasion of individual rights."

The closest Second Circuit precedent is United States v. Cuervelo, 949 F.2d 559 (2d Cir. 1991).  There, the defendant contended that a federal drug enforcement agent seduced her and then played on their romantic involvement to get her to participate in a narcotics conspiracy. Although the jury rejected defendant's entrapment defense, the Second Circuit remanded for a hearing on the issue of outrageous governmental misconduct.  It held that "sexual entrapment" might violate due process even if aimed at a predisposed target.   The Court held that the defendant might prevail if she could show that (1) the government either consciously used sex as a "weapon in its investigatory arsenal, or acquiesced in such conduct for its own purposes after learning that such a relationship existed," (2) the "agent initiated a sexual relationship . . . to achieve governmental ends," and (3) the amorous relationship took place during the period covered by the indictment and was related to the charged conduct.  Id. at 567.

If one substitutes religious appeals for sexual attraction, all of the factors enumerated in Cuervelo are present here.  First, at a minimum, the government – which was contemporaneously listening to each of the recorded meetings – acquiesced in Hussain's repeated efforts to convince Cromitie that committing violence against Jews and Americans was his duty as a good Muslim

and would ensure him a place in Heaven.[12]  Second, Hussain obviously used this invocation of

religion as a principal means for convincing Cromitie to commit criminal acts.  And, third,

Hussain's religious preachings were inextricably intertwined with every phase of the

investigation.

The powerful psychological coercion inherent in the government's deployment of

religious sentiment was cemented by Hussain's offers of extraordinarily rich material benefits to

Cromitie and his co-defendants – $250,000, a BMW, and a barbershop for Cromitie; a Mercedes-

Benz for Onta Williams; vacations and cash for everyone – in exchange for assisting Hussain's

plot.  Because these extravagant rewards were dangled in front of extremely poor and ignorant

men, they infringed the boundaries of due process.  Compare United States v. Williams, 705 F.2d

at 620 ("We doubt that the size of an inducement can ever be considered unconstitutional when

offered to a person with the experience and sophistication of a United States Senator," and

"[t]here is no evidence that the [anticipated profits] exerted an unconscionable pressure upon

him.").


B.     The Government Manufactured the Crime and Coaxed It To Fruition

When Cromitie finally succumbed to the psychological coercion worked by the "reward

in two ways" strategy, the government manufactured a crime for him and his recruits to commit.

As predicted in defendants' pretrial motion, the evidence at trial showed that missiles, bombs,

training, money, plans, expertise, storage, transportation, targets, maps, etc. were all supplied by

---

[12]  An evidentiary hearing is required to determine if the government explicitly instructed
Hussain to invoke religion as a tool for getting Cromitie to commit criminal acts or merely went
along with Hussain's ploy.

the government.  The defendants, by contrast, did little more than ride around in Hussain's fancy cars and follow his orders to carry bags from one location to another.  Notably, the government did not produce any evidence that the defendants took a single step to further the conspiracy when they were not with Hussain.  In short, this was a government show from start to finish.  As Agent Fuller candidly admitted, when the defendants were with Hussain, the government was "pretty much in control of what the defendants were doing."  (Tr. 269).[13]

The trial also confirmed defendants' pretrial prediction that without the government's guiding hand, no crime would or could have occurred.  Despite having every incentive to do so, the government introduced not a shred of evidence that any of the defendants had any prior connections to terrorists or terrorism and/or possessed the necessary resources, skills or commitment that would have enabled them to carry out the offense absent the direction and facilitation by the government.  Indeed, even under Hussain's hovering supervision, the evidence showed them hopelessly incompetent at even the simplest tasks – e.g., remembering a handful of simple "code" words or connecting a few wires.  Nor did the defendants exhibit any independent interest in planning or training for the charged crimes.  The enterprise would have collapsed in an instant had the government withdrawn its guiding hand.

