UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,                           09 Cr. 558 (CM)

       -against

JAMES CROMITIE, DAVID WILLIAMS,
ONTA WILLIAMS and LAGUERRE PAYEN,

       Defendants.

-------------------------------------------------------------X

## POST-TRIAL MOTION FOR A JUDGMENT OF ACQUITTAL

The defendants – James Cromitie, David Williams, Onta Williams and Laguerre Payen – move this Court, following a jury trial, for a judgment of acquittal pursuant to Fed. R. Crim. P. 29( c).   Defendant David Williams joins in the motions filed by all other defendants.

## ARGUMENT

### THE GOVERNMENT FAILED TO PROVE PREDISPOSITION AS TO ALL FOUR DEFENDANTS

In charging the jurors on the defense of entrapment, the Court instructed:

> [T]he first thing you will consider is whether there is any evidence that a government agent – and that term includes a paid confidential informant – gave that defendant the idea to commit the crime, either directly by inducing him to commit the crime, or indirectly by causing another person to induce the defendant to commit the crime. If you conclude, after you consider all of the evidence, that there is no evidence of either direct or indirect inducement by the government agent, then as a matter of law there could be no entrapment and your inquiry on this issue will be over.

(Tr. 3486).

1

Upon finding "any evidence" of direct or indirect inducement, the jurors were required to consider the issue of predisposition, as to which "[t]he government must prove, beyond a reasonable doubt, that the defendant was predisposed to commit the crime when the opportunity presented itself." The Court charged that a "person is predisposed when he is ready and willing to commit a crime without any persuasion, and was awaiting a favorable opportunity to do so. " (Tr. 3486).

Specifically, the Court instructed:

> The government may show that a defendant was predisposed to commit a crime by proving . . . any one of the following three things.
>
> First, that the defendant participated in an existing course of criminal conduct that was similar to the crime with which he is now charged.
>
> Or second, that the defendant had formed a design to commit the crime for which he was charged before the opportunity presented itself.
>
> Or third, that the defendant indicated his willingness to commit the charged crime by his ready response to the government agent's inducement.

(Tr. 3487).

The Court also gave the following limiting instruction:

> Although you may consider evidence relating to a defendant's conduct after he was first approached, you may do so only to the extent that it shows something about the defendant's state of mind before that point. . . . You may not conclude that a defendant was predisposed to commit the charged crimes simply because the government has proved all of the elements of the crime beyond a reasonable doubt.

(Tr. 3488).

Finally, the Court charged that "if the government fails to prove beyond a reasonable doubt that the defendant was predisposed to commit a charged crime, then your verdict on that count must

2

be not guilty." (Tr. 3489).

Because, viewing the evidence in the light most favorable to the government, no rational trier of fact could have found predisposition beyond a reasonable doubt, there exists insufficient evidence to sustain a conviction and a judgment of acquittal must be entered. *See United States v. Stewart*, 590 F.3d 93, 109 (2d Cir. 2009); Fed. R. Crim. P. 29( c).

Evidence of Inducement

The trial record includes not only "any evidence" of government inducement to commit the crimes charged, but ample evidence of inducement. During his meetings with Cromitie, Hussain presented himself as a wealthy Pakistani businessman knowledgeable about Islamic teachings. Among other things, he told Cromitie that the teachings of the Prophet Mohammed permitted or even required Muslims to commit violence against non-believers (GX 101-E1; Tr. 1597-99), denounced Jews and other non-believers as "evil" and urged that "you, me, all these brothers, have to come up with a solution to take the evil down. That's how, it's the hadith." (GX 101-E5).

In the face of continuing inaction by Cromitie, Hussain repeatedly urged Cromitie to select a target, conduct surveillance, and recruit others. On this latter point, by December 2008, Hussain explicitly referred to these potential recruits as "bodies." Hussain would repeatedly tell Cromitie how he should go about recruiting: He told Cromitie how many persons were needed, and urged Cromitie to talk to people at the Newburgh mosque or to reach out to "the whole town" to find recruits. He even proposed, as potential recruits, the names of particular persons who attended the Newburgh mosque or with whom Cromitie was acquainted. (GX 113-E2, GX 114-E2, Tr. 2144, 2146-2150, 2160-2165, 2202).

Hussain also combined this with what would become increasingly large and explicit offers

of financial and material rewards, including promising (in December 2008) to give his BMW to Cromitie – but only after the operation was completed – and later offering to buy Cromitie a barbershop for $60-70,000 (Tr. 893-94, 890, 1857; GX 118-E1).  By February 23, 2009, Hussain was explicitly promising that Cromitie and anyone recruited for an operation would be rewarded in "two ways,"  meaning that they would eventually "go to paradise" but, while on Earth, would receive substantial cash rewards.  (Tr. 822, 1735, 2160).

