UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA        :          09 Cr. 558  (CM)
                                   :

        -against-             :
                                   :
JAMES CROMITIE, DAVID WILLIAMS, :
ONTA WILLIAMS, and LAGUERRE     :
PAYEN,                              :
                                 :
                 Defendants.   :
------------------------------------------------------x

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF RENEWED MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT

In its memorandum in opposition to defendants' renewed motion to dismiss for outrageous government conduct, the government asserts that the opening line from defendants' main brief – "the government created the criminal then manufactured the crime" – is "catchy, but not convincing."  (G. Br. 36).  What the government notably does <u>not</u> say is that this "catchy" line is untrue.  Indeed, the government effectively concedes that the facts as set forth in defendants' renewed motion <u>are</u> true.  "[T]he Government . . . provided the defendants with weapons of mass destruction, transportation, money, and plenty of logistical direction" (G. Br. 40-41); "[t]o be sure, the defendants most likely could not have acquired weapons of mass destruction on their own" (G. Br. 48); it was the government that provided "exotic items like bombs and Stinger missiles" (G. Br. 48); and, "the sting operation [which included the "reward in two ways" strategy of promising both Paradise and extravagant wealth in return for defendants' participation in the plot] was, by law enforcement standards, relatively elaborate." (G. Br. 41).

As set forth in our main brief and below, the government's extraordinary over-involvement in creating the criminal then manufacturing the crime does constitute outrageous government conduct, and thus a violation of the Due Process Clause.  No court in this Circuit has ever been presented with a case quite like this one.  Therefore, the fact that no court in this Circuit has upheld such a claim is beside the point.  This is the case in which such a claim should prevail, which the Second Circuit has said "in principle" exists.  United States v. Rahman, 189 F.3d 88, 131 (2d Cir. 1999), cert. denied, 528 U.S. 1094 (2000).

The government's central argument is that absent "some type of coercive action [or] outrageous violation of physical integrity" (G. Br. 36), the Court cannot dismiss an indictment for outrageous government conduct.  But this is not the law.  In United States v. Rahman, 189 F.3d at 131, and United States v. Schmidt, 105 F.3d 82, 91 (2d Cir.). cert. denied, 522 U.S. 846 (1997), the Second Circuit made clear that if the government's "involvement" in criminal activity is "demonstrably outrageous" or "shocks the conscience," a conviction may be set aside. The Circuit's case law does not require that a defendant's personal integrity be violated or that he be subjected to psychological torture.

Indeed, in denying the motion prior to trial, this Court framed the issue this way: "[D]id the Government become aware of potential criminal activity and take action to neutralize a real terrorist threat, or did it locate some disaffected individuals, manufacture a phony terrorist plot that the individual[s] would (and could) never have dreamed up or carried out on their own, and then wrongfully induce them to participate in it?"  (Decision and Order Denying Defendants' Pretrial Motions, at 9 (May 18, 2010) ("Decision")).  Thus, the question is not whether the defendants were coerced or physically abused; it is whether the government's conduct was

sufficiently outrageous to warrant dismissal because the government located some disaffected individuals, then manufactured a phony terrorist plot and wrongfully induced them to participate in it.

This issue presents a question of law and fact for the Court alone to decide.  United States v. Cuervelo, 949 F.2d 559, 567 (2d Cir. 1991); United States v. Nunez-Rios, 622 F.2d 1093, 1098 (2d Cir. 1980).  The claim can be asserted even if an entrapment defense has failed at trial. United States v. Rahman, 189 F.3d at 131; United States v. Chin, 934 F.2d 393, 398 (2d Cir. 1991).  And, because the Court is the trier of fact on this due process claim, the Court is not bound by the familiar Rule 29 standard that the evidence must be viewed in a light most favorable to the government, with all permissible inferences drawn in the government's favor. See United States v. Myers, 692 F.2d 823, 839 (2d Cir. 1982), cert. denied, 461 U.S. 961 (1983)..

Thus, the Court is not required to credit the testimony of the government's principal witness, Shahed Hussain, as to what did or did not occur during the several unrecorded meetings he had with James Cromitie between June and October 2008, or during the many hours of un-recorded conversations and meetings that took place even after the government started recording.[1]  As the Court knows from having presided at the trial, Hussain is an out-an-out liar who perjured himself repeatedly at trial.[2]  Indeed, the Court has already said that the FBI's "detailed debriefing notes do not reflect many significant things that Mr. Hussain claims to have

---

[1]  The government claims that we have criticized it for not recording the first several meetings. (G. Br. 50).  To be clear, the government's failure to record the meetings is not itself outrageous conduct.  However, the fact is the meetings were not recorded, and we have only Hussain to tell us what did or did not transpire.  The Court need not accept Hussain's testimony.

[2]  The facts relating to Hussain's perjury are set forth in detail in Defendants' Motion for a New Trial in the Interest of Justice, and are incorporated by reference herein.

told them" (Tr. 2011) – for example, contrary to his trial testimony, Hussain did <u>not</u> tell the FBI that on June 23, 2008, Cromitie had expressed hatred towards Jews and Americans (Tr. 1590, 2903-05; GX 3502-12) – and that "I'm skeptical about some of the things that [Hussain] has said, but I am not the trier of fact." (Tr. 2015).[3]  For purposes of this motion, the Court is the trier of fact.

