UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

UNITED STATES OF AMERICA,

     -against-

JAMES CROMITIE, DAVID WILLIAMS,
ONTA WILLIAMS and LAGUERRE PAYEN,

        Defendants.

—————————————————————— x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5/3/11

09 Cr. 558 (CM)

DECISION AND ORDER DENYING DEFENDANTS' POST-TRIAL MOTIONS

McMahon, J.:

     The defendants have filed a series of motions seeking to overturn the jury's verdict finding them guilty of *inter alia*, having conspired to destroy a Bronx synagogue and community center using what they believed to be improvised explosive devices (IEDs) and conspiring to destroy military aircraft at the New York Air National Guard Base at Stewart Airport in Newburgh with what (they thought) was a surface-to-air missile.

     All defendants move, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, for reversal of the jury's rejection of their entrapment defense. See Post-Trial Motion for Judgment of Acquittal, filed by defendant David Williams and joined in by all defendants. ("Rule 29 Mot.").

     All defendants move for a new trial based on the Government's alleged "failure to investigate and correct perjury of its main witness." See Defendants' Motion for New Trial in the Interests of Justice Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, filed by Onta Williams and joined in by all defendants ("Rule 33 Mot.").

All defendants move for a new trial based on the jury's exposure to extra-record material and the return of the verdict by an 11-member jury, also filed by Onta Williams and joined in by all defendants. ("Jury Motion").

A fourth motion, to dismiss the indictment for outrageous government misconduct, is the subject of a separate opinion.[1]

The Court has considered each motion as to each defendant individually.

All motions are denied as to all defendants.

I.       Defendants' Motion for a Judgment of Acquittal

Rule 29(c)(2) states, "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed.R.Crim.P. 29(c)(2).

A Rule 29 motion should be granted only if the district court concludes there is "no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. Taylor, 464 F.2d 240, 243 (2d Cir.1972). To succeed on a Rule 29 motion, a defendant carries a heavy burden; he must show that when viewing the evidence in its totality, in a light most favorable to the government, and drawing all inferences in favor of the prosecution, no rational trier of fact could have found him guilty. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); United States v. Gaines, 295 F.3d 293, 299-300 (2d Cir.2002) (emphasis added).

In assessing the evidence in a given case, a reviewing court asks "not whether [it] believes that the evidence at trial established guilt beyond a reasonable doubt," United States v. Brown, 937 F.2d 32, 35 (2d Cir. 1991 ), but whether "'*any* rational trier of fact

---

[1] The court drafted a separate opinion for the outrageous Government misconduct motion to avoid having two different sets of facts – one set viewed most favorably to the Government, and another (slightly different) set representing findings by the court – in a single opinion. In this opinion, the evidence is viewed most favorably to the Government.

could have found the essential elements of the crime beyond a reasonable doubt.'"
United States v. Autuori, 212 F.3d 105, 114 (2d Cir.2000) (quoting Jackson, 443 U.S. at
319) (Emphasis added). "In other words, the court may enter a judgment of acquittal
only if the evidence that the defendant committed the crime alleged is 'nonexistent or so
meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United
States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (citation omitted).

The Government's case need not exclude every possible hypothesis of innocence.
United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir.1995). Thus, where "either of the
two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must
let the jury decide the matter." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir.
2004) (citing United States v. Autuori, 212 F.3d 105, 114 (2d Cir.2000) (internal
quotation marks omitted).

The contours of this case are well known to all. In June 2008, defendant James
Cromitie, a sometime petty drug dealer and grifter from the impoverished community of
Newburgh, New York, encountered a well-to-do Pakistani named Shaheed Hussain at the
Masjid al-Ikhlas Mosque, a congregation affiliated with Louis Farrakhan's Nation of
Islam movement. Over the course of eight months, Cromitie and Hussain discussed the
possibility of, as Cromitie put it, "do[ing] something to America" in the name of Islam.
Their discussions (most but not all of which were either audio or videotaped) are full of
hate-filled rants against Jews and the United States military. Over the course of those
months they began to talk about mounting a possible attack on a synagogue in New York
City and on planes stationed at Stewart Air Force Base in Orange County. Funding for

3

such a "mission" was to be provided by a terrorist organization known as Jaish-el-Muhammed (JEM), with which Hussain claimed to be affiliated.

Hussain was actually an ex-con with his own shady past and a pronounced history of lying for his personal benefit. He was working with the FBI as a confidential informant, and his real "mission" was to locate disaffected Muslims who might be harboring terrorist designs on the United States. At first blush, Cromitie appeared to be such a person; he claimed to have family ties in Afghanistan and to have traveled there on multiple occasions. He also claimed to have committed violent acts in his past. So the FBI opened an investigation into his behavior: "James Cromitie; aka Abdul Rehman; IT-Sunni Extremists.

Cromitie certainly talked the talk of a terrorist during the long courtship between him and Hussain; the the tapes are replete with some of the most hateful, bigoted and ignorant statements to which this court has ever been exposed. But he was reluctant to walk the walk. Hussain's efforts to get Cromitie to make plans for a terrorist attack – to recruit a "sutra team," select targets and invent details – were unavailing, even after his suggestion that Cromitie would be rewarded in the afterlife were enhanced by promises of earthly treasure. At various point between November 2008 and February 2009, Hussain offered Cromitie *inter alia* a BMW (Tr. 893-94, 988), and as much as $250,000 (GX 115; Defense Clips 357, 358, 395; Tr. 1756-60) to organize a jihadist venture. But while Cromitie, who was desperately poor, accepted meals and rent money from Hussain, he repeatedly backed away from his violent statements when it came time to act on them. No sooner did he appear to commit to participate in Hussain's scheme -- saying, "Hak, you got me," on February 23 2009, and accompanying Hussain on a "reconnaissance

4

mission" the next day – than he dropped out of sight for six weeks, claiming (falsely) to be in North Carolina and refusing to take Hussain's repeated calls.

By this time, the FBI knew that Cromitie's boasts about his connections to Afghanistan and his ostensibly violent criminal past were empty. As his refusal to have anything to do with Hussain continued week after week, the authorities were on the verge of shelving what had turned out to be an unproductive investigation.

It was Cromitie himself who reopened the matter. He lost his job shelving stock at WalMart and was not successful in regaining it. His financial situation was dire; he even sold the camera Hussain bought so Cromitie could take "reconnaissance" photos for the mission. Knowing full well what Hussain and he had been discussing for those many months, Cromitie re-initiated contact on April 5, 2009; he told Hussain that he was broke and needed to make some money. Within five days, he had met with Hussain, committed (or recommitted) to the "mission," and recruited a new participant for the venture – David Williams. By the end of April, Onta Williams and Laguerre Payen were on board as well.

Things came together quickly after that. The FBI created phony improvised explosive devices (IEDs), and even a fake Stinger missile, which were placed in an empty warehouse just across the New York State line in Danbury, Connecticut.   Hussain chauffered the four defendants through the whole operation. He drove them everywhere - to "inspect" the ordnance at the Connecticut warehouse (thereby federalizing their criminal activity), to purchase illegal handguns, to surveil the chosen targets, to "training" exercises where the four were schooled in how to arm and plant IEDs and shoot Stinger missiles.

Finally, on May 9, 2009, Hussain drove the four men from Newburgh to Riverdale in the Bronx. There, Onta Williams and Payen served as lookouts while Cromitie and David Williams planted what they thought were lethal improvised explosive devices at the Riverdale Temple and the Riverdale Jewish Center. The "bombs" (which Hussain had "armed" on the trip south, because Cromitie, despite his "training," could not figure out how to do it) were fake, but the sting was real: The four men were immediately arrested.

There is absolutely no doubt that the defendants committed the charged crimes. The entire episode was monitored and filmed by law enforcement agents. Video of Cromitie and David Williams leaving their "bombs" outside the synagogue was featured on every network and cable news broadcast for days thereafter. All facts pertinent to conviction were uncontested, except one – whether the defendants were predisposed, before they encountered Hussain, to commit the heinous acts they were obviously prepared to carry out.

Defendants' Rule 29 motion, reduced to its essence, challenges the jury's conclusion that defendants were not entrapped into committing the crimes of conviction.

"A defendant is predisposed to commit a crime if he is 'ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity' to do so." United States v. Al-Moayad, 545 F.3d 139, 154 (2d Cir. 2008) (quoting United States v. Salerno, 66 F.3d 544, 547 (2d Cir.1995), quoting United States v. Harvey, 991 F.2d 981, 992 (2d Cir.1993)). The Government may show that a defendant was predisposed to commit the crime charged by demonstrating (1) an existing course of criminal conduct similar to the crime for which he is charged, (2) an already formed

6

design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement. United States v. Al-Moayad, *supra.*, 545 at 154. Predisposition does not require specific prior contemplation of criminal conduct by the defendant; it is sufficient "if the defendant is of a frame of mind such that once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion." United Sates v. Williams, 705 F. 2d 603, 618 (2d Cir. 1983). The jury "need not find that the defendant consciously considered committing the crime before the opportunity arose, or that he was predisposed to accept the opportunity presented to him, i.e., of a frame of mind that made him 'ready and willing' to commit the crime, even on the first occasion that he may have considered it." United States v. Myers, 692 F. 2d 823, 849 (2d Cir. 1982).

I turn first to the evidence against defendant James Cromitie, then to the case against the other three defendants.

A. *James Cromitie*

Cromitie's first encounter with Hussain was on June 13, 2008. Viewing the evidence most favorably to the Government, Cromitie approached Hussain at the mosque and struck up a conversation with the newcomer. Cromitie introduced himself as Abdul Rahman from Afganistan. (Tr. 678). During this half hour conversation, Cromtie made statements that the CI found alarming. Cromitie told Hussain that he would love to travel to Afghanistan and "die like a shahid, a martyr." Cromitie also confided to his new friend that, "I want to do something to America." (Tr. 681-82).