---

[13]  Agent Fuller also candidly admitted that he chose Stamford, Connecticut, as the location for one of the two storage facilities he rented because he wanted to get the defendants to cross a State line.  (Tr. 255-56).  Having one or more of the defendants travel in interstate commerce was the sole jurisdictional element of Counts One through Four of the indictment (conspiracy and attempt to use weapons of mass destruction), and one of two jurisdictional elements of Counts Five and Six (conspiracy and attempt to use anti-aircraft missiles).  The government's rather blatant effort to manufacture federal jurisdiction in this case is itself outrageous government conduct warranting dismissal of these counts.  See United States v. Wallace, 85 F.3d 1063, 1065 (2d Cir. 1996); United States v. Archer, 486 F.2d 670, 682-85 (2d Cir. 1973).

This Court was right when it said that the Second Circuit's "outrageous governmental misconduct jurisprudence does not include a fact pattern quite like this one." (Decision, at 10). But what sets this case apart from every relevant Second Circuit precedent is the government's all-encompassing manufacture and control of the criminal enterprise, coupled with the defendants' utter inability to act on their own and the absence of any on-going criminal activity before the government's intervention.

In cases rejecting due process challenges to government over-involvement in an investigation, the Second Circuit has invariably noted that the targets were already engaged in committing or planning the charged offense before the government came on the scene, were capable of committing the crime on their own, and actively participated in the crime after the arrival of the government.  See United States v. Rahman, 189 F.3d at 131 (in case involving informant who infiltrated terrorist conspiracy, no outrageous misconduct where "defendants were already actively advancing a conspiracy . . . [and] there is no evidence that the criminal conspiracy would have foundered without the Government's entry"); United States v. Schmidt, 105 F.3d 82, 92 (2d Cir.) (government informant's involvement in escape attempt did not violate due process because plan originated with defendant), cert. denied, 522 U.S. 846 (1997); United States v. Ascencio, 873 F.2d 639, 641 (2d Cir. 1989) (no due process violation when government merely facilitated conspiracy started by defendants); United States v. Duggan, 743 F.2d 59 (2d Cir. 1984) (rejecting claim of outrageous government misconduct in IRA  arms smuggling case where it was defendants who initiated contact with informant); United States v. Dyman, 739 F.2d 762, 769 (2d Cir. 1984) (although extensive government involvement in bank robbery

investigation merited "careful scrutiny," indictment did not have to be dismissed where defendants came up with the idea to burglarize bank, purchased equipment for robbery, and informant testified that he always took directions from defendants); United States v. Romano, 706 F.2d 370, 373 (2d Cir. 1983) ("defendants were clearly capable of conspiring to purchase and distribute heroin without the active aid and supervision of the government"); United States v. Alexandro, 675 F.2d 34, 42 (2d Cir.) (undercover operation directed against INS agent did not violate due process where, once approached, agent "became the driving and persistent force behind the intricate scheme"), cert. denied, 459 U.S. 835 (1982); United States v. Corcione, 592 F.2d 111, 115 (2d Cir.) (declining to dismiss indictment based on government over-involvement in narcotics conspiracy where conspirators had initiated the conspiracy prior to meeting the informant and executed most aspects of the crime), cert. denied, 440 U.S. 975 (1979).  Here, by contrast, the defendants were not already engaged in committing or planning the charged crimes, they certainly were not capable of committing the crimes on their own, and they did nothing to carry out the crimes except under the direct control of Hussain and the FBI.

In its pretrial ruling on outrageous government conduct, this Court observed that the "most factually apposite" case from another circuit is United States v. Twigg, 588 F.2d 373, 378 (3d Cir. 1978), in which a conviction was reversed where federal agents not only conceived a drug crime (the illegal manufacture of methamphetamine hydrochloride), but also supplied the defendants with the means to accomplish it.  (Decision, at 10).  Twigg may not be controlling precedent, but the facts developed in this case are even more egregious than those present in Twigg.  Like the defendant in Twigg, Cromitie was not engaged in any illicit activity when he

met Hussain.  And, as in Twigg, the FBI, through Hussain, both "deceptively planted the criminal design in [Cromitie's] mind" and "set him up, encouraged him, [and] provided the essential supplies and technical expertise."  588 F.2d at 381.  Moreover, Cromitie had no prior involvement with any terrorist activities, in contrast to the main defendant in Twigg who had prior experience helping to run a "speed" laboratory and knew the informant from joint prior criminal activity.  The Second Circuit has described Twigg as a case in which "the government's involvement in manufacturing crime is demonstrably outrageous." United States v. Schmidt, 105 F.3d at 91.