Hussain implored Cromitie to accompany him on a surveillance trip around Stewart Airport on February 24, 2009, during which he first told Cromitie of the need for "lookouts" or "lookout guys," a role that Hussain admittedly conceived.  (Tr. 841, 2166-68; Defense Clip 404).  After Cromitie dropped out of sight for six weeks, Hussain stepped up the pressure by pointedly reminding Cromitie, during an April 5, 2009, telephone call, of his previous offer of $250,000.  At their next face-to-face meeting, on April 7, 2009, Hussain also made relentless demands on Cromitie for "lookout guys," while making clear that the "lookouts" would be paid.  (GX 116; Tr. 2172).

After meeting David Williams on April 10, 2009, Hussain met with Cromitie on April 16 and promised to give Williams "separate money" (i.e., separate from the reward money intended for Cromitie) if Williams agreed to participate. (GX 118-E2).  With respect to all of the defendants, Hussain, while making repeated self-serving comments on the need for the men to participate for the cause and not for "the money," made clear at the same time that there were financial rewards in store for all of them.  (Tr. 1926, 1952, 2222, GX 116).

Hussain, and his government handlers, supplied the transportation, the maps,  the cameras, the meeting place, the warehouse, the storage facility, the food and beverages, and the money that made all of this possible.  Hussain used Cromitie to indirectly induce people to participate and also

4

took on a direct role in recruitment, invented the role of the "lookout guy" and offered material and financial rewards to try to cobble together a "conspiracy" where none existed. It would be difficult to find a more compelling case of inducement than that. No reasonable juror could have found otherwise.

<u>Lack of Evidence of Predisposition</u>

The government failed to adduce legally sufficient evidence of predisposition by any of the three routes available to it. As to the first type of predisposition evidence, the government presented no evidence whatsoever that any of the defendants had participated in an existing course of criminal conduct similar to the crime with which he is now charged.

As to the second type of predisposition evidence, the government likewise presented no evidence that any defendant had formed a design to commit the crimes charged before the opportunity presented itself.

Instead, the government focused its argument on the third type of predisposition evidence – namely, that the defendants were ready and willing to commit the crimes charged without any persuasion based on their "ready response" to Hussain's inducement. In its main summation, the government argued that the defendants did not "need any convincing . . . . The innocent person needs convincing; a criminal doesn't." (Tr. 3205). "These men jumped at the chances that they got. . . . There was never a moment's hesitation except their fear of getting caught." (Tr. 3207). The government stuck with this theme in its rebuttal summation: "[W]hen a man does what these men did, when he commits that crime in a matter of weeks without the slightest hesitation or moral reluctance, you know what his state of mind was before that point. It was criminal, not innocent." (Tr. 3334). And, "nobody would accept money from a terrorist to do such a violent, destructive act

without hesitation, unless they were ready and willing to commit acts of terror." (Tr. 3337-38). "These men went all the way without hesitating. That tells you everything you need to know about their ready response." (Tr. 3343).

As a variation on the same theme, the government repeatedly argued that the fact that the defendants did what they were charged with doing itself showed that they were predisposed to do it. "What about putting bombs on the street. What about firing a missile. Common sense tells you that people who do that are predisposed to do it. . . . The truly innocent-minded person doesn't help plant that bomb ever, at least not without some convincing, more convincing then we saw in this case." (Tr. 3206-07). And, "[w]ho, in their right mind, would blow up synagogues and shoot stinger missiles [wreaking] violence and death, for any amount of money. Nobody unless they are predisposed." (Tr. 3337).

The problem with the government's arguments is two-fold: First, as the Court made clear to the jury, it could not "conclude that a defendant was predisposed to commit the charged crimes simply because the government has proved all of the elements of the crime beyond a reasonable doubt." (Tr. 3488). The government explicitly argued that because the defendants "put bombs on the street" and planned to "fir[e] a missile," they were predisposed to do so.

Second, the government's oft-repeated refrain that the defendants acted "without hesitation" is, in fact, either not supported by the evidence presented at trial or directly contrary to the evidence at trial. As to defendants David Williams, Onta Williams, and Laguerre Payen, by late 2008, it had become painfully obvious that neither Hussain nor his government handlers were seeking to uncover some existing conspiracy. Rather, Hussain's strategy was to pressure and implore Cromitie to induce others to agree to participate in an operation – i.e., to create a crime rather than investigate

6

one.  Because Hussain's strategy was principally one of indirect inducement with respect to potential recruits, the government did not, and could not, establish for how long the inducement went on.  In other words, the government simply did not prove that these defendants did not need convincing or that they acted without hesitation.  Absent such proof, the government did not prove a "ready response" to the inducement.  *See United States v .Gilmore*, 436 F.Supp. 187, 191-192 (WDNY 1977) (District Court, in rendering not-guilty verdict in a non-jury trial involving an entrapment defense, found insufficient evidence of defendant's "ready intent" to commit the crime charged, noting the "difficulty" presented by the unavailability of the government informant who directly interacted with and induced the defendant.)