The government attempts to overwhelm the Court with a wall of authority purporting to support its position that what occurred here is not outrageous government conduct.  (G. Br. 37-48).  But every one of those cases is inapposite, because the degree of government over-involvement in the crimes charged here is much greater than the degree of government involvement in any of those cases.  For example, in the leading over-involvement case – <u>United States v. Rahman</u>, 189 F.3d 88 (2d Cir. 1999) – the government's informant befriended members of an existing organization already set up for the purpose of jihad (holy war).  Later, members of the organization enlisted the informant's aid in a bombing plot and a jail-escape plot.  189 F.3d at 104-06.  Even after the informant left the organization the plots continued, including the 1993 bombing of the World Trade Center.  <u>Id</u>. at 107-08.  The Second Circuit analyzed the outrageous government conduct claim by focusing on the informant's role in infiltrating the organization and contributing to its criminal conduct by lending "direction, technical expertise, and critical resources."  <u>Id</u>. at 131.  In rejecting the claim, the court noted that the informant's contribution to the criminal conspiracy was small: "the defendants were already actively advancing a conspiracy and they already had substantial resources and technical expertise.  There is no evidence the

---

[3]  The Court also said Hussain's testimony contained a "substantial number of inconsistencies."  (Tr. 2011).

criminal conspiracy would have foundered without the Government's entry." Id.  Moreover, the entry of the informant "was intended not only to gather evidence, but also to prevent further death and destruction."  Id.  The critical point is that the court did not ground its decision on the absence of an "egregious invasion of individual rights," such as physical coercion or psychological torture, but rather on the fact that the government's involvement was not so substantial or pervasive that it shocked the conscience.  Id.

        To say the least, our case presents a very different set of facts.  Here, there was no existing organization or conspiracy – after months of trying, Hussain finally created a conspiracy by repeatedly asking for and finally paying for recruits.  Moreover, this "organization" (actually just an ad hoc collection of "disaffected individuals") had no resources (e.g., money or even transportation) and no technical expertise; as the government readily concedes, all the resources and technical expertise, as well as logistics, were supplied by the FBI.  And, as the government also concedes, the "conspiracy," such as it was, would certainly have foundered without the government's continued involvement and offers of spiritual and financial rewards.  Finally, Hussain's "entry" certainly did not "prevent further death and destruction."  Before Hussain met Cromitie, Cromitie was, at most (and only if Hussain is to be believed), an angry and resentful loud mouth engaged in no dangerous activity whatsoever.

        The other leading case in the Second Circuit is United States v. Schmidt, 105 F.3d 82 (2d Cir. 1997).  There, the defendant approached fellow inmates and asked them to hire two hit men to help her escape by killing the federal agents who accompanied her to court.  The defendant promised to pay the other inmates and hit men several hundred thousand dollars for their help.  The inmates promptly reported the defendant to the authorities, who then set up an elaborate

sting operation involving two deputy marshals posing as hit men who actually transported the defendant to a "safe house" where she was arrested.  105 F.3d at 85.  The court stated that the due process guarantee would be violated by "government action that is fundamentally unfair or shocking to our traditional sense of justice, or conduct that is 'so outrageous' that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction."  Id. at 91 (citations omitted).  The court also said that reversal of a conviction would be "rare" in the absence of coercion or violation of the defendant's person.  Id.  But the court did not say a conviction would never be reversed in the absence of coercion or invasion of personal integrity.  To the contrary, the court cited with approval two cases from outside the Circuit (United States v. Lard, 734 F.2d 1290,1292, 1296-97 (8th Cir. 1984), and United States v. Twigg, 588 F.2d 373, 378 (3rd Cir. 1978)) as involving "demonstrably outrageous" government involvement in manufacturing crime which did warrant reversal of convictions.  Id

Neither Lard nor Twigg involved physical or psychological coercion.  In Lard, undercover agents repeatedly implored the defendants to make a pipe bomb, which the defendants had never done before and initially resisted making, and then arrested them for making and possessing the pipe bomb.  734 F.2d at 1291-94.  The court held that this conduct constituted entrapment as a matter of law, id. at 1296, and that the agents' "overinvolvement in conceiving and contriving the crimes here approached being" outrageous government conduct in violation of the Due Process Clause.  Id. at 1296-97.  This was because the agents' conduct was "aimed at creating new crimes" rather than at "facilitating discovery or suppression of ongoing illicit dealings in unregistered firearms."  Id. at 1297.

In <u>Twigg</u>, agents both conceived a drug crime (the manufacture of methamphetamine) and then, over a period of months, supplied the defendants with the necessary equipment and raw materials, as well as a production site for a speed lab.  588 F.2d at 375-76.  The court held that the police involvement was "so overreaching as to bar prosecution of the defendants as a matter of due process of law."  <u>Id</u>. at 377.  In language that could be used to describe the instant case, the court stated:  "We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators."  <u>Id</u>. at 379.