7

Hussain reported to his FBI handlers after this meeting. He was told to reconnect with Cromitie and try to tease more information out of him. The two men met on three additional occasions (June 23, July 3, and August 20) before the FBI formally opened an investigation into Cromitie.   According to Hussain, Cromitie reinforced his jihadist inclinations dudring those meetings. Indeed, on June 23, Cromitie announced his hatred for Jews, American and American soldiers, and expressed his desire to "kill [] President [Bush] 700 times because he's an antichrist, if Allah dosen't kill him, one of my brothers will." (Tr. 686). At their meeting on July 3, Hussain told Cromitie that he (Hussain) was a member of a terrorist group known as Jaish e Muhammed (JeM); Cromitie claimed to want to join JeM and to die a martyr.

Not everything that Hussain now claims Cromitie said was contemporaneously reported to the FBI. For example, debriefing notes kept by Special Agent Robert Fuller reveal that Hussain did not tell his handlers that Cromitie made anti-Semitic comments on June 23. But while this omission (and many, many other bits of evidence) cast doubt on Hussain's veracity, the view of the evidence most favorable to the Government shows that it was Cromitie, not Hussain, who first broached the idea of "doing something to America."

Cromitie himself confirmed this view of the evidence. Indeed, the jury heard Cromitie all but admit that he was predisposed to committing the charge crimes. During a November 2009 trip to a Muslim conference in Philadelphia, Cromitie disclaimed having been pressured into agreeing to commit jihad, "So you already knew I was like that. It wasn't you who was talking to me . . . when we first met in the parking lot, I talked to you about it." (GX 109-E3-T, at 16). Cromitie even told Hussain that he had wanted to

8

conduct a terrorist attack "since I was 7" (GX 109-E3-T), and said that he had considered bridges between New York and New Jersey, and even the White House, as potential targets. Subsequently, on February 23, 2009, Cromitie told Hussain: "When on the day of judgment Allah wanna say, 'Ah, yes Maqsood, you enticed Abdul Rahman (Cromitie) to do that.' No! I would be the truth on that day: No! [Allah] gave me my own will. You gave me my own mind setting, Allah. I did that on my own." (GX 114-E3-T). (Emphasis added).

It is true that quite a bit of what Cromitie told Hussain turned out to be false or exaggerated. It is also true that, on May 1, 2009, Cromitie gave his co-defendants a somewhat different account of who had originated the idea of doing jihad.[2] But the statements quoted above, viewed most favorably to the Government, are consistent with a finding of predisposition, and the jurors were entitled to credit them, rather than Cromitie's last-second suggestion that the idea for "doing something to America" did not emanate from him.

The evidence just summarized is more than sufficient to establish Cromitie's predisposition beyond a reasonable doubt. A reasonable trier of fact could have concluded, based only on Hussain's testimony and Cromitie's admissions, that he had long harbored a desire to commit terrorist acts, and so was predisposed to participate when offered the opportunity to do so.

But Cromitie made numerous other statements that corroborated this evidence. In an early recorded meeting with Hussain, he expanded on this theme:

---

[2] "Hussain said, . . . when he met me ten months ago, he said, 'Hak, I got a plan. You gonna make some money out of it.' And then he said, 'But that's not what I want you to do. I don't want you to do it for the plan.' He wants to go to heaven with Allah on his tongue." So do I. So that's why he said , don't just do it for the money. But do it, also say, in the name of Allah." (GX 123-E3-T).

9

> If the Muslims attack the World Trade Center or the Pentagon, all these planes
> and everything, . . . if the Muslims want the United States down, believe me, we
> can do it. With regular Muslims here, all somebody has to do is give a good
> *fatwa* to the brothers and let, make sure they understand. You, they taking down
> our Islamic countries. What do we do to make that stop? So, we start taking
> something down here. You understand what I'm saying?

(GX 102-E3-T, at 2-3.)  What Cromitie is saying is clear enough:  he is an aggrieved

American Muslim who is ready and willing to seek redress against America through acts

of terrorism.

The jurors listened to hours of tapes replete with Cromitie's genuinely frightening

rants about Jews (see e.g. "The Jewish guy.  Look at the Jewish guy.  You're not smiling

no more, you fucker.  I hate those bastards.  I, no disrespect, but I ain't never thought I

can hate someone.  I hate those motherfuckers.  Those fucking Jewish bastards. . . . GX

109-E4-T).  He expressed a desire to participate personally in an attack on a synagogue –

especially if people were inside – and he did so in terms that indicated a particular desire

to "bother" Jews:

> I ain't gonna lie, Hak.  I think I'd like to do the synagogue thing by myself, Hak. .
> . . Yeah, I'm serious.  I'd like to do that by myself, Hak.  (CI: What do you think
> about the military planes?)  I don't give a damn who do that.  I want to do the
> synagogue.  I have a choice to do what I want, Hak.  I'm sorry, brother.  I don't
> care, Hak.  That synagogue would fuck a lot of shit up.

(GX 113-E5-T.),

> I don't care if it's a whole synagogue of men.

(GX 116-E1-T)

> You think the World Trade Center was something?  That was nothing. . . .  When
> you hit those spots like synagogues  . . . that bothers them.

(GX 116-E2-T).  Cromitie also expressed enthusiasm for mounting an attack on Stewart

Air Force base:

10

How far does a rocket launcher hit? . . . Oh, you can set it to 300 yards. Let me see something, 300 yards, Hak? We should be able to get away with that, Hak. That's more than enough time to do anything. You feel me on what I'm saying? . . But you just don't wanna hit the building, you wanna hit where the main gas or something is out where, where we get a big pow. We get a big pow from SAM, and we get a big pow from the gas there too. That's how you want to do it.

(GX 111-E4-T).

I want to see that place. Hak, let me ask you something, Okay? If we could just hit those planes that's sitting there, right? And we could just hit those, right? The ones that's sitting there. It ain't gotta be one up there. It could be one sitting right there . . . (CI: "on the ground"). Yeah. Wow, that'd be some real, that'd be some real . . . (CI: "firework"). Yeah that'll be a real firework. I'm laughing because I really wanna get away with it. . . . You hear that'll be something special right there. That'll be something serious. . . . You could fucking watch it on the news, the fireworks that went up at the airport.

(GX 114-E5-T).

Imagine we hit all the planes in one spot? . . . And then one will blow up, the other one blow, and then they'll all blow because they close to each other and they all got gasoline. And we don't even have to be nowhere in sight. We can be some good distance, and I'll let it go. That's it. And we gotta run like hell. We just move nice and easy, right? . . . And we can blend right in, fade and blend. Blend right in. That's the main thing. To blend in.

GX 115-E2-T).

Cromitie even volunteered an explanation for why he would participate in an attack on the Air Force planes:

They bringing 'em [troops] over there [Afghanistan] to do damage to us. So, if they don't have the planes to carry 'em over there, you can't do too much damage.

(GX 115-E3-T).

Cromitie argues that these damning statements (all of which were made before February 24, 2009, when he cut off contact with Hussain for six weeks), could not possibly have convinced a reasonable trier of fact that he was predisposed beyond a reasonable doubt, because they were just that – mere statements, idle talk. Cromitie

11

argues that he repeatedly refused to follow through on what he was saying, and that refused to do anything other than talk about jihad for many, many months. Despite Hussain's prodding, Cromitie failed to introduce Hussain to any "like-minded brothers" who would participate in a "sutra team." He declined to provide any guns, pick any targets, decide what equipment would be needed, come up with any code words, or make any concrete plans. Cromitie expressed reluctance to get involved personally in any attack: He did not want to go to Afghanistan (GX 102-E3) and he was evasive when asked by Hussain if he would "go to jihad." (GX 103-E1). At the same time he was making the chilling statements quoted above, he also said, "Maybe it's not my mission then. Maybe my mission hasn't come yet." (GX 112-E3-T). When he could not produce additional participants, Cromitie's inclination was not to go forward alone, but rather to "call it off." (GX 112-E4-T). Although one might think that a mosque was a good place to look for "like-minded brothers" (if any existed), Cromitie flat out refused to solicit other mosque members to participate. (see e.g. "…..I'm not, I'm not gonna involve nobody else. . . . Don't ever ask me to ask the brothers in the mosque to do anything.") (GX 114-E2-T).

Eventually, Cromitie himself dropped out of sight. He avoided any contact with Hussain from February 25 to April 5, 2009. Cromitie argues that this in and of itself was powerful evidence of the fact that he was not in fact predisposed to commit terrorist acts. Defendant's hesitancy about actually doing what he so freely talked about doing is apparent: On the tape of their April 7 meeting, Hussain can be heard literally badgering Cromitie to re-involve himself in a mission, complaining that Cromitie's disappearance had put his (Hussain's) life at risk. (GX 116-E1; Tr. 1825-33)

12

From the totality of the evidence about his actions, rather than his statements, Cromitie argues that there is insufficient evidence for the jury to conclude that he was predisposed to commit the crimes charged.

Actions do indeed speak louder than words, and Cromitie's vacillation is certainly amenable to the interpretation that the defense puts on it. But as the Government argued to the jury, it is also open to another plausible interpretation: that Cromitie's well-developed sense of self-preservation caused him to get nervous and back away when confronted by (1) the enormity of what he was talking about doing and (2) the prospect of getting caught (something about which Cromitie expressed concern on more than one occasion). United States v. Salerno, 66 F.3d 544, 548 (2d Cir. 1995). The jury obviously found the Government's view of the evidence more persuasive than Cromitie's. On a Rule 29 motion a court must defer to that finding as long as there is some evidence to support it. There is.

Cromitie also argues that no reasonable trier of fact could find him predisposed beyond a reasonable doubt because his response to Hussain's overtures was not sufficiently "ready." While Cromitie admits that he repeatedly responded to Hussain's overtures with verbal enthusiasm, he argues that his unequivocal agreement to participate in terrorists acts was anything but prompt. Cromitie points to the passage of many months – eight – between his first contact with Hussain and April 7, 2009, the date on which he was beyond peradventure prepared to go forward with the "mission."