The government claimed its investigation was nothing more than a perfectly appropriate attempt to monitor a man who had waved his finger in the air and made a statement about wanting to "do something to America" while expressing a desire to die like a martyr in Afghanistan.  When Hussain reported these remarks to the FBI, the government argues it had a duty to "keep an eye" on Cromitie.  Accordingly, Agent Fuller "just asked the CI to get him more information" so as "to determine if it was just words or as the CI said, is he going to act on his words and how far is he going to act on his words."  (Tr. 3413).

Had Hussain and the FBI actually implemented the above-described investigatory plan, there would be no viable allegation of outrageous government conduct.  There is certainly nothing wrong with the FBI's aggressively keeping tabs on a man who makes alarming comments about wanting to commit terrorist acts.  But Hussain and the FBI did not just try to find out if Cromitie was a terrorist or only a big talker.  Rather, as detailed above,  Hussain – acting under the FBI's control – employed all his talents as a fraudster and faux-Islamic terrorist

-25-

to convince Cromitie, over a period of months, that his sacred duty as a Muslim was to commit violent acts against Jews and Americans and that doing so would earn him a coveted spot in Paradise. And, when that produced no action, the government – through Hussain – upped the ante with promises of earthly rewards including $250,000, a BMW, a barbershop, and a two-week vacation in Puerto Rico.[14]

In short, the government's investigation cannot be justified as a legitimate law-enforcement effort to investigate and monitor a potentially dangerous individual. Even if, initially, that had been the government's aim, the evidence overwhelmingly demonstrates that the FBI and Hussain soon abandoned all constraints in their determination to get Cromitie – and, later, his three co-defendants – to participate in a spectacular, albeit made-up, terrorist plot.

Under these unique circumstances, due process principles require the dismissal of this indictment.

---

[14]  Even worse, the FBI kept up its campaign to get Cromitie to commit an act of terror even after it had concluded that Cromitie, despite all his inflammatory talk and professed agreement with Hussain's goals, was "unlikely" to commit a terrorist act on his own and lacked plans, expertise or associates. The FBI also knew that his boasts about such matters as commanding a "sutra team," traveling to Afghanistan, blowing up police stations, serving fifteen years in prison for attempted murder, and stealing handguns from Wal-Mart were pure fiction. (Tr. 403-11, 436-37; 1625-28, 1696; GX 3501-188).

<u>CONCLUSION</u>

For the foregoing reasons, defendants' renewed motion to dismiss the indictment for outrageous government conduct should be granted.

The Court should conduct an evidentiary hearing on the matters raised by this motion.

Defendant Cromitie joins in all of the post-trial motions made by his co-defendants.

Dated: White Plains, NY
       January 7, 2011

                                         BRICCETTI, CALHOUN & LAWRENCE, LLP

                              By:    s/_____
                                     Vincent L. Briccetti
                                     81 Main Street, Suite 450
                                     White Plains, NY 10601
                                     (914) 946-5900

                                     *ATTORNEYS FOR DEFENDANT*
                                     *JAMES CROMITIE*

cc:    AUSA David A. Raskin
       AUSA Jason P.W. Halperin
       AUSA Adam S. Hickey
       One St. Andrew's Plaza
       New York, NY 10007

       Theodore S. Green, Esq.
       Green & Willstatter
       200 Mamaroneck Avenue
       White Plains, NY 10601

       Susanne Brody, Esq.
       Mark Gombiner, Esq.
       Federal Defenders of New York
       52 Duane Street
       New York, NY 10007

       Samuel M. Braverman, Esq.
       901 Sheridan Avenue
       Bronx, NY 10451