The government sought to overcome this gap in its proof by focusing, in its jury arguments, on what it purported to be the defendants' lack of apparent hesitation <u>after</u> they first appear on camera in the presence of Hussain – <u>i.e.</u>, beginning in April 2009.  However, since Hussain's method was to urge Cromitie (for months) to go out into the community and try to recruit people (while adding financial incentives into the mix), the government cannot prove "ready response" by focusing on what was said or done after the men first encountered Hussain.  The government presented no proof of what these men said or did <u>before</u> they encountered Hussain.

Moreover, no evidence was offered that any of these defendants – including Cromitie – had any pre-existing associations or ideations, or history, that would suggest a predisposition to commit the crimes charged.  None of the defendants was shown to have belonged to any organizations, or associated with any persons, that advocated terrorism or violence against the United States or any particular religious group; they were not shown to have a reputation for advocating such acts; they were not shown to have possessed any literature, personal writings, computer files, or computer-

7

usage histories that reflected such intentions, plans or ideas; and searches of their homes revealed no weapons, no bomb-making materials, and no literature about making or using bombs or weapons.

As to Cromitie, there was so much evidence as to his lack of predisposition that no rational trier of fact could have found predisposition beyond a reasonable doubt.

Even if the Court were to credit all of Hussain's testimony (as reluctant as it might be to do so), Cromitie's bellicose pronouncements about Jews and American soldiers amounted to nothing more than the rants of a loud-mouthed bigot. Between June 2008 and February 24, 2009 (the first trip to Stewart Airport), despite relentless prodding from Hussain, Cromitie never did anything on his own to further the plot. He tells Hussain that he does not want to go to Afghanistan. (GX 102-E3). He is evasive when asked by Hussain if he would "go to jihad" (GX 103-E1), and says that "[m]aybe it's not my mission." (GX 112-E3). Much to Hussain's chagrin, Cromitie does not introduce Hussain to any like-minded brothers, provide any guns, pick any targets, decide what equipment would be needed, come up with any code words, or make any concrete plans. All this, despite the fact that Hussain in December promised to give Cromitie a BMW after he had completed a mission and offered him a large sum of money. (Tr. 892-94, 988, 1708-09, 1869-70).

Then, from February 25 to April 5, 2009, Cromitie not only dropped out of sight, but he also went to great lengths to avoid Hussain. On February 25, he failed to show up for a planned meeting with Hussain. He repeatedly lied to Hussain about his whereabouts. He deleted Hussain's numerous voice mail messages. He pretended not to be home when Hussain showed up again and again at his house, unannounced. He made excuses about why he did not return Hussain's calls. And he made sure not to attend regular religious services at the Newburgh mosque, knowing that Hussain would be there. (Tr. 1761-83, 1791-92). He even sold the brand new digital camera Hussain bought for

8

him on February 24, with which he was supposed to take surveillance photographs, for $50 or $60. (Tr. 1854-55, 3054-56).

Finally, after he had been fired from his low-wage job at Wal-Mart and had tried, without success, to get his job back (Tr. 3043-47), Cromitie called Hussain on April 5, 2009. Cromitie said he was broke and needed to make some money. Not knowing that the call was being recorded, Hussain reminded Cromitie of his earlier promise to pay Cromitie $250,000 to participate in the plot. (GX 239). Cromitie asked to see Hussain. On April 7, at the Newburgh house, Hussain badgered an obviously reluctant Cromitie to get back involved, complained that Cromitie's disappearance had put Hussain's life at risk, and even made veiled threats of physical harm against Cromitie. (GX 116-E1; Tr. 1825-33). Hussain also made a new promise of a two-week all expense paid trip to Puerto Rico for Cromitie and his family, but only after the operation was complete. (GX 240). Cromitie agreed to go forward. Later, Hussain explicitly promised Cromitie a brand new car, a $60-70,000 barbershop, and enough cash to do what ever Cromitie wanted to do. (GX 118; Tr. 890, 1857). He gave him money for rent and groceries, and said he would make Cromitie "the happiest man on planet Earth." (GX 245; Tr. 1894-95). He also reiterated his promise to give Cromitie a BMW. (GX 265; Tr. 1958-59).