In <u>Schmidt</u> itself, the Second Circuit held that the government's extensive involvement in the breakout plan did not amount to a due process violation.  This was because the plan originated with the defendant, the defendant herself planned the entire operation, and she also solicited the "hit men" to murder the guards.  "When police do no more than facilitate a criminal enterprise started by another, due process principles are not violated."  <u>Id</u>. at 92.

The facts of our case are much more like the facts of the two cases cited favorably by <u>Schmidt</u> as involving demonstrably outrageous government conduct warranting reversal of convictions.  As in <u>Twigg</u> and <u>Lard</u>, the criminal conspiracy here was conceived entirely by the government, and the government supplied all of the equipment, money, training, and logistics over an extended period of time.  Prior to meeting Hussain, Cromitie was doing nothing criminal.  And, unlike <u>Schmidt</u>, the planned operation here did originate with the FBI, and the defendants did absolutely nothing to further it other than ride around in Hussain's cars and follow his elaborate instructions.

The government's assertion to the contrary – "notwithstanding the CI's assistance and direction, the defendants actively participated in all of the key stages of the plot, and themselves often took control of the operational planning in its latter stages" (G. Br. 48) – is, to put it mildly, a gross exaggeration of the evidence presented at trial.  The government cites five snippets from the massive trial record to support this claim: David Williams saying the missile should be fired from the other side of the airport; Payen telling Hussain that the "team" needed a leader; all four defendants agreeing that Cromitie should be the leader; the defendants "convincing" Hussain to push back the time of the operation; and Onta Williams leading a discussion about respective assignments and avoiding police detection.

It is almost as if the government forgot this Court actually attended the trial.  The evidence is overwhelming, and uncontested, that it was Hussain who provided the missiles and fake bombs, trained the defendants, and selected the targets.  Despite constant prodding and encouragement from Hussain, Cromitie did nothing on his own to further the plot.  Indeed, he dropped out of sight for six weeks, selling the camera Hussain bought for him to do surveillance, and only got back involved when Hussain offered him $250,000.  The FBI chose the spots at or near Stewart Airport it wanted Hussain to show the defendants, and Hussain, in his car, gave the defendants several tours of the airport.  Hussain also led the entire discussion about where to fire the missiles and what to fire them at.  Payen may have said the "team" needed a leader (and the other defendants may have joined in), but Hussain's response was to say that Cromitie was the leader – in other words, Hussain decided who the leader would be, which really meant Hussain was the leader.  The group's only leader was Hussain, obviously and always. Hussain (and the FBI) also made all the decisions about when and where to pick up the weapons, where to store

them, when and where to conduct "surveillance," how much money to pay Cromitie and any "lookouts," and where the fake bombs should be placed.  The defendants may have discussed the time of day in which to conduct the "operation" but it was Hussain, not the defendants, who picked the date for the operation, and then changed that date more than once.  Hussain, more than once, rejected Cromitie's suggestions about when to carry out the operation.  And Onta Williams (and the others) may have talked about how not to get caught, but it was Hussain who repeatedly said things like "I just want to make sure everybody knows their job tomorrow," and who gave each of the defendants explicit instructions as to what to do and where to go on the day of the "mission," down to the most minute detail.

Moreover, the government continues to accept at face value Hussain's testimony as to what transpired at the first meeting between Hussain and Cromitie in June 2008.  ("Cromitie was the one who right off the bat said he wanted 'to do something' to America."  G. Br. 47.)  But the government has chosen to ignore how Cromitie, on tape, described that first meeting to Hussain and the other defendants on May 1, 2009, without objection or contradiction from Hussain: "[Hussain] said, . . . when he met me ten months ago, he said, 'Hak, I got a plan.  You gonna make some money out of it.'  And then he said, 'But that's not what I want you to do.  I don't want you to do it for the plan.'  He wants to go to heaven with Allah on his tongue.  So do I.  So that's why he said, don't do it just for the money.  But do it, also say, in the name of Allah."  (GX 123-E3-T, at 1-2; Tr. 1950-52).  Instead, the government points to another statement Cromitie made (on November 29) about the first meeting, when Cromitie said that he had approached Hussain in the mosque parking lot and asked whether Hussain had seen what "they did to my people over there . . . in Afghanistan. . . .  And you knew I wanted to get back.  You knew I did.

-9-

And I would.  I will."  In the same conversation, Cromitie also said that Hussain did not "have to

give [him] a damn dime.  You my brother.  You show me love from day one, and it wasn't

because of something like that."  (G. Br. 52).  (GX 109-E3-T, at 16).

What Cromitie said on November 29 is not inconsistent with what he said on May 1.

Read together, it appears that at the first meeting (according to Cromitie), regardless of who first

approached whom, Hussain said he had a plan to do something in the name of Allah for which

Cromitie would be paid, and that Cromitie said he was not only interested in the money.[4]  The

point is that it was Hussain who said he had a plan to do something in the name of Allah – i.e.,

Hussain was the initiator, not Cromitie.  Thereafter, Cromitie failed to do anything to further any

plan, and even dropped completely out of sight – until Hussain got him to rejoin the plot by

offering him large sums of money and things of great value.