Cromitie also notes, correctly, that he did absolutely nothing to violate the law until after the Government (through Hussain) had made repeated offers of material (as opposed to spiritual) rewards to a desperately poor man – and that even those offers took

13

considerable time to bear fruit. Hussain began inveigling Cromitie with material

incentives to participate in a "mission" as early as December 10 or 17, 2009 (Hussain

could not remember for sure which of those two dates), when he promised to give

Cromitie his BMW -- but only after he had completed the mission. (Tr. 893-94).

Hussain let it be known that there was significant money on the table for Cromitie and

prospective recruits who participated in the mission. (Tr. 816, 1708-09). Especially

after returning from a trip to Pakistan – a trip he told Cromitie he took for the purpose of

meeting with Jaish-e-Muhammed and obtaining funding for their "mission" – Hussain

upped the material ante, offering Cromitie a post-attack getaway trip to Miami, Puerto

Rico or Costa Rica (GX 118-E2-T, at 4), a barbershop of his own (Tr. 1857; GX 118-E1-

T), and what must have seemed to a poor man as a great deal of money -- $250,000. (GX

239-T, Tr. 1036, 2507, 2513-14).[3]  Only when the offers became outrageously high – and

when Cromitie was particularly vulnerable to them, because he had lost his job – did he

finally succumb. This, defendant argues, does not a qualify as a "ready" response to

inducement.

Cromitie's argument that his response was insufficiently "ready" depends for its

force on defendant's assertion that the idea for committing jihad emanated from Hussain.

However, as described above, when the evidence is viewed most favorably to the

Government, the idea for committing jihad was Cromitie's, not Hussain's. Under this

view of the evidence, Cromitie was not "responding" at all – he was expressing "an

already-formed design on the part of the accused to commit the charged crime," which

[3]  During the April 5, 2009, telephone call that reunited the two men after the six week hiatus, Hussain reminded Cromitie that he had previously promised to pay Cromitie $250,000 if Cromitie would participate in the plot. Hussain did not know that this call was being recorded (GX 239-T), which makes his statement to Cromitie more credible. The evidence revealed that the Government neither knew of nor authorized an offer of this magnitude to Cromitie, but as far as predisposition goes, that is of no moment.

has been identified by the Second Circuit as one way for the Government to establish predisposition.   Al-Moayad, *supra*., 545 at 154.   Cromitie's statements about his longstanding desire to commit jihad – which the jury heard from his own mouth (via the tapes), as well as from the mouth of Hussain – provide enough evidence of his already-formed design to justify the jury's verdict.

Finally, Cromitie argues that his lack of predisposition can be inferred from the fact that every single detail of the crimes – the targets, the methods, the weapons, the transportation – came from  the Government, not from him.

There is not the slightest doubt in my mind that James Cromitie could never have dreamed up the scenario in which he actually became involved. And if by some chance Cromitie had imagined such a scenario, he would not have had the slightest idea how to make it happen.

But the Government does not have to prove beyond a reasonable doubt that Cromitie was predisposed to place a particular type of device at a particular location. "It is sufficient if the defendant is of a frame of mind such that once his attention is called to [a particular] criminal opportunity, his decision to commit the [particular] crime is the product of his own preference and not the product of government persuasion." United States v. Williams, 705 F.2d. 603, 618 (2d Cir. 1983). The fact that the precise targets of the jihadist attacks, as well as the method for carrying them out, were suggested by Hussain (which means that they were, ultimately, the FBI's idea) does not negate the Government's proof of Cromitie's predisposition – especially when his *immediate* response to Hussain's ideas was the expression of tremendous enthusiasm. The fact that Cromitie did not actually do anything until he thought he was going to make a lot of

money – a point that does not exactly cut in his favor – does not negate the force of the Government's evidence, either.

So while Cromitie never expressed the desire to perform the specific acts he ended up either performing (planting a bomb at a synagogue) or agreeing to perform (shooting a Stinger missile at U.S. Air Force planes), that is of no moment. To prevail at trial, the Government only had to prove beyond a reasonable doubt that Cromitie was predisposed to commit violent terroristic acts against Jews and American government facilities that were involved in wars in countries where Islam is the predominant religion. This it did, by letting the jurors hear Cromitie's bragadosio. His own mouth condemneth him.

Cromitie's Rule 29 motion is denied.

*B. The Other Three Defendants*

The other three defendants present an entirely different set of issues – and David Williams' situation differs in subtle but potentially significant ways from that of Onta Williams and Laguerre Payen.

The issue common to all three men is the conspicuous lack of *any* evidence about their thoughts on jihad or terrorism prior to the time when they were recruited to join the plot. There are no tapes on which they boast of a long-standing desire to perform jihad; no months of hate-filled statements about America or Jews; no evidence from Hussain about attitudes displayed during early encounters. In fact, Hussain never met any of these men until after they had been recruited. So while he was their principal accuser, he told the jury nothing about how they came to participate in the plot. The jury was also not apprised of anything in the past of any of these men that would tend to suggest a pre-

16

existing interest in committing a terrorist act against Jews, the United States Air Force -- or, for that matter, against anyone else. There is no evidence in the record about whether any of these three men ever thought about committing jihad, or expressed any hatred toward Jews or the United States, until they were recruited to participate in Hussain's and Cromitie's plot. There is no evidence in the record about when these were first contacted, how they responded to that initial contact, what they were told about the "mission," how long it took to persuade them to participate, and what if any inducements were offered to induce them to come to their first meeting with Hussain. For that matter, as to Onta Williams and Payen, there is no evidence about who first offered them the opportunity to participate in the plot – other than evidence showing that one of them (known only as "the other Muslim brother", (GX 255-T)) was recruited by David Williams.

The defendants rest on what the Government concedes is the "black hole" in its evidence – the lack of any direct evidence about how the defendants responded when they were first approached about participating in the plot. They argue that the Government offered no admissible evidence about their predisposition to commit the crimes charged, aside from the fact that they actually committed them -- which cannot be relied on as evidence of predisposition. No one disputes that "ready response to inducement" is the only one of the three Al-Moayad factors that could establish predisposition in the case of David and Onta Williams and Payen, and these defendants urge that the evidence was insufficient for they jurors to conclude beyond a reasonable doubt that they "readily responded" to the Government's inducement to commit the charged crimes -- because there is no evidence at all about how "readily" they said yes to the opportunity that was presented to them.

17

The Government argues that the record nonetheless contains ample evidence to support the jury's conclusion, citing both (1) the relatively brief period that passed between their initial encounters with Cromitie[4] and their agreement to participate, and (2) the defendants' conspicuous lack of any reluctance or hesitation about committing the charged crimes once they had been recruited, and the enthusiasm with which they carried out their parts in the plot.

The defendants reply that the evidentiary "black hole" means there is no proof, let alone proof beyond a reasonable doubt, that the period between their initial encounter with a Government agent and their entry into the conspiracy was in fact brief. They also urge that the jury should have been precluded from considering evidence of their post-recruitment conduct (including evidence about how enthusiastically they participated in the plot) by the United States Supreme Court's decision in United States v. Jacobson, 593 U.S. 540, 548 (1992).

Because the defendants' second argument controls whether certain evidence on which the Government relies can be considered in assessing the sufficiency of the evidence, I address it first.

### (1) Jacobson and the Relevance of Post-Initial Encounter Evidence

In Jacobson, the Supreme Court announced that, under the entrapment doctrine, "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." The Jacobson Court vacated the defendant's conviction for possession of child pornography. The defendant had mail-ordered

---

[4]   There is evidence in the record that either Payen or Onta Williams was first recruited by David Williams. (GX 255-T).

18

magazines depicting nude children at a time when it was not illegal to do so. Following enactment of the federal law that criminalized the receipt of such items by mail, the Government began soliciting the defendant to violate that law. After more than two years of repeated government badgering, which involved the use of "five fictitious organizations and a bogus pen pal," Id. at 543, the defendant finally ordered a magazine entitled "Boys Who Love Boys," which contained child pornography, for delivery by mail. He was indicted under the new statute and convicted, despite having argued that he was entrapped into committing the crime.

The Supreme Court held that the Government had failed to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime before he was subjected to what the court described as "relentless pressure" over a prolonged period of time. The court held that the Government needed to prove that the defendant was predisposed to commit a crime "before the Government intervened." Because the record in Jacobson contained no evidence that the defendant had any pre-existing desire to violate the new law by ordering child pornography through the mail, his conviction was overturned.

Relying on Jacobson, the two Williamses and Payen argue that there was insufficient evidence for a jury to find them predisposed to commit the charged crimes beyond a reasonable doubt. They point out (and it is indubitably true) that there is even less evidence about either their conduct or their state of mind pre-dating their initial contacts with Cromitie and Hussain than was the case in Jacobson -- there, the defendant had at least demonstrated a pre-existing interest in looking at child pornography, and had ordered it for delivery by mail when it was legal for him to do so.

19

Some post-Jacobson courts have held that conduct that occurs after the time of the inducement can be considered as some evidence of predisposition. United States v. Nguyen, 413 F. 3d 1170, 1178 (10th Cir. 2005); United States v. Squillacote, 221 F. 3d 542, 565 (4th Cir. 2000); United States v. Garza-Juarez, 992 F. 2d 896, 908 (9th Cir. 1993).

For example, in Nguyen the defendant, who was accused of distributing pseudophedrine knowing that it would be used to manufacture methamphetamine, argued that he was entrapped. The Tenth Circuit held (without reference to Jacobson in this context) that "inferences about [defendant's] predisposition may be drawn from events occurring after the two parties came into contact." Nguyen, 413 F. 3d at1178. For this proposition, it cited an earlier, pre-Jacobson Tenth Circuit case, United States v. Garcia, 182 F. 3d 1165, 1169 (10 Cir. 1999).