If Cromitie was predisposed, prior to his initial meeting with Hussain, to commit the acts of terror charged in this indictment, why did he drop out of sight after the first trip to Stewart Airport on February 24, the first concrete thing he had done to further the plot after more than eight months of talking to Hussain? Why did he go to such great lengths to avoid talking to Hussain, let alone meeting him, between February 25 and April 5, 2009? Why did Hussain have to promise him so many things of great value, and such large sums of money, to get him re-engaged in the plot?

9

The simple answer is that Cromitie was <u>not</u> predisposed, <u>not</u> inclined in any way, shape, or form, to commit these crimes before he met Hussain. The evidence is overwhelming that Cromitie was not "ready and willing to commit a crime without any persuasion, and . . . awaiting a favorable opportunity to do so." (Tr. 3486). Cromitie's behavior was the exact opposite of a "ready response" to the government's inducement. If Cromitie was predisposed, the government would not have had to badger, pursue, pressure, and offer him huge sums of money to participate. Contrary to the government's arguments, Cromitie did need convincing, he did not jump at the chance to commit acts of terror, and he certainly did not act "without hesitation."

<u>Manufactured Jurisdiction</u>

In addition to the insufficiency of the evidence with respect to the indictment as a whole, Counts One, Two, Three, and Four included as the sole jurisdictional element that one or more participants traveled in interstate commerce, and Counts Five and Six included interstate travel as one of two alternative jurisdictional bases, the other being an attempt to use a missile against property owned, leased or used by the United States.

In *United States v. Wallace*, 85 F.3d 1063 (2d Cir. 1996), the Court clarified the "manufactured jurisdiction" concept that first appeared in *United States v. Archer*, 486 F.2d 670, *reh. denied*, 486 F.2d 670 at 683 (2d Cir. 1973). The Court characterized the concept "as a subset of three possible defense theories":

> (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense, see *[United States v. ] Podolsky*, 798 F.2d [177] at 181 [(7th Cir. 1986)]; (ii) the defendant's due process rights were violated because the government's actions in inducing the defendant to commit the federal crime were outrageous, see *[United States v.] Laporta*, 46 F.3d [152] at 160 [(2d Cir. 1994)]; or (iii) an element of the federal statute has

10

>not been proved, so federal courts have no jurisdiction over the crime, see *United States v. Clark*, 62 F.3d 110, 112 (5th Cir. 1995), *cert. denied*, 133 L.Ed.2d 684, 116 S.Ct. 734 (1996); *Podolsky*, 798 F.2d at 181.

*United States v. Wallace*, supra, 85 F.3d at 1065-1066.

In *Wallace*, entrapment was not in issue and, accordingly, the Court did not have occasion to rule on the issue of whether the defendant was predisposed to commit the crime in a way that turned it into a Federal offense. *Id.*[1]

In the present case, the government case agent, Robert Fuller, admitted that the FBI had chosen a warehouse in Stamford, Connecticut, in order to get the defendants to cross a state line. (Tr. 255-256). This "interstate travel" element was solely a contrivance of the government. It was the government that provided the out-of-state destination (the warehouse), the means of travel there (Hussain's vehicles) and the idea of traveling there. No defendant was shown to have been predisposed to commit a crime by crossing state lines. Accordingly, the verdict should be set aside for that additional and alternative reason.

---

[1] The "manufactured jurisdiction" concept is also relevant to the issue of outrageous government conduct, which is addressed in a separate motion.

CONCLUSION

For the reasons set forth herein, the verdicts should be set aside and a judgment of acquittal entered.

Dated:   January 7, 2011

>Respectfully submitted,
>
>s/ Theodore S. Green
>THEODORE S. GREEN
>*Attorney for David Williams*
>GREEN & WILLSTATTER
>200 Mamaroneck Avenue - Suite 605
>White Plains, New York   10601
>(914) 948-5656

To:   DAVID A. RASKIN, ESQ.
      JASON P.W. HALPERIN, ESQ.
      ADAM S. HICKEY, ESQ.
      Assistant U.S. Attorneys
      1 St. Andrew's Plaza
      White Plains, New York 10601
      (212) 637-2635

      VINCENT L. BRICCETTI, ESQ.
      *Attorney for James Cromitie*
      Briccetti, Calhoun & Lawrence, LLP
      81 Main Street, Suite 450
      White Plains, New York 10601
      (914) 946-5900

      SUSANNE BRODY, ESQ.
      MARK GOMBINER, ESQ.                SAMUEL M. BRAVERMAN
      *Attorneys for Onta Williams*      *Attorney for Laguerre Payen*
      Federal Defenders of New York      901 Sheridan Avenue
      300 Quarropas Street               Bronx, New York   10451
      White Plains, New York   10601     (718) 293-1977
      (914) 428-7124