In any event, as the finder of fact on this motion, the Court certainly need not credit

Hussain's testimony about the first meeting.  Having sat through all of Hussain's testimony, there

is no way the Court could find him to be a reliable or credible witness.

The government also argues that the "sting operation" here – in other words, the

government's involvement in manufacturing the crimes – although "elaborate," was no more

---

[4]  The government also points to a stray comment Cromitie made on April 23 regarding
the first meeting: "It wasn't you who said anything, it was me right?"  (G. Br. 52).  (GX 129-E1-
T, at 2-3).  But Cromitie did not make clear what he was referring to as having said to Hussain at
the first meeting.  The context of Cromitie's comment was that Hussain was telling David
Williams that he did not want him to get involved for money alone.  Cromitie said: "Right.  But
they givin' us money anyway," and made several other similar comments.  (GX 129-E1-T, at 3-
6).  This was one of the many times when Cromitie pretended he was not in it for the money,
while making it clear that there was money in it for him and anyone else.  Thus, the comment
quoted by the government may well have been a reference to Hussain's offer of money at the first
meeting, but it is too opaque to know for sure.

elaborate than the Abscam sting operation in United States v. Myers, which the Second Circuit

found was "not even close to the line."  692 F.2d 823, 843 (2d Cir. 1982).  The government

contends that, as in Myers, what the government did here was merely create "an opportunity for

the commission of crime by those willing to do so."  Id. at 837.  (G. Br. 41, 45).

But our case is not remotely like what happened in the Abscam investigation.  There, the

government spread the word about people with fictitious identities who said they could pay

bribes to Congressmen.  "From that point on, the essential conduct of the agents and their paid

informant was to see who showed up to take the bribes."  United States v. Myers, 692 F.2d at

837.  In other words, the government went to some lengths to create fictitious identities for

people who let it be known they had money to bribe Congressmen.  But the acceptance of the

bribes was entirely up to the Congressmen who came forward to take the bait.  The government

did not manufacture the crimes, because only when the Congressmen said they would accept the

bribes did the crimes occur.

In our case, by the government's own admission, the FBI's involvement in the charged

conspiracy was far, far greater.  The FBI planned the whole operation; supplied all of the

weapons and other instrumentalities of the crimes; trained the defendants how to use them;

provided all the logistical support; and plied the defendants with the "reward in two ways"

strategy – Paradise and huge financial rewards if they agreed to participate.  The only way our

case could have been like Abscam is if Hussain had told Cromitie about some bombs and

missiles he had for sale, and then waited for Cromitie, on his own, to (1) come up with the

financing to purchase the weapons from Hussain, (2) make a plan to use them, (3) recruit and

train other participants, (4) find a place to store the weapons, (5) make numerous surveillance

trips, and (6) deliver the weapons to the targeted locations he selected.  It is preposterous to compare our case to Myers.[5]

As noted above, this Court framed the issue this way:  "[D]id the Government become aware of potential criminal activity and take action to neutralize a real terrorist threat, or did it locate some disaffected individuals, manufacture a phony terrorist plot that the individual[s] would (and could) never have dreamed up or carried out on their own, and then wrongfully induce them to participate in it?"  (Decision at 9).

The answer to the first part of the question is clearly "no," the government did not become aware of potential criminal activity and take action to neutralize a real terrorist threat.

The answer to the second part of the question is "yes," the government did locate some disaffected individuals and then manufacture a phony terrorist plot that these men would and could never have dreamed up or carried out on their own.

And the answer to the third part of the question is also "yes," the government wrongfully induced these men to participate in that phony plot.  That is why Hussain's shameless – i.e., "wrongful" – exploitation of Cromitie's religious beliefs is so important.  As set forth in our

_____

[5]  The government also tries to liken this case to United States v. Al Kassar, 582 F. Supp. 2d 488 (S.D.N.Y. 2008), and United States v. Chin, 934 F.2d 393 (2d Cir. 1991).  (G. Br. 41-43, 54-55).  But in Al Kassar, the defendants actively procured and sold weapons, provided specifications for surface-to-air missiles they wanted to buy, organized the logistics of transporting the weapons, asked for significant payments for the weapons they intended to sell, and traveled overseas to conclude the transaction.  Id. at 492-93.  Those facts are not remotely like the facts here.  And Chin was a garden-variety undercover sting operation involving child pornography.  All the undercover agent did in Chin was win the defendant's trust through a phony pen-pal arrangement and then arrest the defendant when he sent the agent a magazine containing child pornography.  The defendant claimed that the agent used psychological manipulation to get him to send the magazine.  The court said the agent's conduct did not rise to the level of physical or psychological torture.  Id. at 399 & n.4.  Unlike the instant case, Chin did not involve a government "over-involvement" claim.

main brief, Hussain, posing as an Islamic wise man, repeatedly employed religion to convince Cromitie that hatred of Jews was an essential precept of Islam, that it was Cromitie's sacred duty to engage in violence against Jews and Americans, and that if Cromitie did so he would be rewarded with acceptance into Paradise. The government, through Hussain, exploited Cromitie's quest for "Islamic guidance" to incite him to commit violent acts. And then the government sealed the deal by offering Cromitie and his co-defendants cars, cash, vacations, and even a barbershop, but only if they would agree to participate, and only to be provided after the "mission" was completed. This was the "reward in two ways" strategy the government, though Hussain, employed.