In Garza-Juarez – a case handed down only months after Jacobson, -- the Ninth Circuit held, "Evidence of predisposition may arise both before the government's initial contact and during the course of dealings." Garza-Juarez, 992 F. 2d at 908. The court applied a five-factor test for determining whether the defendants were entrapped – a test that is not and never has been the law in this Circuit,

Seven years later, the Fourth Circuit relied on both Garza-Juarez and the pre-Jacobson cases that undergirded Nguyen (notably Garcia) to conclude that Jacobson "does not prohibit the consideration of actions occurring after the defendant was contacted by the government when determining whether the defendant was predisposed to commit the crime." Squillacote, 221 F. 3d at 565. Specifically, the Squillacote court held that the Government could show predisposition by offering evidence of

20

"independently motivated behavior that occurs after government solicitation begins" Id.
at 566. I understand the Fourth Circuit to have endorsed using evidence of post-
solicitation behavior to prove predisposition as long as that evidence could be wholly
divorced from any Government sting operation.[5]

Assuming that these cases do not conflict with Jacobson, it is significant that they
all come from other circuits. In their post-trial motions, the defendants argue that no
*controlling* authority reaches the same result. Quite the contrary, they say: in the Second
Circuit's most recent pronouncement on the subject, United States v. Brand, 467 F. 3d
179 (2d Cir. 2006), Judge Wesley, writing for a unanimous panel, suggested that our
Circuit reads Jacobson more restrictively: "Because we are bound by the Court's holding
in Jacobson, Brand is correct in pointing out that the government's reliance on certain
evidence of acts that occurred *after* Brand's initial contact with government agents is
misplaced. This evidence would not be probative of 'petitioner's state of mind prior to the
commencement of the Government's investigation.'" Id at 191, *quoting* Jacobson, supra,
503 U.S. at 549 n.2. (Emphasis in original). In light of this language, defendants insist
that the jury was not entitled to consider evidence of their conduct that post-dated their
initial meeting with the Government's (unwitting) agents (Cromitie and David Williams)
– the date or dates of which were not firmly established by any evidence.

The facts of Brand are very different than the facts in this case. Matthew Brand
was charged with attempting to entice a minor to commit illegal sexual activity and
traveling across state lines for the purpose of engaging in illegal sexual activity with a
minor. Unbeknownst to him, "Jessica," the teenaged girl he planned to meet at the Port
Authority Bus Terminal, was an adult male FBI agent who had chatted with Brand over

---

[5] Squillacote's discussion of the meaning of "ready response" will be taken up later in this opinion.

21

the Internet, in a chat room called "I Love Older Men."  Brand contended that he, like Jacobson, had been entrapped.

In Brand, there was ample evidence of conduct suggesting that the defendant might have been predisposed to travel across state lines to meet a minor before he encountered "Jessica" and the Government agents who initiated the operation that led to his arrest. Before wandering into the sting that led to his indictment, Brand had visited a different chat room, called "I Love Much Older Men," where he had engaged in a sexually explicit chat with an FBI agent in Los Angeles. (Significantly, the Los Angeles agent was not responsible for tipping off the FBI in New York – "Sara," a private citizen who apparently trolls chat rooms looking for child predators, told the FBI about a chat she had with Brand; thereafter, "Sara" introduced Brand on line to her friend "Jessica" ). Brand had also downloaded photographic child pornography onto his computer prior to his first encounter with "Jessica," which the Circuit ruled was admissible to prove predisposition – as was his confession, in which he admitted to having used a screen name to engage in explicit communications with young girls for some time.  Finally, the very fact that Brand, of his own volition and without any prior inducement or enticement, contacted both "Sara" and "Julie" by going to a chat room called "I Love Older Men" – "bears on Brand's predisposition." Brand, *supra.*, 467 F. 3d at195.

As Judge Wesley pointed out, "All of these events occurred prior to, and were independent of, any contact by the government agents, as required under Jacobson. Based on these circumstances, the jury could rationally find that Brand was predisposed to commit the crimes charged." Id. The Circuit needed nothing more than this ample

22

evidence of the defendant's state of mind prior to his initial encounter with Government operatives to sustain the conviction.

There is not a scintilla of evidence against David or Onta Williams or Laguerre Payen in the record before this court that corresponds to the pre-initial encounter evidence of Matthew Brand's state of mind that I have just summarized. Pretty much the only evidence of their state of mind prior to an approach by a Government agent is the fact that they participated in the criminal activity itself. The Government's effort to distinguish between "participation" and "enthusiastic participation" – and to argue that the latter can be relied on to demonstrate the defendants' state of mind prior to any contact with a Government agent, even while conceding that the former does not – strikes this court as sophistry. The Brand panel read Jacobson as "*reject[ing]* any evidence that the government developed 'during the course of the investigation.'" (Emphasis added). Enthusiastic or not, the defendants' participation in the criminal activity that took place from and after mid-April 2009 occurred entirely after they first encountered a Government agent.

The Brand court also read Jacobson as refusing to convict the defendant based on a state of mind that was "the product of the attention that the Government had directed at petitioner." Brand, *supra.*, 467 F. 3d at 192, *citing* Jacobson, *supra.*, 503 U.S. at 550. The Fourth Circuit's decision in Squillacote is entirely consistent with this. As noted previously, the Squillacote court insisted that the only post-encounter conduct that could be considered was "independently motivated behavior that occurs after the government solicitation begins." Squillacote, *supra.* 221 F. 3d at 566. Whether enthusiastically or not, from the moment they appeared on the scene (April 10 for David Williams, April 28

23

for the other two), *everything* that these three defendants did was at the behest of the Government; as a result, it was "the product of the attention that the Government . . . directed" at them. Id. The Government has not pointed to anything that David Williams, Onta Williams or Laguerre Payen did or said that could possibly be characterized as "independent of" the sting operation. Even the most Government-friendly view of the evidence reveals that nothing any of these men did was the product of any independent motivation on their parts – and the Government, to its credit, has not argued the contrary.

But while Brand would have been a straightforward case if the Second Circuit had limited its discussion to the evidence summarized above, it is in fact a very complicated decision. No sooner had the Circuit announced that the government could *not* rely on "certain evidence of acts that occurred after Brand's initial contact with government agents" to establish "Brand's state of mind 'prior to the commencement of the Government's investigation'" than it said the following: "However, even under Jacobson, the Government can still establish predisposition based on "'the accused's ready response to the inducement.' . . . We have recognized this characteristic of predisposition both before and after Jacobson." *See* Brand, *supra.*, at 192, *quoting* United States v. Brunshtein, 344 F. 3d 91, 102 (2d Cir. 2003).

The Brand panel then went on to cite evidence of conduct that occurred well after Brand's initial contact with the Government agent – conduct that was manifestly *not* "independent of" the Government's sting operation -- as proof that Brand had "readily responded" to the Government's solicitation. That evidence included the fact that Brand "planned the logistics of meeting with 'Julie' and, ultimately, traveled to meet 'Julie' at the appointed time and place." Brand, *supra.*, at 195.

24

Because of this discussion - which consumes all of one paragraph in a thirty page decision -- the Government argues that evidence of conduct that occurred after the three defendants' initial contact with Cromitie can be relied on to prove that they "readily responded" to Cromitie's solicitation.

I have struggled to reconcile Jacobson and Brand. It appears that the Second Circuit believed Jacobson not to apply to predisposition as proved by "ready response to inducement." But nothing in Jacobson suggests that the rule announced therein applies only in some, not all, cases where entrapment is the defense and the Government must prove predisposition beyond a reasonable doubt. Certainly, the Supreme Court did not say anything like, "The Government can only prove predisposition with evidence that was not developed during the course of the investigation, or that consists of act that occurred after the defendant's initial contact with Government agents – except when it is proving predisposition by the 'ready response to inducement' method, in which case it can use such evidence."

Furthermore, any suggestion that proving "ready response" is somehow different than proving "the defendant's state of mind prior to his first encounter with the Government agent" suffers from a logical flaw. *Pre*disposition means precisely that – the defendant's state of mind *before* (prior to, "pre") he was inveigled to commit a crime. I always thought that the readiness of a defendant's response constituted evidence of predisposition only because it shed light (albeit circumstantially) on the defendant's state of mind prior to the Government's solicitation.

Finally, it is difficult to base so momentous a decision in this case on a single paragraph in Brand that is arguably dictum. The paragraph on which the Government

25

relies so heavily was hardly necessary to the panel's decision, for at least two reasons. The Brand court had already concluded that there was enough evidence about the defendant's state of mind prior to his first encounters with "Sara" and "Jessica to justify the jury's verdict in a manner consistent with Jacobson and without resort to "ready response." Also, the record in Brand (unlike the record in this case) contained ample evidence about the defendant's first encounters with law enforcement – specifically, about Brand's immediate (and graphic) response to "Sara's" mention of sexual activity and "Jessica's" "single mention of 'sex stuff. " This was more than enough evidence to prove beyond a reasonable doubt the Brand responded "readily;" there was no need for the trier of fact or the Court of Appeals to consider anything that happened after those first on-line chats.[6]

But the Circuit apparently sees no inconsistency between its decision in Brand and the Supreme Court's decision in Jacobson, and a district judge has no discretion to reject her Court of Appeals' interpretation of a Supreme Court ruling. Lacking explicit guidance from the Circuit on this point, I have endeavored to figure out why the two cases do not conflict. Here is what I have come up with.

In past cases explaining what is meant by "ready," the Second Circuit has used the word "prompt." See e.g. United States v. Harvey, 991 F.2d 981 (2d Cir. 1993). Contrary to the defendants' suggestion, "prompt" is not a synonym for "immediate." As

---

[6] There is a third possible reason why the paragraph on which the Government relies might well be dictum: the Circuit itself recognized that it was really not necessary to reach the issue of predisposition in Brand. Entrapment is an affirmative defense; in order to put the Government to the trouble of proving predisposition, the defendant must first prove, by a preponderance of the evidence, that the crime originated with the Government (inducement). The Government did not concede inducement in Brand – a significant difference from this case – and as the panel recognized (Brand, 467F. 3d at 190), it is arguable that the defendant did not meet his burden to raise the defense successfully. The panel's choice not to grapple with that preliminary issue, but instead to skip straight to the more complicated second step (predisposition), has introduced an unfortunate level of complexity into the law of entrapment in this Circuit, one that makes resolving this already difficult case all the harder.