In short, the extraordinary and unprecedented extent to which the government both "created the criminal then manufactured the crime" constitutes the rare instance in which government over-involvement in criminal activity is "so outrageous that due process principles would absolutely bar the Government from invoking judicial processes to obtain a conviction.'" United States v. Russell, 411 U.S. 423, 431-32 (1973); accord, United States v. Rahman, 189 F.3d at 131; United States v. Schmidt, 105 F.3d at 91.

Finally, the government argues that no evidentiary hearing is required because the "defendants identify no central factual question here that has yet to be fleshed out," and because "the allegations of outrageous government misconduct in Cuervelo were, simply put, much more serious than those alleged here." (G. Br. 58).

The government is wrong on both points. Taking the second point first, the allegations of outrageous conduct here are actually far more serious than in any of the cases in this Circuit or elsewhere that considered the question of whether the government's over-involvement in

-13-

criminal activity was sufficiently outrageous to warrant dismissal.  There truly is no other case,

reported or otherwise, in which the defense has contended – and shown – that the government

used religion as a tool to incite someone, who had never before committed violent or terrorist

acts or had any terrorist connections, to become involved in an elaborate, but entirely fake, plot

to bomb synagogues and shoot down military aircraft; then promised Paradise and extravagant

financial rewards to that person in return for his participation, to be paid only after he had

completed his "mission"; while at the same time initiating, financing, planning, supplying, and

otherwise orchestrating every single detail of the charged scheme.  It is hard to imagine more

serious allegations than these.  Moreover, the defendants have all been convicted of offenses that

carry a mandatory minimum jail sentence of 25 years and a sentencing guidelines range

(according to the initial presentence report) of life in prison.  This Court needs to have a full

factual record on which to base its decision on this motion, as does any appellate court should the

case proceed that far.  See United States v. Cuervelo, 949 F.2d 559, 567 (2d Cir. 1991) ("A

hearing allows for a searching inquiry into the particulars of the investigative process . . . [and] is

the preferred course of action in cases where disputed factual issues exist.")

     The defense has identified four specific areas as to which a hearing is required:

     1.  The extent to which Hussain was supervised or unsupervised by the FBI and/or any

other government agency with respect to his invocations of religion to incite violence.  As the

Court has correctly observed, the jury was not "asked to pass on the propriety of the

Government's conduct."  (Decision at 9).  Now, however, the Court is being asked to do exactly

that.  For example, did the FBI or other government agencies actually orchestrate Hussain's

appeal to Cromitie's religious beliefs; did they know what Hussain was saying and doing and

merely acquiesce in it; did they "consciously avoid" knowing what Hussain was doing; or did

they not know what Hussain was doing, in which case were they failing in their oversight

responsibilities?  The Court needs to know more about the origins of this conduct, and how it

was carried out, in order properly to assess its propriety.

    2.  <u>The extent to which the FBI and/or any other government agency was aware of the</u>

<u>financial inducements offered by Hussain to the defendants.</u>  We know that outlandish sums of

money and other things of value were certainly offered by Hussain at one time or another to

Cromitie and the other defendants.  However, the government produced a memorandum of an

FBI interview of Hussain conducted on November 13, 2009 (the "November 13 302")[6] – during

which Hussain was asked "to identify incidents when [Hussain] may have promised and/or

provided . . . money, gifts or any items of value" to the defendants or their relatives – and that

memorandum did <u>not</u> report numerous instances in which Hussain promised money or things of

value.

    Prior to turning over the November 13 302, prosecutors had stated there were no

unrecorded payments or promises of financial reward (9/17/09 Pretrial Conference Tr. 12-13),

which turned out to be incorrect.  After turning over the November 13 302, prosecutors stated

that, other than what was identified therein, their informant had not provided or promised any

---

    [6]  This interview was conducted by the FBI nearly six months after the case was indicted, and only after the Court ordered the government to provide information about money or things of value offered or given to the defendants.  A copy of the FBI 302 documenting the interview is attached as Exhibit A to this reply brief.  (GX 3502-87).

other things of value to the defendants (12/4/09 Pretrial Conference Tr. 3-4), which was also not accurate.[7]