26

far as I know, the law does not place any specific limit on the number of days, hours, minutes or seconds that can transpire between a Government agent's initial suggestion of criminal conduct and a defendant's definitive "yes" before a response ceases to be "ready." Of course, this period cannot be overly long: after Jacobson, it is clear that two and a half years between the Government's first approach and the defendant's final, committed "yes" makes the defendant's response insufficiently prompt as a matter of law. However, unless the period between the first overtures and the final "yes" is so lengthy as to make a finding of readiness legally unreasonable, what constitutes a sufficiently "prompt" response to an agent's solicitation is for the jury to decide.

It has long been the law that readiness can be measured, not only by the amount of time it took for a defendant to respond to an overture, but also by (1) the tone and quality of his response; (2) the type of criminal opportunity presented; (3) whether the defendant expressed hesitation, and if so, whether that hesitation stemmed from fear of getting caught; the nature of the inducement. Paul Marcus, The Entrapment Defense § 4.15 (3d ed. 2002). Indeed, a response can be "ready" even if the defendant is initially reluctant to commit the crime -- as long as that reluctance "quickly evaporate[s], " Brand, supra., 467 F. 3d at 195, citing Salerno, supra., 66 F. 3d at 548. Matters like hesitation, reluctance, and the "evaporation" of such impulses necessarily occur after the Government's first approach. So the trier of fact must perforce be allowed to consider some evidence of conduct that occurs after that first encounter – even conduct that is not "independent of" the Government's sting operation – as it evaluates the "readiness" of the defendant's response. Any other result would limit the meaning of "ready" response

27

to an instantaneous and unhesitating assent to the Government's very first approach. That is not and never has been the law.

If I have correctly adduced the reason why <u>Brand</u> does not conflict with <u>Jacobson</u>, then certain evidence about the conduct of David Williams, Onta Williams and Laguerre Payen during the few weeks between their entry into the conspiracy and May 9, 2009 – conduct that took place entirely after their first encounter with James Cromitie (and even with Shaheed Hussain), and that cannot be divorced from the Government's actions – was properly considered by the jury during its evaluation of their *pre*disposition, their state of mind prior to the Government's first approach,.

### (2) The Black Hole: The Relevance of the Lack of Direct Evidence of Solicitation

Defendants argue that the jury's verdict cannot be sustained because there is absolutely no evidence of how readily they responded to the Government's solicitation – what they refer to as the "black hole" in the evidence. This argument is common to David Williams, Onta Williams and Laguerre Payen.

I do not find it persuasive.

The Government concedes that there is no direct evidence of when or how these defendants were solicited. Indeed, as to Onta Williams and Payen, there is not even evidence about who first approached them, although it appears that David Williams recruited one (GX 255-T) and Cromitie the other.[7] But the Government suggests that this complete absence of evidence makes no difference – and for support, it calls the court's attention to a number of cases that discuss "ready response."

---

[7] The lawyers obviously believe they know whom David Williams and Cromitie recruited. During oral argument they suggested that Onta Williams was brought into the operation by David Williams (he was "the other Muslim brother"), while Cromitie recruited Payen. I know of no evidence in the record to support this, however.

28

The principal difference between this case and every case cited by the Government is factual. In every one of those other cases, the jurors had direct evidence from which they could conclude that the immediate response was enthusiastic. The jurors in Brand knew everything that transpired in Brand's initial conversations with "Sara" and "Jessica." The jurors in United States v. Young, No. 96-1368, 1997 WL 76875, *1 (2d Cir. Feb. 24, 1997) (unpublished), heard tape recordings that "reveal[] numerous instances in which Young gave a 'ready response' to an undercover government agent's inducements to engage in drug transactions;" whenever the agent asked Young if she wanted to participate in a drug deal, Young immediately said yes, apparently with no hesitation or equivocation. In Squillacote, *supra.*, the jury knew that the defendant had been an East German spy for many years before the FBI set up the "false flag" operation that led to her arrest, and heard about her delight when she was contacted out of the blue by someone she thought was a foreign operative. In United States v. Bala, 236 F.3d 87 (2d Cir. 2011), a money laundering case, the jury heard that the defendant had conversed with a third party about laundering money before that person agreed to cooperate with the government.

Here, by contrast we have no idea what happened at those first fateful meetings – no direct evidence of how readily David Williams, Onta Williams and Laguerre Payen responded to the approach and solicitation of a Government agent. We do not know whether these defendants "jumped at the opportunity" that was presented to them as soon as the topic was broached, as was the case in Brand. We have no idea whether their enthusiasm for the mission (so evident from the tapes created in late April and early May of 2009) was "unhesitating" from the very beginning. We do not know how much

29

convincing it took to get an affirmative response or what inducements were offered to induce their participation. And we certainly have none of the evidence – so ample, in Cromitie's case – about their pre-existing attitudes and prejudices.

But this does not automatically doom the Government's effort to prove "ready response" beyond a reasonable doubt. "As a general rule that the law makes no distinction between direct and circumstantial evidence, but simply requires that, before convicting a defendant, the jury must be satisfied of the defendant's guilt beyond a reasonable doubt from all of the evidence in the case," whether it be direct, circumstantial, or a combination of both.    (Cromitie charge at 8). This standard instruction, read to every jury in every case, fatally undermines any suggestion that direct evidence is needed to prove "ready response" or any other element of the Government's case. It would of course be *easier* for the Government to prove ready response with direct evidence about the initial meeting between each defendant and the person who recruited him for the operation, but direct evidence is not *required*. As long as there is enough credible circumstantial evidence from which the jurors could conclude that a particular defendant responded to the Government agent's overture "readily" or "promptly" (as those two words are used interchangeably in entrapment jurisprudence), the Government has sustained its burden of proof.

The evidence must be examined as to each defendant. I thus turn to their particular situations.

### David Williams

David Williams' name (or at least his alias, Daoud) was first mentioned to Hussain by Cromitie during a telephone conversation on April 7 – the day the two men

30

met after Cromitie reinstituted contact with the CI on April 5. (GX 240-T). Cromitie said in passing that his Muslim brother Daoud (David Williams) said "salam alaykum too." Id. Hussain responded that he did not know who Cromitie was referring to (Tr. 866), but he told Cromitie to "Tell Daoud, maybe Daoud is a good guy, too. . . . Talk to him. Maybe he can be part of us you know?" (GX 240-T).

Three days later, on April 10, 2009, David Williams first appeared on the tapes on April 10, 2009. He rode along with Cromitie and the CI as they conducted surveillance of potential targets and took pictures. (GX-117). The transcript of their conversation during the trip from Newburgh to Riverdale does not include any references to jihad, and it is unclear how much "Daoud" knows about Cromitie's mission. However, from a subsequent (April 16, 2009) conversation between Cromitie and Hussain, it is apparent that Cromitie had not fully disclosed to Williams what he and Hussain were up to:

| Cromitie: | And all of this stuff is good, is really appreciated, but sometimes this just don't...let me just talk to him. I uh..he's a good brother, I know he'll listen to me....'cause once I tell him the deal that I want to tell him...he's gonna uh...I know he's gonna tell me. |
| CI: | You haven't talked to him yet? |
| Cromitie: | I don't want to talk to him. |
| CI: | Oh you haven't talked to him. Alright. |
| Cromitie: | It's not that easy. |
| CI: | But you, you wouldn't have guessed that day anyhow, wouldn't he.... |
| Cromitie: | No, he's just uh....he asked me what uh....what will you do with the pictures you take? I'll tell him we sent him to the other country and we make calendars for him. You gotta be smart sometimes to say something. |

31

(GX 118-T).

However, when Williams -- who served a ten day sentence for marijuana possession at Rikers Island between April 10 and April 23 (Id.) – next met with Cromitie and Hussain (on April 23), Cromitie had plainly overcome his squeamishness and explained the details of the plot to "Daoud:"

| | |
|---|---|
| CI: | How much, uh . . . (UI), brother, he knows? |
| Cromitie: | I told him already (pointing at David Williams). |
| CI: | Oh, he knows everything. |
| Cromitie: | Yeah, he knows.  And you know he's just like me, Hak, you know, we, we, we do what we gotta do and we gonna be out, Hak.  I don't even care. |
| CI: | You understands what we are doing, right? |
| D. Williams: | (Shakes his head, yes.) |

(GX-129-E1-T).

The evidence, viewed most favorably to the Government, supports the conclusion that Williams was recruited into the plot between April 20 and April 23, 2009.

We do not know precisely when Cromitie offered David Williams the chance to perform jihad. But there is considerable circumstantial evidence tending to show that Cromitie did not recruit David Williams prior to April 5, when he reinitiated contact with Hussain.

On the view of the evidence most favorable to the Government, Cromitie (by his own admission) did nothing in terms of recruiting anyone prior to February 24, 2009, when he dropped off the Government's radar screen. From a very early point in their dealings, Hussain urged Cromitie to bring in others who wanted to perform jihad (see,

e.g. GX 104E2-T; GX 108-E3-T), but Cromtie never took any concrete steps to recruit fellow jihadists. In December 2008, after months of conversations, Hussain, appearing exasperated, pressed Cromitie to explain, "....why the first step has not been started. . . . You know, with the target, *the recruiting*, and the codes." (GX 112-E3-T)(Emphasis added). Cromitie's response suggested that he was all but resigned to abandon the whole idea: ". . . It's not so easy, bro. How you start something like that? I'm trying, then every time I turn around it seems like my, my shit is not, that's not my mission." Id. Cromitie also admitted that while Hussain was out of the country in January and February 2009, he did nothing at all in furtherance of the plot. (GX-114-E2-T). On February 23, 2009, even as he was telling Hussain, "You got me," Cromitie specifically said that he would not recruit other members of the mosque: ". . . I'm not going to involve anyone else" (Id.)