Specifically, the November 13 302 failed to mention the following items, all of which came to light during the trial:  (1) the unspecified amount of money Hussain offered Cromitie at their first meeting (not taped) (GX 123-E3-T, at 1-2; Tr. 1950-52); (2) the BMW he offered Cromitie in December 2008 (not taped) (Tr. 893-94, 988) and again on May 1, 2009 (taped) (GX 265; Tr. 1958-59)[8]; (3) the unspecified amount of money he offered Cromitie on December 17, 2008 (not taped) (Tr. 1708-09); (4) the unspecified amounts of money (he said it was "a lot of money") he offered Cromitie on several occasions (not taped) (Tr. 892, 1869-70); (5) the explicit offer of cash for jihad made to Cromitie on February 23, 2009 (taped) (GX 114-E1; Tr. 822, 1735, 2911-12); (6) the cash Hussain offered on February 24 to pay for lookouts (taped) (GX 115; Defense Clips 357, 358, 395; Tr. 1756-60); (7) the $250,000 he offered Cromitie at least twice (only one of those offers, on April 5, 2009, was taped: "I told you, I could make you $250,000, but you don't want it brother.  What can I tell you?") (GX 239); (8) the all-expense paid two-week vacation to Puerto Rico he offered Cromitie on April 7 and April 16, 2009 (taped) (GX 118-E1; GX 240; Tr. 2177-79); (9) the money he offered Cromitie on April 16 so he could buy a "brand new car" (taped) (GX 118; Defense Clip 370); (10) the barbershop worth $60-70,000 he offered to buy Cromitie on April 16 (taped) (GX 118-E1; Tr. 890, 1857); (11) the cash

---

[7]  The prosecutors who made these statements in court were, respectively, David Leibowitz and Eric Snyder, both of whom were off the case by the time of trial.

[8]  The government says it first learned about the promise of the BMW on May 27, 2010, shortly before the original trial date in this case.  A copy of the government's <u>Brady</u> disclosure letter dated May 27, 2010, is attached as Exhibit B to this reply brief.

he offered on April 16 and April 28 to pay for lookouts (taped) (GX 118-E3, 121-E1, 121 E-4);

(12) the money he promised Cromitie on April 19 to "make [him] the happiest man on planet

Earth" (taped) (GX 245; Tr. 1894-95); (13) the brand new Mercedes Benz he suggested Onta

Williams would get (by remaining silent when Cromitie said Williams would get the car) once

the mission was over (not taped) (Tr. 951); (14) the cash he said on May 1 he was going to

Florida to pick up (taped) (GX 265); (15) the unspecified amount of money he offered Cromitie

and Payen on May 15 (not taped) (Tr. 1032-33, 2068-69, 2077-78); and (16) the explicit offers of

$5,000 he said he made to each defendant on May 19 for their participation in the plot (not taped)

(Tr. 1035-36, 2070, 2079-81).

It seems unlikely that these numerous offers of money and things of value were made

without the knowledge and authorization, or at least without the acquiescence, of the FBI and/or

some other government agency.  Quite a few of these offers are on tape; many are not.  If the FBI

was aware of these offers on or before November 13, 2009, then the November 13 302 is both

incomplete and misleading.  Likewise, the prosecutors' statements in court on September 17 and

December 4, 2009, were not correct.  The Court needs to conduct a hearing to determine (1) who

knew (and when they knew) about these offers, (2) whether government agents or officials

orchestrated the offers as part of the "reward in two ways" strategy, and (3) whether these offers

were deliberately left out of (or mis-described in) the November 13 302.

3.  When did the FBI and/or any other government agency learn that Cromitie was lying

to Hussain about such matters as commanding a "sutra team," traveling to Afghanistan, blowing

up police stations, serving fifteen years in prison for attempted murder, and stealing handguns

from Wal-Mart?  The Court needs to determine why the government "responded [to Cromitie's

empty boasts] by setting a criminal scheme in motion and coaxing it to fruition" (Decision at 11), rather than shutting the investigation down.

      4.  <u>The extent to which the FBI and/or any other government agency decided to use Cromitie to enlist others to participate in the "plot," and instructed Hussain about creating a conspiracy; i.e., getting someone in addition to Cromitie to participate.</u>  The "plot" itself never required anyone other than Hussain and Cromitie.  However, for the "plot" to become a conspiracy, two or more non-government members needed to participate.  The Court needs to determine how and why the investigation continued to the point of getting David Williams, Onta Williams, and Laguerre Payen to join Hussain's plot.

      The necessary witnesses for this hearing would be: Shahed Hussain, Special Agent Robert Fuller, and Assistant U.S. Attorneys Eric Snyder and David Leibowitz.  Other witnesses may be required as well, depending on the testimony of the listed witnesses.

<div align="center">CONCLUSION</div>

      For the reasons set forth in this reply brief as well in defendants' main brief, the renewed motion to dismiss the indictment for outrageous government conduct should be granted.

Dated:  White Plains, NY
         February 25, 2011

                           BRICCETTI, CALHOUN & LAWRENCE, LLP

By:      _____
                           Vincent L. Briccetti
                           81 Main Street, Suite 450
                           White Plains, NY 10601
                           (914) 946-5900

                           *ATTORNEYS FOR DEFENDANT*
                           *JAMES CROMITIE*

<div align="center">-18-</div>

cc:     AUSA David A. Raskin
        AUSA Jason P.W. Halperin
        AUSA Adam S. Hickey
        One St. Andrew's Plaza
        New York, NY 10007

        Theodore S. Green, Esq.
        Green & Willstatter
        200 Mamaroneck Avenue
        White Plains, NY 10601

        Susanne Brody, Esq.
        Mark Gombiner, Esq.
        Federal Defenders of New York
        52 Duane Street
        New York, NY 10007

        Samuel M. Braverman, Esq.
        901 Sheridan Avenue
        Bronx, NY 10451

EXHIBIT A

11/13/2009  16:35    2818074228          FBI_NEW_YORK_CART                    PAGE  81/85

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/13/2009

      On 11/13/2009, a CHS who is in a position to testify, provided the following information during a secure video telephonic conference. The purpose of this interview was to attempt to identify incidents when the CHS may have promised and/or provided meals, beverages, money, gifts or any items of value to James Cromitie, David Williams, Onta Williams, Laguerre Payen and/or their relatives.