The jurors would also have been justified in concluding that Cromitie did not spend his six weeks of "radio silence" recruiting others to participate in the venture from which he appeared to be disassociating himself. Certainly that is the conclusion the FBI drew: From his silence and persistent evasion of Hussain's efforts to contact him, the FBI concluded that the Cromitie investigation "has gone cold" and that Cromitie has "backed away from furthering the conspiracy against Stewart." (GX 3501-259, FBI email dated April 1, 2009). The F.B.I. offered three possible reasons why the investigation had gone cold, one of which was that Cromitie did not have any co-conspirators to help as look-outs.

David Williams first appeared in our narrative on March 22, 2009, when he spoke to Cromitie by phone. In that call (which was recorded because Cromitie's phone was

33

wiretapped), Williams indicated that he was not in Newburgh (he said he would "be up there in, like, another two days,") and suggested that he [Williams] wanted to talk to Cromitie about "some business me and you."(GX 236-B-T). A fair reading of the transcript of that telephone call suggests that Cromitie was not the "initiator" of this "business," which in turn suggests that the "business" is not performing jihad. Furthermore, there is no specific mention during this conversation of any jihadist plot to bomb synagogues or shoot down Air Force aircraft; and this conversation occurred during the period when Cromitie was avoiding contact with Hussain. For these reasons, an inference that the "business" Williams was discussing referred to something other than Hussain's "business" is consistent with the evidence as viewed most favorably to the Government.

From the tenor of Hussain's remarks in his April 7 conversation with Cromitie – especially his suggestion that "Maybe he [Daoud] could be a part of us?" – a reasonable trier of fact could have concluded that Cromitie had not yet recruited "Daoud" into the plot. Indeed, a reasonable trier of fact could conclude that recruiting "Daoud" was Hussain's idea, not Cromitie's. And while David Williams accompanied the two men on April 10, there is no indication that he learned anything about the true contours of their plot on that trip. And the Cromitie/Hussain conversation of April 16 suggests that Cromitie had not yet "….[told] him the deal. " By April 23, however, Williams was plainly knowledgeable and wholly on board.

Based on the totality of this circumstantial evidence, a reasonable trier of fact could conclude that David Williams had to have been recruited after April 7 and before April 23. Viewing the evidence most favorably to the Government (which means

34

interpreting Cromitie's April 16 statements in the manner most favorable to the Government) fixes the period when David Williams was recruited as sometime between the date when he was released from Rikers Island (April 20 at the earliest) and April 23, when David Williams went on a reconnaissance trip with Hussain and Cromitie and offered numerous suggestions for how to carry out the mission (see discussion below).

Thus, viewing the evidence most favorably to the Government, only a brief period – no more than a few days -- passed between the time that Cromitie first "talked to him" and "told him the deal" and the time when David Williams showed himself to be fully committed himself to participating in what Cromitie and Hussain were planning. This extremely short span of time permitted the jury to infer that Williams was ready and willing to commit crimes when approached.[8]

Once David Williams was in, he immediately and enthusiastically entered into planning the criminal venture. On April 23, Williams expressed delight over the remote operation of the IEDs, and even said that he wanted to be the stinger "trigger man:"

| CI: | It's like a hundred, hundred miles range.  So, it's with a cell phone, so if you put it up there (presumably Riverdale), and come back here.  You can sit down here, and it blows up there. |
| --- | --- |
| Cromitie: | (Laughs)  (Cromitie and David Williams fist bump) |
| CI: | So once we put it up there, we come here, we do the stinger and the planes. . . . |
| Cromitie: | No, he, those . . . . |
| D. Williams: | What's that? |

---

[8] As the parties have pointed out in recent submissions to the court (made in response to my questions), not all of this evidence was played for the jury during the trial or called to the jury's attention during summations. However, everything I have cited above was admitted into evidence and the jury had all of the relevant transcripts in the jury room. Who am I to say that the jurors did not review them?

| | |
|---|---|
| Cromitie: | . . . he ain't gotta do those.  Those, that's, we can mess with that, Hak. |
| CI: | And . . . |
| Cromitie: | 'Cause I . . . . |
| D. Williams: | How do you know I don't want to do that? |
| Cromitie; | What?  Remember, remember, um . . . (UI) |
| CI: | The rocket launcher. |
| D. Williams: | Oh, Oh . . . . |
| Cromitie: | The one you could just throw it over your shoulder. |
| CI: | I'm going, we're gonna pick it up and then I'm going to train you how to uh . . . and see, and see. . . . |
| D. Williams: | I wanna (UI), too. |

(GX-129-E3-T).

David Williams also said that he wanted to be armed for the operation and offers

to purchase the handguns for the operation with the CI's money:

| | |
|---|---|
| CI: | Do you want to be armed? |
| Cromitie: | No, no . . . |
| CI: | You don't want to be armed? |
| Cromitie: | See, I'm not gonna tell nobody . . . . |
| D. Williams | Well, I do Hak.  I do. |
| | . . . . . . . . . . . . . . . . . . . . . . . . |
| CI: | How much, how much do guns cost here?  How much?  Five hundred?  A thousand? |
| D.Williams: | Probably like five, four, I probably can get them cheaper than that though. |

36

CI:          If I, if I pay you money can you get me guns?

D. Williams: Yeah.

(GX-129-E4-T). Williams expressed his commitment to the operation in response to

direct questions from Hussain – who also gave Williams an opportunity to back out:

CI:          Is there any questions you want to ask me brother? (To David
             Williams)

D. Williams: Nah.

             . . . . . . . . . . . . . . . . . . .

Cromitie:    He's the same way, Hak. So don't worry about it.

CI:          Okay.

Cromitie:    Whatever he got to say, he's gonna say it. If don't like something
             he gonna tell you he don't like it, and that's that. Holla at your
             boy.

CI:          That's what it is. That's how it should be.

D. Williams: It's for Allah, so there is nothing really I can say.

Cromitie:    Heard what he said? It's for Allah's sake. There is nothing, you
             know, there is nothing he can really say. What can he say? That's
             the same what I told you, right? I said what can you say when it's
             for Allah's sake, you, you can't really say much.

CI:          I'm not recruiting you. I'm not giving you anything except Allah.

Cromitie:    Meaning, what he's saying is the door is open for you to leave at
             anytime.

CI:          You want to, you want to say no, you don't want to do it, you can
             walk out, brother.

D. Williams: We already had this discussion.

CI:          Okay.

(GX-129-E2-T).

David Williams rapidly became more involved with the actual planning of the attack. For example, during surveillance at Stewart Airport on April 24, 2009, Williams advised the group on where to launch the stinger missile:

| D. Williams: | I think you should do it from the other side. If you gotta go stealth moving, climbing through the woods and all that . . . this is not safe. See (UI) jumped over, like . . . |
| | . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| CI: | Okay, let's, let's find the other spot then. |
| D. Williams: | You go to the woods, I'll do it through the woods. |
| Cromitie: | That's how I would do it. |
| CI: | But, Yeah . . . |
| Cromitie: | I'll creep right through the woods, Hak. I'll creep right through the woods. |
| D. Williams: | I'll be right with you, Hak. I don't trust this right here, man, it's too much. . . . |

(GX-120E2-T). Throughout the weeks leading up to May 9, David Williams suggested various changes or refinements, many of which Cromitie and the CI agreed to adopt. (E.g. GX-120E2-T; GX-121-E3-T (discussing acquisition of guns); GX123-E2-T (discussing placement of the bombs); GX-125-E2-T & GX-126E4-T (discussing the timing of the attacks). In fact, it is fair to say that David Williams had more to do with planning the logistic of the actual "mission" than Cromitie did, although he was involved in the plot for only a few weeks.

Nearly everything that Williams said or did buttresses the conclusion that he did not come reluctantly into this plot. Williams did at one point express reluctance to hurt anyone, saying, "We just want to destroy property – we don't want to take no lives." GX 120-E5-T. That statement, however, does not suggest a lack of predisposition to commit

38

the charged crimes, since none of the crimes of conviction requires an intent to take human life or to inflict injury.

In the end, David Williams' argument boils down to the proposition that the Government had to give the jury direct evidence of when he was first approached – and how he responded to that first approach – in order to prove that he was predisposed to commit the charged crimes. I do not read the cases as imposing any such rule. There was ample evidence for the jury to conclude beyond a reasonable doubt that only a matter of a few days – and no more than two weeks at most -- passed between Cromitie's initial recruitment of David Williams and the latter's active involvement in the operation. That alone supports the verdict against him. The evidence about Williams' post-initial encounter activities -- assuming that can be considered if I read Brand correctly (and if this reading of Brand does not conflict with Jacobson) -- is simply icing on the cake.

David Williams' Rule 29 motion is denied.

### Onta Williams and Laguerre Payen

These two defendants can be discussed together, because their situations *vis a vis* the evidence are identical.

Onta Williams and Laguerre Payen were recruited to be lookouts. The idea for "lookouts" was not conceived by Hussain on February 24, 2009, when he and Cromitie made the initial surveillance of Stewart Airport. (Tr. 841, 2166-68; Defense Clip 404). From this, jurors could reasonably conclude that these two men were not recruited before Cromitie's six week period of "radio silence."

Cromitie first told Hussain, "We got two more brothers Hak," on April 28, 2009 (GX 121-E1-T). The new recruits, Onta Williams and Payen, were introduced to Hussain

39

at the Shipp Street House later that same day.  (GX 121A-E1-T).  For the reasons discussed above in connection with David Williams' motion, there is ample (albeit entirely circumstantial) evidence that these two men were recruited within days of, or at most a couple of weeks prior to, that April 28 meeting. The relative brevity of that period warrants a finding that their affirmative response was sufficiently "ready" to suggest predisposition.

As noted above, the evidence does not reveal which defendant recruited Onta Williams and which recruited Payen. But David Williams plainly took credit for recruiting one of them; on April 25 he told Cromitie that he "got the other brother . . . . I got my Muslim brother." (GX-255-T).  Since the evidence, viewed most favorably to the Government, suggests that David Williams was not recruited until the period between April 20 and April 23 (i.e., after the April 16 telephone conversation, in which Cromitie tells Hussain that he has not yet "talked to" Daoud), it stands to reason that the person recruited by David Williams had to have been approached after April 20. From the fact that Onta Williams and Payen showed up at Shipp Street on April 28, the jury could also find that this "other brother" said yes in short order -- a matter of days after he was first approached, which a reasonable juror could conclude was "prompt."