      The interviewing agents discussed various incidents, meetings and conversations between the CHS and subjects including the following:

      During June 2008, CHS recalled purchasing a soft drink for Cromitie at a Newburgh convenience store.

      On approximately October 12, 2008, the CHS purchased breakfast for Cromitie at the Airmont Diner.

      On October 19, 2008, CHS purchased coffee from Dunkin Donuts for Cromitie.

      October 29, 2008, CHS purchased Chinese food for Cromitie.

      October 31, 2008, CHS purchased lunch for Cromitie at Danny's restaurant in Newburgh, New York. The cost of Cromitie's lunch was less that $10.00.

      The CHS advised that on a date after October 31, 2008 the CHS purchased a $20.00 Boost Mobile cell phone card for Cromitie's wife Kathleen at a Gulf gas station.

      On November 7, 2008, CHS purchased beverages for Cromitie and another male at Dunkin Donuts in Newburgh, New York.

      On November 12, 2008, CHS purchased food at Danny's Restaurant for Cromitie.

      On November 14, 2008, CHS purchased coffee from Dunkin Donuts for Cromitie.

      From November 28 to November 30, 2008, CHS and Cromitie visited Philadelphia, PA to attend the Muslim Alliance of North America (MANA) conference. The CHS paid $70.00 for Cromitie's admission to the conference and $70.00 for Cromitie to attend a

Investigation on    11/13/09    at  New York, New York          (telephonically)

File #

by  Detective John White
    SA Robert Fuller

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

000004300

3502-87


FD-302a (Rev. 10-6-95)



Continuation of FD-302 of _____ , On 11/13/09 , Page 2

Saturday night banquet. During the travel to Philadelphia, CHS
purchased a Starbucks coffee in New Jersey for Cromitie when the
two stopped to get gasoline for the vehicle. The CHS also bought
dinner for Cromitie and himself on the first night of the
conference. The total bill for dinner was approximately $28.00. The
CHS also advised he bought Cromitie a camouflaged bandana for $5.00
with the words "ALLAH AKBAR" written on it from a conference
vendor. The MANA registration fee included their meals during the
day. The CHS advised before they left Philadelphia, MANA provided a
large lunch which the two ate.

On December 5, 2008, the CHS purchased a meal for himself and
Cromitie at Danny's Restaurant in Newburgh, New York. The CHS also
bought coffee from Dunkin Donuts for Cromitie.

On February 23, 2009, the CHS advised that on this occasion,
and at least one other, it was Cromitie who paid for the CHS' meal
at Danny's restaurant. (However, the CHS advised that all other
meals and beverages described in previous reporting and recordings
was paid for by the CHS, except for one occasion when Cromitie
purchased a coffee for CHS.) The CHS advised he/she also gave
Cromitie an Islamic shirt he had bought in Dubai, United Arab
Emirates for $5.00.

On April 7, 2009, the CHS purchased a coffee from Dunkin
Donuts for Cromitie.

On April 10, 2009, the CHS bought lunch for himself, David
Williams and Cromitie at a Latin Restaurant in the Bronx. The total
bill was approximately $31.00 ( $10 per subject). The CHS advised
David Williams purchased items at a Sunoco station for David
Williams' girlfriend and these items were paid for by David
Williams.

On April 16, 2009, the CHS purchased lunch for himself and
Cromitie at a Newburgh Crown Fried Chicken. The cost was
approximately $11.00-$12.00 for the both of them. The CHS advised
there was a discussion with Cromitie about how JEM would provide
funds to facilitate their escape from the area after the attack.

On April 17, 2009, the CHS purchased a soft drink for
himself/herself at a Newburgh Gulf Station convenience store. CHS
did not buy anything for Cromitie.

On April 23, 2009, the CHS purchased food for Cromitie and
David Williams at Danny's Restaurant. The CHS paid approximately

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of _____ , On  11/13/09   , Page   3

$6.25 for each of them. Also, the CHS advised that on the same day, he/she may have given David Williams $20.00 in cash or purchased a $20.00 cell phone card for David Williams.

On April 28, 2009, the CHS advised the food purchased by the CHS that day was for Cromitie, David Williams, Onta Williams and Laguerre Payen, and it was purchased from Crown Fried Chicken for approximately $31.00 for all five people (or $6.25 each). Also, earlier in that meeting, coffee was purchased by the CHS at a Dunkin Donuts for Cromitie and David Williams. Investigators note: although the previous 302 describing this event indicated that "food was purchased" at "a restaurant on Route 32" it appears that this is not accurate.