Cromitie appears to have recruited the fourth participant.  For the reasons discussed above, the evidence viewed most favorably to the Government establishes that Cromitie did not recruit anyone until on or shortly before April 5. The fact that Cromitie did not tell Hussain about the new recruits until April 28, and never mentioned either Onta Williams or Payen to Hussain until that date, suggests that the fourth man was recruited well after April 7.  Cromitie did not customarily hold his counsel, and the jury

would have been justified in concluding that he was unlikely to keep a new recruit secret from his "Hak" for months, or even weeks. Cromitie did not mention anyone other than David Williams prior to April 28; the most Government-favorable view of the evidence (which requires that the trier of fact apply what he knows about Cromitie to the facts) suggests that his recruit, like David Williams' recruit, signed on in a matter of a few days.

While this evidence fully supports a finding that Onta Williams and Payen agreed to become involved "promptly" after they were first approached, their statements and actions from and after April 28 also suggest that these two men were willing to join in a terrorism plot without any hesitation or reservation. Onta Williams and Payen accepted the task of procuring handguns for the operation. (Williams: "some joints" (GX-121-E5-T); Payen: "J-ratchets" (GX-266.1-T)). Both men helped to plan the attacks, interjecting their opinion at times (Payen less so that Onta Williams). Neither voiced any objection, or showed any hesitation about participating in what were intended to be deadly attacks. Onta Williams was extremely enthusiastic about having the opportunity to launch a stinger missile:

> O. Williams:   So this is it.  Put the eye up.  Put the lock down.  Put your finger on the trigger.  Hold your finger on the what's its name . . . safety . . . .
>
> CI:            Pull the trigger.
>
> O. Williams:   That's what's up.  Shit, let me bust that thing off.
>
> CI:            Where?
>
> O. Williams:   Straight downtown.
>
> CI:            On Broadway?
>
> O. Williams:   Downtown, go to the new court system.  Our new court system.

(GX-126-E6-T).

Onta Williams' greatest concern was not the prospect of killing large numbers of innocent people, but the possibility of getting caught:

O. Williams:   My main concern is Stewart Airport . . . . That's my main concern.

CI:   In Newburgh?

O. Williams   Yeah. . . . And I thought, I thought I would feel more comfortable "cause that's my home town.   But, because it's sectioned area. You know what I'm saying?

CI:   But you'll be on the corner and, uh, 17K.   You will be on the corner there.

O. Williams:   . . . . I'm not worried about where I'm going to be. . . . My main thing is . . . . safety.

(GX-126-E3-T).   To guard against this, Onta Williams planned his alibi in advance: "That's why I want to know the date for this.   Would it be, obviously it wouldn't be on a working day.   So that means the day before, I'll leave my backpack at work, and that will be my reason for going to the job.   That's my cover up in there."   (GX-125A-E1-T).

For his part, Payen can be heard on tape "teaching" Onta Williams about the operation of the stinger launcher. (GX-124A-E1).   Indeed, Payen appeared eager to be the stinger shooter; he and Cromitie squabbled over the stinger like children fighting over a new toy:

Payen:   It's not big, Hak.

CI:   That's not what I said.

Payen:   I could handle too, you know . . . .

Cromitie:   It's only 40 pounds.

Payen:   Yeah, Hak was thinking I could handle it.   He said I could handle it, too.

42

| Cromitie: | No, 'cause the way he was like this . . . . |
|---|---|
| Payen: | You holin' it with me, I'm like . . . I'm like . . . . |
| O. Williams | He, he treating it like a baby. |
| Payen: | Yeah!  I'm like, Hak, you holding it.  Let go! |
| Cromitie: | Well you should have seen, Hak, when I got it . . . Hak was like, oh, look let me get it.  You should've seen me, I threw it up like . . . .(UI) like I had a .38 snubnose. |
| Payen: | He was like I ain't touching it.  I was like, you may never get another chance.  My eyes lit up when I see that.  I'm like I gotta get me one of those (UI). |

Id.  Resigned to his lookout role, Payen asked questions throughout the planning process,

sometimes offering his observations. He never voiced any reservation about taking part in

the attacks.

In the end, Onta Williams and Payen essentially told the jury that they were

predisposed to participate in jihad:

| Payen: | I'm, I'm basically, you know, I'm doing this for the sake of Allah. |
|---|---|
| CI: | Apart from your financial, what do you think about this, this, uh, operation? |
| Payen: | I think it's *hamdulillah*.  You know, for Allah. |
| CI: | Okay, that's fine.  What do you say, Hamza? |
| O. Williams: | I'm doing it for the sake of Allah.  I mean, the money, the money helps, but I'm doing it for the sake of Allah. |

(GX-125A-E5-T).  Put otherwise, Payen and Onta Williams were ready and willing to

plant bombs at synagogues and shoot Stinger missiles at U.S. aircraft when the

opportunity presented itself because -- like Cromitie and David Williams -- they believed

that Islam sanctioned such attacks, and they were willing to commit a heinous crime for money— "the money helps."

Onta Williams' and Payen's motions pursuant to Rule 29 are denied.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

The entrapment issue presented by this case is far more complex, and hence far more difficult to resolve, than in any other case with which the court is familiar. Contrary to what the Government says, this case is not Salerno; it is not Brand; it is definitely not Young. It is not even United States v. Aref, 285 Fed.Appx., 784 (2d Cir. 2008), *cert. denied*, 129 S.Ct. 1582 (2009), in which the very same confidential informant recruited a different group of Muslim defendants to participate in a different faux terrorist plot. This case is *sui generis*.

It is beyond question that the Government created the crime here. As to Cromitie, the view of the evidence most favorable to the Government comfortably supports the jury's verdict. But the evidence of predisposition against the defendants other than Cromitie is entirely circumstantial. Where David and Onta Williams and Payen are concerned, the Government recruited persons who (as far as the record shows) had never before expressed any interest in jihad, and gave them the opportunity to become terrorists. The bulk of the evidence relied on by the Government to demonstrate their "ready response to inducement" -- especially as against Onta Williams and Payen -- consists of their post-recruitment conduct.

I read Brand to suggest that Jacobson does not bar reliance on such evidence where predisposition is proven on a theory of "ready response to inducement." But if that is a misreading of Brand – or if that reading cannot be reconciled with Jacobson – then, to

use Judge Wesley's phrase, "....evidence of acts that occurred after [their] initial contact with government agents is misplaced." In that event, literally the only thing that could support a finding of predisposition is circumstantial evidence that only a brief period passed between the time these were initially approached (on a date that cannot definitively be established) and the time they began to participate (with evident gusto) in the Hussain/Cromitie venture. For the reasons set forth above, I believe that this brevity establishes the "promptness" that allows a trier of fact to conclude that the defendants responded "readily." But nothing else in the trial record does so. I state this plainly, because I want to be sure that the issue is squarely framed for the Court of Appeals.

All defendants' motions to set aside the verdict and enter a judgment of acquittal on the ground that the verdict on entrapment is against the weight of the evidence are denied.

II.     Perjury by Confidential Informant

All defendants move, pursuant to Fed. R. Crim. P. 33, for a new trial on the

ground that the CI committed perjury and the Government made knowing use of that

false testimony in obtaining a conviction. The defense has identified six areas of perjured

testimony – all of them collateral to the testimony about the events underlying the

indictment – that warrant a new trial:

(1) Factual misstatements contained in the PreSentence Investigation Report
(PSR) that was prepared prior in connection with Hussain's 2006 sentencing
in his criminal case in the Northern District of New York, as well as Hussain's
internally inconsistent and plainly inaccurate (as stipulated by the
Government) testimony about his relationship with the attorney who
represented him during his Albany criminal proceeding.

(2) The "gift" of a Mercedes Benz (or of $40,000 cash for use in purchasing a
Mercedes Benz) from Benazir Bhutto, the former Prime Minister of Pakistan.

(3) The CI's receipt of large sums (hundreds of thousands of dollars) of money in
Pakistan, which he variously described as a trust fund (of which he was the
beneficiary) and a loan from his family that would have to be repaid.  The
CI's access to this money was not revealed either to the court that presided
over Hussain's bankruptcy petition or in connection with the Northern District
criminal case, where Hussain (like any convicted defendant) was required to
disclose his assets. Hussain ultimately agreed that his failure to disclose those
assets was "a lie," a "gross omission" and a "fraudulent misrepresentation to
Probation . . . and ultimately to the sentencing judge." (Tr. 1352, 1480-82,
1515-16, 1643-48, 2036-41, 2051-52, 2855-58, DX 32).

(4) Inconsistent prior statements about the reasons why Hussain had been arrested
three times in Pakistan, made variously in a narrative submitted in support of
his application for asylum in the United States and to one of his FBI handlers.

(5) The date of his entry in the United States, which was variously represented as
having occurred in 1993 or 1994.

(6) Unpaid income taxes

Rule 33 provides that the court may vacate any judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). In this Circuit, motions for a new trial are disfavored and the standard for granting such motions is strict – they may be granted only in the most extraordinary circumstances. United States v. Petrillo, 237 F. 3d 119, 123 (2d Cir. 2000); United States v. Locasio, 6 F. 3d 924, 949 (2d Cir. 1993). The "ultimate test" is whether "letting a guilty verdict stand would be a manifest injustice. . . . There must be a real concern that an innocent person may have been convicted." United States v. Canova, 412 F. 3d 331, 349 (2d Cir. 2005).