On April 30, 2009, the CHS drove David Williams' mother to a hospital in Westchester to see her son. The CHS purchased soft drinks and one fish and fries meal for Cromitie and David Williams at a Crown Fried Chicken location in Brooklyn. This meal cost less that $10.00.

On May 1, 2009, The CHS purchased food for himself, Cromitie, David Williams, Onta Williams and Laguerre Payen at Danny's restaurant, each meal cost approximately $6.00-$7.00.

On May 6, 2009, food was purchased by the CHS for Cromitie, David Williams, Onta Williams and Laguerre Payen at Crown Fried Chicken (each meal cost approximately $6.00-$7.00). The CHS advised they stopped at a Starbucks location and purchased two bottles of water and a coffee for Cromitie, David Williams, Onta Williams and Laguerre Payen. The CHS gave $20.00 to David Williams on this date. The CHS also paid a cab fare ($8) for Onta Williams and Payen to take a cab from Lowes to Sears to try to throw off law enforcement surveillance.

On May 8, 2009, the CHS purchased food at Danny's Restaurant for Cromitie, David Williams, Onta Williams and Payen. After picking both up at 114 Lake Drive, Newburgh, New York.

On May 13, 2009, the CHS purchased water and coffee for Cromitie, David Williams, Onta Williams and Laguerre Payen at a coffee shop in Stamford, Connecticut.

On May 19, 2009 the CHS purchased food for Cromitie, David Williams, Onta Williams and Laguerre Payen at a TGI Fridays Restaurant. (Total expense for the food provided to all four defendants on this occasion was approximately $100.00.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On __11/13/09__ , Page __4__

On May 20, 2009, CHS advised that he/she purchased fast food from McDonald's for Cromitie, David Williams, Onta Williams and Laguerre Payen.

The CHS advised that, in addition to the above meals and expenses, on two occasions, the CHS paid for meals that Laguerre Payen and other(s) had eaten at Crown Fried Chicken. The first of these was for Payen and one other in early May 2009 and these two meals cost less that $10.00 total. The second time was later in May 2009, and was for Payen and two other people. The cost for these three meals was approximately $13.00.

The CHS advised there may have been another occasion, in May, 2009 when, as the CHS was dropping Payen off at his house, Payen asked the CHS to buy him chicken from Crown Fried Chicken. The CHS bought the meal, which cost approximately $6.25.

The CHS advised he/she drove David Williams to the Beacon train station and provided him with $60.00 for train fare and food, so that David Williams could travel to New York City.

The CHS advised on two occasions, the CHS provided money to Cromitie, $250.00 on one occasion and $200.00 on another, because Cromitie claimed he did not have enough money to pay the rent. These amounts were given as loans to Cromitie, but they were never repaid by Cromitie. Proof of the $200 payment was in the form of a Western Union money gram receipt.

The CHS advised, on one occasion, Cromitie's girlfriend, Kathleen, asked the CHS if he could get her a jacket/coat similar to one that he was wearing at the time. The CHS responded that he would try to do so. The CHS never provided a jacket/coat to Kathleen.

The CHS advised on one occasion, the CHS gave $20.00 to Cromitie's grandson.

Finally, during the weeks leading up to the May 20th terrorist operations, CHS and subjects had evolving discussions regarding what funds JEM would provide to the subjects to allow them to flee the area after the attacks, and live outside the New York metropolitan area until law enforcement attention subsided. The CHS advised that he/she informed that JEM would provide as much as $5,000 to each member to allow them to purchase airfare/bus

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On __11/13/09__ , Page __5__

     tickets, obtain lodging and food for what could be a prolonged
period of time.

000004304

# EXHIBIT B



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York  10601*

May 27, 2010

**BY ELECTRONIC MAIL**

Vincent Briccetti, Esq.
  vbriccetti@bricallaw.com
    *for defendant James Cromitie*

Theodore S. Green, Esq.
theosgreen@msn.com
    *for defendant David Williams*

Susanne Brody, Esq.
susanne_brody@fd.org

Mark Gombiner, Esq.
mark_gombiner@fd.org
    *for defendant Onta Williams*

Sam Braverman, Esq.
braverlaw@aol.com
    *for defendant Laguerre Payen*

Re:   <u>United States v. James Cromitie, et al.,</u>
      **09 Cr. 558 (CM)**

Dear Counsel:

By this letter, the Government provides additional discovery pursuant to *Brady* v.
*Maryland*, 373 U.S. 83 (1963).

Today we learned as part of witness preparation, and here disclose, that in or
about December 2008, Kathleen Baynes asked the CI whether James Cromitie and she could
have the black, 2000 BMW that the CI was driving, and the CI agreed.  Later in the investigation,
the CI told Cromitie (in a recorded call that the Government provided in discovery) that he would
get the BMW after the operation was completed.

All Defense Counsel
May 27, 2010
Page 2 of 2

Should you have any questions, please contact one of us.

Very truly yours,

PREET BHARARA
United States Attorney

By:

David Raskin
Jason P. W. Halperin
Adam S. Hickey
Assistant United States Attorneys
(212) 637-2635,  (914) 993-1933, (212) 637-1039