Here the basis for the motion is Hussain's purported perjury. In order to grant a motion for a new trial on the ground that a witness committed perjury, the defendant must show that the witness actually committed perjury, that the perjury was material, that the government knew or should have known of the perjury at the time of the trial, and that the perjury remained undisclosed during the trial. United States v. Josephberg, 562 F. 3d 478, 494 (2d Cir. 2009). When the perjury was disclosed during the trial, a new trial should not be granted. United States v. McCarthy, 2571 F. 3d 387, 400 (2d Cir. 2001), United States v. Canova, supra., 412 F. 3d at 349; United States v. Joyner, 201 F. 3d 61, 82 (2d Cir. 2000). As long as the jury is alerted to a witness' lies, the jury – the "appropriate arbiter of the truth" – can sift falsehood from fact and make its own credibility determinations. United States v. Zichettello, 208 F. 3d 72, 102 (2d Cir. 2000).

I disagree with the Government's assertion that the defense failed to establish that Hussain committed perjury at the trial (or, for that matter, bankruptcy fraud and deception at sentencing in other courts in this circuit). Hussain lies at trial were mostly designed to cover up lies he told in the past, in connection with his own previous criminal

47

and bankruptcy cases. For example, Hussain lied about issues relating to his representation in a criminal matter by a lawyer hired by the FBI. He lied when he testified that he had been gifted a Mercedes-Benz by Benazir Bhutto during a meeting at the Ritz-Carlton Hotel. The reason for these lies on these two points was clear: he wanted to cover up the fact that he had committed bankruptcy fraud and lied to the probation office.

But Hussain's most notably lie at trial did not involve his past conduct, or covering up lies previously told. Rather, it was his repeated claimed that he only offered $5,000 to each of the defendants to participate in the criminal venture that underlies this indictment. Hussain's testimony was wholly contradicted by his recorded statement reminding Cromitie that he [Hussain] had previously offered defendant an opportunity to make $250,000.

Still worse was Hussain's utterly implausible explanation that "$250,000" was merely "code for the operation" (albeit a code known only to Hussain himself). Although Hussain was given repeated opportunities on cross to disavow this incredible story, he never budged. There is no question in my mind that Hussain perjured himself at trial in connection with his testimony about the inducements offered to Cromitie to get him to participate in the mission.

That said, I disagree equally with the defendants' argument that the jurors were not made aware of Hussain's mendacity, or that the Government failed in its obligation to be candid with the jury and the court.

As there was no denying that the defendants went to Riverdale on May 9, 2009, and placed what they thought was a bomb outside of a synagogue, attacking Hussein's

48

credibility was the centerpiece of the defense strategy. To that end, the extraordinarily
able lawyers who represented the defendants assembled a montage of the numerous
falsehoods told by Hussain over the years, on every subject from his criminal past in
Pakistan to his personal finances here in the United States. During the trial, Hussain was
cross examined for hours about dozens of flat out misstatement and inconsistent
statements he has made on multiple subjects dating back 15 or more years. By the end of
the trial, the jury knew that Hussain had lied about his finances to at least two courts (the
Northern District of New York and the Northern District Bankruptcy Court), lied to the
Immigration and Naturalization Service, lied to the Town of Colonie and its school
district about his residence, lied to potential customers of his motel, and lied to the IRS
about his income at tax time. It even became apparent that Hussain had lied to his FBI
handlers -- or at a minimum omitted to tell them about certain matters that were germane
to this case. The most significant and glaring example of Hussain's lies to his handlers
relates to his offer to give Cromitie $250,000; Agent Fuller testified that Hussain told him
the $250,000 was to pay for the cost of the operation. (Tr. 425).

The defendants argue, based on cases such as Napue v. Illinois, 360 U.S. 264
(1959) and DuBose v. Lefevre, 619 F.2d 973 (2d Cir. 1980), that a new trial is required
because the Government knew that its witness was lying and knowingly failed to correct
his testimony. However, the facts here are nothing like the facts in those cases. In cases
granting new trials based on the prosecution's knowing failure to correct perjury, the
witness lied on the stand about highly material matters that remained unexplored during
cross-examination; there is no question that the jury was entirely in the dark about the

witness' mendacity. See Napue v. Illinois, 360 U.S. at 265, 270; see also DuBose v. Lefevre, 619 F.2d 978-79.

In this case, by contrast, Hussain admitted to some of his lies, denied others and minimized them all. But the fact that he was a serial liar was certainly not kept from the jury. The jurors watched as each inconsistency was exposed. They listened to extensive argument from all four defense attorneys, which focused, laser-like, on Hussain's credibility. To argue, as defendant do here, that the jurors were misled about the CI's credibility flies in the face of the entire conduct of the trial.

Morever, this case lacks the odor of prosecutorial misconduct that often attaches to cases where new trial motions are granted on the ground of perjury. We are a far cry from cases where the prosecutor "plainly crafted . . . question[s] to achieve literal accuracy while conveying . . . false impressions," Drake v. Portuondo, 553 F.3d at 241-244, or otherwise elicited false testimony in order to cast the witness in a favorable light, e.g., Wallach, 935 F.2d at 457-58. Here, the defense (not the Government) elicited the testimony in question, which weighs against penalizing the Government. Cf. United States v. Damblu, 134 F.3d at 493.

Nor is this a case where the prosecutors reached the private conclusion that the cooperating witness had lied but nevertheless failed to investigate, see Morris v. Ylst, 447 F.3d 735, 744-45 (9th Cir. 2006), or "hid[] behind Rule 608 and rehabilitate[d] a witness," (Tr. 2133), by "elicit[ing] his rather dubious explanation of what had happened" despite "powerful evidence that [he] was lying," Wallach, 935 F.2d at 457. Instead, although the Government apparently believed that Hussain's testimony could be explained away, it questioned him about that testimony outside of court, gathered

50

hundreds of pages of additional material that addressed (and sometimes undermined) what he had said on the witness stand, and disclosed to the defense the results of its investigation -- including results that established certain inaccuracies in Hussain's testimony.

As the defense points out, "on re-direct examination, the government . . . did not address a single one of the challenged false statements." (Rule 33 Mot. at 16). That is exactly what the Government did. It denied Hussain any opportunity to compound any prior false statement, leaving the jury to consider his testimony and the defendants' unrebutted showing that, on at least some occasions in the past, he had lied when it was helpful to his cause. The Government "conducted an investigation and formed a good-faith belief that the [alleged lies] referr[ed] only to the already-known inconsistencies in [the witness's] testimony that were aired at trial," and thus, "there [was] nothing for the prosecution to disclose and no duty under . . . Napue," or the other authorities cited by the defense. Morris v. Ylst, 447 F.3d 735 (9th Cir. 2006); (See Govt. letter dated September 21, 2010).

It is equally meritless for the defendants to argue, as they do, that the Government committed misconduct by not admitting during their summations that Hussain was a liar. Interestingly, the defendants are careful not to say that the Government vouched for the credibility of the CI during summations. Instead, as counsel for Onta Williams said during his summation, "Mr. Raskin didn't say you should believe him. He didn't say he was credible. He didn't say anything about him. It was like Mr. Hussain did not exist." (Tr. 3398-99).

51

The Government was indeed in a tight spot by the close of the evidence where Hussain's credibility was concerned. It argued to the jury that it should believe the CI's account of unrecorded events, like his earliest conversations with Cromitie. But the Government did so by focusing the jury's attention on those aspects of Hussain's testimony that were corroborated by recorded evidence (including Cromitie's own damning recorded references to his first encounters with Hussain). Notably, the Government did not argue that Hussain's testimony about the many collateral matters on which he was cross examined should be believed. To the extent that the prosecutors spoke about those matters, it was to urge the jury to disregard obvious falsehoods (such as the lies he told to the Bankruptcy Court) and to focus on the recorded evidence, much of which came out of the defendants' (particularly Cromitie's) mouths. The Government did argue that the CI lacked any motive to lie about the facts of this case, but that is a far cry from asserting that the CI could be believed because he had no history of lying in the past.

The Government also argued explicitly that the jury could discount all of Hussain's testimony and still be convinced beyond a reasonable doubt that the defendants were guilty. That argument was supported by the record. Until this court heard all of the evidence, I was under the impression that Hussain's testimony was a necessary element of the Government's case, because I thought (based on what was disclosed by the lawyers prior to trial) that only Hussain could give testimony about Cromitie's attitude toward doing jihad in their initial, unrecorded encounters. With the benefit of familiarity with the entire record, I realize that this is simply not true. By insisting that he himself had raised the subject of getting back at the United States because of "what they did to my people

over there" (who, ironically, were not Mr. Cromitie's people at all), Cromitie himself

supplied all the evidence that was necessary to support a finding of predisposition, and a

rejection of his entrapment defense. As to the other three defendants, Hussain had

nothing at all to say on the issue of whether David Williams, Onta Williams and Laguerre

Payen were predisposed to commit the charged crimes; the only evidence he gave about

those three defendants can be confirmed by videotapes  and audiotapes that recorded

every single moment of their interaction with the CI.  There is no possibility that the

verdicts against any of the defendants were tainted because of Hussain's mendacity,

because, on the one and only point that mattered – predisposition -- Hussain's credibility

ended up being immaterial.

Finally, Rule 33 jurisprudence constrains a district court to grant relief only where

I am convinced that the defendants are truly innocent. Applying that test, the defendants'

application fails miserably.

Defendants' motions to dismiss based on Hussain's perjury is denied.

III.    Extra-Record Material

Defendants move for a new trial pursuant to Fed. R. Crim. P. 33(b), on the ground

that one juror was excused during deliberations when she should not have been, and the

remaining jurors were prejudiced by being exposed to the transcript of a tape recording

that was erroneously left in their exhibit binders after the Government decided not to

introduce the underlying tape.

The court denied a motion for a mistrial when these issues first arose, and my

reasoning is set forth in a contemporaneous Decision and Order Denying Defendants'

Motions for a Mistrial, which was filed on October 14, 2010. Nothing in the moving

papers causes the court to question today the conclusions I reached during the trial. In fact, not a single new argument has been raised. Therefore, for the reasons discussed in the October 14 opinion, I deny this aspect of defendants' motion for a new trial.

    This constitutes the decision and order of the Court.

    The defendants will be sentenced on Tuesday, June 7, 2011, at 10:30 a.m.

May 2, 2011

_____
Colleen McMahon
U.S.D.J.


BY ECF TO ALL COUNSEL