CALHOUN & LAWRENCE, LLP
ATTORNEYS AT LAW
81 MAIN STREET
SUITE 450
WHITE PLAINS, NEW YORK 10601

CLINTON W. CALHOUN, III*
KERRY A. LAWRENCE**
ANDREW D. KAIZER ***

*ALSO ADMITTED IN VA & DC
**ALSO ADMITTED IN CT
***ALSO ADMITTED IN MA

(914) 946-5900

FAX (914) 946-5906

May 25, 2011

**BY E-MAIL**
Honorable Colleen McMahon
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

     Re:    United States v. James Cromitie
              09 Cr. 558 (CM)

Dear Judge McMahon:

     I represent defendant James Cromitie in the above-referenced case, which is scheduled for sentencing on June 16, 2011. This letter is respectfully submitted to assist the Court in determining an appropriate sentence for Mr. Cromitie.

     For the reasons set forth below, the Court is respectfully urged to sentence Mr. Cromitie to 300 months' (25 years') imprisonment, which is the mandatory minimum sentence in this case.[1] The Court should also sentence Mr. Cromitie to 5 years' supervised release and a special assessment of $800 ($100 for each of the eight counts of conviction). This significant term of incarceration would be "sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in 18 U.S.C. § 3553(a).

---

[1] Counts Five and Six (conspiracy and attempt to use anti-aircraft missiles) are the only two counts that require a mandatory minimum sentence. The maximum sentence is life imprisonment for all counts except Count Eight. The maximum sentence for Count Eight (attempt to kill officers and employees of the United States) is 20 years' imprisonment. 18 U.S.C. §§ 1114(3) and 1113. The PSR incorrectly states that the maximum sentence is life for Count Eight. (PSR ¶ 159).

Honorable Colleen McMahon, U.S.D.J.
Re:  United States v. James Cromitie - 09 Cr. 558 (CM)
May 25, 2011
Page 2


Offense Conduct

      The defendant objects to the description of the offense conduct at paragraphs 19 through 41 of the presentence report ("PSR") on the ground that it constitutes an unbalanced and seriously misleading presentation of the relevant facts adduced at trial. The defendant's summary of the relevant facts is set forth at paragraph 44 of the PSR, and is repeated below for the Court's convenience.

      The confidential informant ("CI") presented himself as a wealthy Pakistani businessman knowledgeable about Islamic teachings. The CI was, in fact, a wealthy Pakistani businessman with an MBA and years of training in Islamic studies. From the beginning, the CI told Cromitie that he (the CI) had a plan and that Cromitie would make money out of it, but that Cromitie should not "do it just for the money," but also "in the name of Allah."

      On October 12, 2008, it was the CI, not Cromitie, who brought up the subject of "things happening" in Pakistan, and informed Cromitie that "mushriks" (non-believers in Islam) were killing Muslims there. When Cromitie asked what the CI was talking about, the CI told Cromitie that the teachings of the Prophet Mohammed permitted or even required Muslims to commit violence against non-believers. The CI explained that, as a Muslim, Cromitie needed to "do something in jihad" to retaliate against the non-believers. The CI also denounced Jews and other non-believers as "evil" and urged that "you, me, all these brothers, have to come up with a solution to take the evil down. That's how, it's the hadith."

      At their next meeting, on October 19, 2008, the CI told Cromitie that, according to the Prophet Mohammed, the Jews "are responsible for all the evils in the world" and that they should be eliminated. Cromitie responded that "they aren't responsible for that. I don't wanna go that far with him." The CI repeatedly urged Cromitie to do "something" for the cause of Allah, and offered to spend money to help Cromitie do such a thing. On October 29, 2008, the CI demanded of Cromitie: "Brother, tell me, I want to know. If Allah . . . asked for, for you to go, to go to the jihad, would you say Allahu akbar?" Cromitie was evasive, and said maybe he would and maybe he wouldn't.

      At their next several meetings, the CI pressed Cromitie to introduce him to some of Cromitie's supposedly like-minded "brothers," which Cromitie never did. The CI said there could be "no peace" until the mushriks left the Holy Land. The CI repeatedly raised the subject of jihad, and repeatedly urged Cromitie to join him in committing violence for the cause of Islam. The CI also said he could supply all the missiles, guns, and rockets they would need.

Honorable Colleen McMahon, U.S.D.J.
Re:  United States v. James Cromitie - 09 Cr. 558 (CM)
May 25, 2011
Page 3

From late October through December 2008, The CI repeatedly and explicitly urged Cromitie to make a plan, pick a target, find recruits, get guns, and conduct surveillance. Although he made a number of hateful remarks, and suggested he might be interested in engaging in some jihadist act, Cromitie never produced any recruits or came up with any concrete ideas or plans for any terrorist plot.  On December 10, the CI reminded Cromitie that he had done none of the things he was supposed to do.  CI: "[Y]ou've not started the first step brother.  Come on." Cromitie: "Maybe it's not my mission then.  Maybe my mission hasn't come yet."

By December 2008, the CI began explicitly referring to these potential recruits as "bodies."  The CI repeatedly told Cromitie how he should go about recruiting.  He told Cromitie how many persons were needed, and urged Cromitie to talk to people at the Newburgh mosque or to reach out to "the whole town" to find recruits.  He also proposed, as potential recruits, the names of particular persons who attended the Newburgh mosque or with whom Cromitie was acquainted.

The CI combined this with what would become increasingly large and explicit offers of financial and material rewards, including promising (in December 2008) to give his BMW to Cromitie – but only after the operation was completed – and later offering to buy Cromitie a barbershop for $60-70,000.  By February 23, 2009, the CI was explicitly promising that Cromitie and anyone recruited for an operation would be rewarded in "two ways," meaning they would eventually "go to paradise" but, while on Earth, would receive substantial cash rewards.  The CI, more than once, told Cromitie he would make him "the happiest man on planet Earth."

At some point (although it is not on tape), the CI offered to pay Cromitie a $250,000 cash reward if he would agree to participate in the plot.  On April 5, 2009 (on tape), the CI reminded Cromitie of the earlier $250,000 offer.  At trial, the CI admitted that on several occasions he had "suggested" to Cromitie that he would "get a lot of money" for participating in the plot.

The CI implored Cromitie to accompany him on a surveillance trip around Stewart Airport on February 24, 2009, during which he first told Cromitie of the need for "lookouts" or "lookout guys," a role that the CI admittedly conceived.  That day, the CI repeatedly referred to the cash he was willing to pay such "lookouts."  Also, the CI bought Cromitie a digital camera with which Cromitie was supposed to take surveillance photographs at the airport.  At the end of the day, they agreed to meet the next day, February 25.

On February 25, Cromitie failed to show up for the planned meeting.  Then, for the next six weeks, Cromitie dropped completely out of sight, telling the CI, falsely, that he had gone to North Carolina for work.  He avoided the CI's calls and even hid in his house when the CI came looking for him.

Honorable Colleen McMahon, U.S.D.J.
Re: <u>United States v. James Cromitie</u> - 09 Cr. 558 (CM)
May 25, 2011
Page 4

During that six week period, Cromitie was fired from his low wage job at the Newburgh Wal-Mart, and tried unsuccessfully to get his job back. In March 2009, Cromitie sold the digital camera the CI had bought for him on February 24 to a neighbor for $50 or $60.

On April 5, 2009, Cromitie called the CI to say he was broke and needed to make some money. The CI's response: "I told you, I can make you $250,000, but you don't want it brother. What can I tell you?" The CI's offer got Cromitie's attention; they agreed to meet two days later.

On April 7, the CI repeatedly told Cromitie of the need for "lookout guys," while making clear that the "lookouts" would be paid, after Cromitie told the CI (as he had repeatedly told the CI before), that he had not found any recruits for an operation. The CI complained that Cromitie's foot-dragging had put the CI's life at risk. The CI also promised an all-expense paid two-week vacation to Puerto Rico for Cromitie and his family, but only after the operation was complete.

After meeting David Williams on April 10, 2009, the CI met with Cromitie on April 16 and promised to give Williams "separate money" (<u>i.e.</u>, separate from the reward money intended for Cromitie) if Williams agreed to participate. At that time, Cromitie had been telling the CI David Williams was not part of the operation and that Cromitie could not say whether he would be.

Also on April 16, the CI reiterated the offer of an all expense paid vacation to some place warm and sunny, and promised Cromitie enough cash to do "whatever you want to do" and to "buy a brand new car" (presumably in addition to the previously-promised BMW). He also promised to buy Cromitie (whose only skill is barbering) a barbershop for $60-70,000. As Cromitie and the other defendants did on many occasions, Cromitie pretended he wasn't in it for the money, but ultimately made the following observation: "Oh, they pay us to do this. . . . [G]ive the brother something [for] doing that mission."

Throughout April and May 2009, the CI gave small amounts of money to Cromitie and the other three defendants, to pay for rent, groceries, meals, cell phone cards, and car fare, and held out the promise of far greater cash rewards after the mission was complete. On May 1, 2009, the CI told Cromitie he had "very good news"; he was "going to Florida to pick up the money." Cromitie delightedly passed the news on to his co-defendants. In the same conversation, the CI reminded Cromitie of his earlier promise to give Cromitie the BMW. On May 8, Cromitie complained to Onta Williams that the CI had not given them enough of the promised reward, and that he was going to tell the CI that they weren't going to do anything until they "got paid" what they were "supposed to get." Later that day, Cromitie did complain to the CI, and the CI reassured him that he and the others would "be rewarded for the things they do."

Honorable Colleen McMahon, U.S.D.J.
Re: <u>United States v. James Cromitie</u> - 09 Cr. 558 (CM)
May 25, 2011
Page 5

      The CI admitted at trial that he promised cash rewards to each of the defendants. He claimed the money reward was limited to $5,000 for each defendant, but did not record the only conversation in which he claimed to have told the defendants about this amount. On May 20, 2009, while driving the four defendants to the Riverdale section of the Bronx where they were arrested, the CI provided keys to each of the defendants, which he claimed would open UPS mailboxes where the defendants could pick up their money after the operation.

      The CI and his government handlers devised all the plans, identified all the targets, picked all the operative dates, and supplied all the transportation, maps, cameras, "weapons," meeting places, storage facilities, food and beverages, and money for the operation. Every logistical detail of the plot was orchestrated, financed, and facilitated by the CI and the FBI. The defendants did not take a single step to further the CI's plot when they were not with the CI. As the case agent admitted at trial, the government was "pretty much in control of what the defendants were doing."

      Also, there was no evidence adduced at trial that any of the defendants had any prior connections to terrorists or terrorist organizations, or had ever communicated with each other or anyone else about any activities remotely similar to the ones involved in this case. There was also no evidence adduced that any of the defendants possessed the necessary resources, skills, or equipment that would have enabled them to carry out the plot absent the direction of the government. Without what the government has conceded was a "sting operation [that] was, by law enforcement standards, relatively elaborate," no crime would or could have occurred.

<u>Objection to Grouping Enhancement Under USSG § 3D1.2 (PSR ¶¶ 46-88)</u>

      The PSR concludes that the eight counts of conviction should be grouped into three separate groups, on the ground that the defendants planned to bomb or attack "three separate targets." The PSR analogizes this case to one of the examples described in the Introductory Commentary to the "multiple counts" section of the Sentencing Guidelines manual; namely, independent instances of assault or robbery. (PSR, p. 36). But this case is more analogous to the following portion of the Introductory Commentary: "When offenses are closely interrelated, group them together for purposes of the multiple count rules." The offenses here are closely interrelated and certainly do not constitute independent instances of criminal conduct.

      Indeed, USSG § 3D1.2 provides that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group," such as "[w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." USSG § 3D1.2(b). As set forth in Application Note 2 to

USSG § 3D1.2, in cases where there is no identifiable victim, the "victim" is deemed to be "the societal interest that is harmed," and "the counts are grouped together when the societal interests that are harmed are closely related."

Here, the counts relating to the attempted bombings in the Bronx and attempted missile firings in Newburgh were all "part of a common scheme or plan." Moreover, there is no identifiable victim in this case. (PSR ¶ 42). And all eight counts involve a "closely related" societal interest – that is, the societal interest protected by laws against using bombs and missiles against targets in the United States. Accordingly, all of the counts of conviction should be grouped together as closely related, and not separated into different groups.

The defense is not relying on the fact that the crimes were not completed. Rather, we are relying on the fact that the number of the targets was decided upon by the government. It could have been one target just as easily as it could have been twenty targets. In that sense, this scheme did not involve separate targets or separate instances of distinct criminal conduct.

Therefore, the 3 level multiple-count grouping adjustment set forth in the PSR at paragraphs 78-84 does not apply.

<u>Objection to Terrorism Base Offense Level 42 Under USSG § 2M6.1(a)(1) (PSR ¶¶ 51, 58, 67)</u>

The defense objects to the application of USSG § 2M6.1(a)(1), which sets the base offense level at level 42. This guideline applies "if the offense was committed with intent (A) to injure the United States; or (B) to aid a foreign nation or a foreign terrorist organization." There was no credible evidence at trial that Cromitie intended to aid a foreign nation or terrorist organization. As set forth above in the defendant's additions to the offense conduct section, and below in the objection to the terrorism enhancement, the evidence showed that, in reality, all Cromitie cared about was getting the cash, cars, and other things of value promised to him by the CI. That was his true intent. As Your Honor has observed, "Hussain did not infiltrate some pre-existing criminal enterprise; there was no criminal activity for him to detect until he helped Cromitie put such activity together." ". . . I am left with the firm conviction that if the Government had simply kept an eye on Cromitie, and moved on to other investigations, nothing like the events of May 9, 2009 would ever have occurred." Decision and Order Denying Defendants' Renewed Motion to Dismiss the Indictment Based on Outrageous Government Conduct, May 3, 2011, p.24.

If the base offense level under this guideline is not 42, it would be 28 under USSG § 2M6.1(a)(2).

Moreover, it would be impermissible "double counting" to set a base offense level of 42 under this guideline, and then also impose the 12 level terrorism enhancement under USSG § 3A1.4. The base offense level under USSG § 2M6.1 is 28 unless the offense was committed with the requisite intent to injure the United States or aid a foreign nation or terrorist organization, in which case the base offense level is 42. The terrorism enhancement is imposed when the offense of conviction involved, or was intended to promote, a federal crime of terrorism, meaning an offense "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

Thus, if USSG § 2M6.1(a)(1) applies (base offense level 42), the 12 level terrorism enhancement should not apply because Section 2M6.1(a)(1) already takes such conduct into account. "Impermissible double counting occurs when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines." United States v. Volpe, 224 F.3d 72, 76 (2d Cir. 2000) (quoting United States v. Napoli, 179 F.3d 1, 12 n.9 (2d Cir. 1999), cert. denied, 528 U.S. 1162 (2000)) (internal quotation marks omitted); accord, United States v. Sabhnani, 599 F.3d 215, 251 (2d Cir. 2010), cert. denied, 131 S. Ct. 1000 (2011).

The PSR states that there is nothing in the Guidelines that expressly precludes the application of both the Level 42 terrorism base offense level and the 12 level terrorism enhancement. (PSR, p. 37). That may be so, but as the Second Circuit said in Volpe, it is still "[i]mpermissible double counting . . . when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines." 224 F.3d at 76.

The PSR also states that there they may be cases in which one provision applies but the other does not (PSR, p. 37), meaning, apparently, that the two provisions are not identical. Again, that may be so, but here if the Court were to apply the 12 level terrorism enhancement after finding that the base offense level for the offense of conviction is 42, then the defendant's sentence will be increased by a "kind of harm" that has already been taken into account in setting the base offense level of 42.

There may also, theoretically, be a case in which the application of both provisions would not constitute double counting. But that's not this case. Here, the same "kind of harm" would be included in both provisions; hence, to apply both would be impermissible double counting.

Honorable Colleen McMahon, U.S.D.J.
Re: <u>United States v. James Cromitie</u> - 09 Cr. 558 (CM)
May 25, 2011
Page 8

     The final offense level as calculated under this guideline should be no more than 28 under subsection (a)(2). If the 12 level terrorism enhancement applies, the final offense level would be 40. If the court determines that the base offense level is 42 under subsection (a)(1), then the 12 level terrorism enhancement would not apply because of double counting, and the final offense level would be 42.

<u>Objection to Firearm Base Offense Level 26 and 15 Level Enhancement Under USSG § 2K2.1 (PSR ¶¶ 68-71)</u>

     The defense objects to using base offense level 26 under USSG § 2K2.1(a)(1), and also objects to the 15 level enhancement under USSG § 2K2.1(b)(3).

     The PSR states that the base offense level is 26 because the offense involved a "firearm" described in 26 U.S.C. § 5845(a). The PSR also states that the portion of Section 5845(a) to which it refers is the "destructive device" subsection. (PSR, p. 37). 26 U.S.C. § 5845(a)(8). However, since the "missiles" provided to the defendants by the FBI were inert and were not capable of being fired, the only arguably pertinent portion of the definition of a "destructive device" that might apply is "any type of weapon by whatever name known which . . . may be *readily converted* to expel a projectile by the action of an explosive or other propellant." 26 U.S.C. § 5845(f)(2) (emphasis added). Thus, the question is whether the weapons provided to the defendants could have been readily converted to expel a projectile, or not.

     The PSR says the answer to this question is "yes," relying the testimony of a government witness at trial, FBI Special Agent Stryker. (PSR, p. 37). But the witness merely testified that the devices could be "fitted" to fire a missile (Tr. 2748); he certainly did not testify that they could be "readily converted" to do so. There was no testimony about how easy or hard it would be to "fit" the inert devices to fire a missile. It seems obvious that it would be very difficult to do so, both logistically and technically. Someone would need to obtain a real (as opposed to inert) heat-seeking surface-to-air missile as well as live explosive components. Such items, we submit, are not readily available on the street. Absent these items, the weapons could not be "readily converted to expel a projectile by the action of an explosive or other propellant."

     Thus, the offense did not involve a firearm described in 26 U.S.C. § 5845(a). USSG § 2K2.1(a)(1).

The only arguably applicable subsection of Section 2K2.1 would be subsection (a)(2), which sets the base offense level at 24. (The "defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense.")

The defense also objects to the 15 level enhancement under USSG § 2K2.1(b)(3), which applies to an offense involving a "destructive device that is a portable rocket, a missile, or a device for use in launching a portable rocket or a missile." Since the guideline gives the term "destructive device" the "meaning given that term in 26 U.S.C. § 5845(a)," Application Note 1, and since, as noted above, the inert missiles in this case could not have been "readily" converted to expel a projectile, this enhancement does not apply.

In short, the maximum offense level under USSG § 2K2.1 is 28. (Base offense level 24 under subsection (a)(2), plus 4 levels under subsection (b)(6) because the defendant possessed a "firearm" (presumably the inert missiles) in connection with another felony offense.)

Objection to Hate Crime Motivation Enhancement Under USSG § 3A1.1 (PSR ¶¶ 53, 60)

The 3 level "hate crime motivation" enhancement applies to a defendant convicted at trial (such as Cromitie) only if "the finder of fact . . . determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of" impermissible factors such as "religion" or "ethnicity." USSG § 3A1.1. Here, no such determination was made by the trier of fact, as the question was never submitted to or considered by the jury. There should be no hate crime motivation enhancement.

The PSR notes that "special evidentiary requirements govern the application of this subsection" (PSR, p. 38), but does not address the fact that the jury did not make this determination.

The probation department may have relied on the government's argument that the jury's verdict "implies the necessary factual finding" because the Riverdale synagogues were specifically targeted. But this is not a case where the jury was <u>required</u> to find that the defendants were motivated by hatred of Jews. None of the elements of the various offenses included as an element that the victim or property was selected because of religion or ethnicity, and the jury was not instructed to make that finding. This case is clearly distinguishable from cases in which juries were instructed that, in order to find a defendant guilty, they had to find that

Honorable Colleen McMahon, U.S.D.J.
Re: United States v. James Cromitie - 09 Cr. 558 (CM)
May 25, 2011
Page 10

the defendant was motivated by a desire to intimidate victims on account of their race or national origin. See, e.g., United States v. Weems, 517 F.3d 1027 (8th Cir. 2008) (cross-burning case); United States v. Pospisil, 186 F.3d 1023 (8th Cir. 1999) (same).

Objection to Official Victim Enhancement Under USSG § 3A1.2 (PSR ¶¶ 66-68, 73)

The 3 (or 6) level official victim enhancement applies if the victim was a current or former government officer or employee and the offense "was motivated by such status." USSG § 3A1.2(a). Application Note 1 provides that the enhancement "applies when specified individuals are victims of the offense. This guideline does not apply when the only victim is an organization, agency, or the government." There are no specified individual victims in this case. Indeed, the PSR correctly states that there are no "identifiable" victims. (¶ 42). There should be no official victim enhancement.

Objection to Terrorism Enhancement Under USSG § 3A1.4 (PSR ¶¶ 12, 54, 61, 66-68, 74, 122)

The defense objects to the 12 level terrorism enhancement as well as the automatic upward departure to Criminal History Category VI that results from the terrorism enhancement. USSG § 3A1.4(a), (b). The enhancement applies if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." To qualify as a "federal crime of terrorism" that may serve as a predicate for the terrorism enhancement, the crime must be "an offense that . . . is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A), and it must also be listed in 18 U.S.C. § 2332b(g)(5)(B). The offenses of conviction here are all listed in subparagraph (B) of the statute.

To satisfy the "calculation" requirement of 18 U.S.C. § 2332b(g)(5)(A), the defendant himself must have had the specific intent "to influence or affect the conduct of government." United States v. Stewart, 590 F.3d 93, 138 (2d Cir. 2009), cert. denied, 130 S. Ct. 1924 (2010). In this case, the jury made no such findings. Whether Cromitie "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" was not an element of any of the offenses charged. Therefore, the fact that he was found guilty of these offenses does not mean the jury necessarily made these findings.

Honorable Colleen McMahon, U.S.D.J.
Re:  <u>United States v. James Cromitie</u> - 09 Cr. 558 (CM)
May 25, 2011
Page 11


      Moreover, there was no credible evidence adduced at trial that Cromitie had the specific intent "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." If anything, assuming Cromitie was properly found guilty, what he did was "calculate" to get money from the CI. From the moment they met, the CI promised Cromitie he had a plan that would make Cromitie money. He repeatedly gave small amounts of money to Cromitie and paid many of his expenses, including his rent. But Cromitie did nothing at all to further the plot until the CI explicitly promised him, among other things, a BMW, a barbershop worth $60-70,000, $250,000 in cash, a brand new car, and an all-expense paid vacation to Puerto Rico – to be paid only after the mission was completed. Talk of financial reward pervaded the evidence at trial, not talk of influencing or affecting the conduct of government.

      There should be no terrorism enhancement.


<u>Objection to Aggravating Role Enhancement Under USSG § 3B1.1(c) (PSR ¶¶ 55, 62, 66-68, 75)</u>

      Mr. Cromitie objects to the 2 level aggravating role enhancement because the defendant supposedly "served as an organizer, leader, manager, or supervisor" in criminal activity. USSG § 3B1.1(c). The credible evidence adduced at trial showed that there was one and only one organizer, leader, manager, or supervisor in this case – the confidential informant. As set forth above, the CI was the group's leader, obviously and always. Cromitie did nothing on his own to further the plot; he had no decision-making authority; he did not plan anything; and, according to the informant, he did not have a claim to a larger share of the "fruits of the crime." Moreover, Cromitie did not recruit accomplices – he simply passed along the informant's offer of cash rewards to people he casually encountered or knew from the community. It was the informant, not Cromitie, who came up with the idea for lookouts and who engineered their recruitment by paying extravagant cash bribes.

      The PSR states that Cromitie's "actions in recruiting the accomplices helped make the offense 'operational,'" and that his co-defendants decided that Cromitie "would serve as the leader." Actually, in fact, the lookouts were completely unnecessary to the plot. Their "recruitment" was engineered by the FBI for the sole purpose of enabling the government to charge a conspiracy. Moreover, it was the CI, not the co-defendants, who decided that Cromitie would be the leader, and it was the CI who told the others that Cromitie was the leader. (Tr. 2000; GX 125-E1). Cromitie was a classic "follower," not an "organizer, leader, manager or supervisor."

      There should be no aggravating role enhancement.

Honorable Colleen McMahon, U.S.D.J.
Re: <u>United States v. James Cromitie</u> - 09 Cr. 558 (CM)
May 25, 2011
Page 12


Final Offense Level and Criminal History Category

      Pursuant to the assault guideline, USSG § 2A2.1 (PSR ¶ 66), the offense level is 33. However, because Mr. Cromitie qualifies as a career offender under USSG § 4B1.1 (PSR ¶ 122), and because the offense statutory maximum is life imprisonment, his final offense level is 37 at Criminal History Category VI.


Sentencing Range and Mandatory Minimum

      Based on a final offense level of 37 and a Criminal History Category of VI, the sentencing range is 360 months (30 years) to life. The mandatory minimum term of imprisonment for Counts Five and Six is 25 years. (PSR ¶ 159).

      If the court determines that the final offense level is 42 under USSG § 2M6.1(a)(1) (with no terrorism enhancement), at Criminal History Category VI, the sentencing range would also be 360 months to life.

      If the court determines that the final offense level is 40 under USSG § 2M6.1(a)(2) and USSG § 3A1.4 (the terrorism enhancement), at Criminal History Category VI, the sentencing range would also be 360 months to life.


Downward Departure

      The PSR states: "Because the instant offense did not result in loss of life, accounting for the role of the CI, and when compared to sentences imposed in other terrorism offenses, we believe the sentencing objectives can be satisfied by a sentence of 40 years' imprisonment." (PSR, p. 42). Such a sentence would be below the advisory sentencing range of life imprisonment determined by the probation department. (PSR ¶ 160). The PSR does not call this non-guidelines sentence a "downward departure"; rather, it states that it would be a sentence sufficient but not greater than necessary to comply with the sentencing purposes set forth in 18 U.S.C. § 3553(a).

      The Court, however, should consider a downward departure in this case – whether the applicable sentencing range is 360 months to life, or life – because there exists a mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing

Commission in formulating the guidelines that should result in a sentence" below the range. 18 U.S.C. § 3553(b)(1). "A departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." USSG § 5K2.0(a)(2)(B).

This is a rare and exceptional case. Indeed, the Court has described it as *sui generis*.[2] (3/24/11 Tr.34). We are at the sentencing stage because the Court has decided that the facts and the law do not warrant a dismissal, or a setting aside of the verdict, or a new trial. However, what happened here was truly remarkable. Viewed in a light most favorable to the government, what happened was that the government located a disaffected individual with a long criminal record and a big mouth who said he wanted to do terrible things to the United States and to Jews, but who, as it turned out, had never done anything remotely like that in the past, was not involved in planning such a crime, had no prior connections to terrorists or terrorist organizations, and had never communicated with anyone else about any activities remotely similar to the ones involved in this case. He also had none of the necessary resources, skills, or equipment that would have enabled him to carry out any such plot absent the direction of the government.

Moreover, it was the FBI, not the defendant, who devised all the plans, identified all the targets, picked all the operative dates, and supplied all the transportation, maps, cameras, "weapons," meeting places, storage facilities, food and beverages, and money for the operation. Every logistical detail of the plot was orchestrated, financed, and facilitated by the FBI. Mr. Cromitie did not take a single step to further the plot when he was not with the CI. But for the government's involvement, no crime would or could have occurred. Your Honor recently concluded, "It is beyond question that the Government created the crime here." Decision and Order Denying Defendants' Post Trial Motions, May 2, 2011, p.44.

In short, while the crimes of conviction are extremely serious (indeed, there is a 25 year mandatory minimum), we are aware of no other case like this one, and it is doubtful the government can point to any such case. Surely, this case is not within the "heartland . . . of typical cases embodying the conduct that each guideline describes." USSG Chapter 1, Introductory Commentary 4(b). As such, the Sentencing Commission did not have this case in mind when it promulgated the applicable terrorism-related guidelines. "When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." USSG Chapter 1, Introductory Commentary 4(b).

---

[2] "Sui Generis. Lat. Of its own kind or class; *i.e.*, the *only one* of its own kind; peculiar." Black's Law Dictionary 1602 (rev. 4th ed. 1968).

Honorable Colleen McMahon, U.S.D.J.
Re:  United States v. James Cromitie - 09 Cr. 558 (CM)
May 25, 2011
Page 14


The Second Circuit has acknowledged that "there might be cases whose circumstances would warrant a downward departure on the basis of imperfect entrapment," meaning government conduct "that does not give rise to an entrapment defense but that is nevertheless 'aggressive encouragement of wrongdoing.'" United States v. Bala, 236 F.3d 87, 92 (2d Cir. 2000) (quoting United States v. Garza-Juarez, 992 F.2d 896, 912 (9th Cir. 1993)).

That the CI's conduct constituted aggressive encouragement of wrongdoing is undisputed.  The sting operation here – with its "reward in two ways" strategy of promising both Paradise and extravagant wealth in return for Mr. Cromitie's participation in the plot, combined with the FBI's providing the defendants with all the weapons, money, transportation and logistical direction used in the plot – is, to put it mildly, aggressive encouragement of wrongdoing.  Your Honor has found that Cromitie ". . . did absolutely nothing to violate the law until after the Government (through Hussain) had made repeated offers of material (as opposed to spiritual) rewards to a desperately poor man — and even those offers took considerable time to bear fruit." May 2, 2011 Decision, p.13-14.  "There is not the slightest doubt in my mind that James Cromitie could never have dreamed up the scenario in which he actually became involved. And if by some chance Cromitie had imagined such a scenario, he would not have had the slightest idea how to make it happen." Id. at 15.

Accordingly, the Court should downwardly depart (from whatever sentencing range it determines applies) to the mandatory minimum of sentence of 300 months (25 years') imprisonment.


Section 3553(a) Factors

The Guidelines sentencing range is, of course, not binding on the sentencing court. United States v. Booker, 543 U.S. 220 (2005).  The Court is free, after considering "the nature and circumstances of the offense and the history and characteristics of the defendant," to impose a non-Guidelines sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) – namely, the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to deter criminal conduct; to protect the public; and to provide the defendant with needed correctional treatment, such as educational or vocational training. See generally United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), cert. denied, 549 U.S. 915 (2006).  The sentencing range is a "starting point."  The Court must then make "an individualized assessment" as to the appropriate sentence, considering all of the Section 3553(a) factors.  Gall v. United States, 552 U.S. 38, 50 (2007).

As noted above, the probation department is recommending a non-Guidelines sentence in this case based on the following: "[T]he instant offense did not result in loss of life, accounting for the role of the CI, and when compared to sentences imposed in other terrorism offenses, we believe the sentencing objectives can be satisfied by a sentence of 40 years' imprisonment." The probation department also believes that a 40 year sentence would punish the defendant, serve as both a specific and general deterrent, and impress upon him the seriousness of and severe consequences of his actions. Likewise, the probation department says that it hopes the defendant will reflect on his criminal actions and understand the loss of life that would have occurred had the plot succeeded. Finally, the probation department believes that such a sentence would "promote respect for the laws of the United States." (PSR, p. 42).

Given his current age of 45, a 40 year sentence of imprisonment for Mr. Cromitie would likely be a life sentence. A life sentence, or even a 40 year sentence were he to survive it, would be much greater than necessary under the circumstances of this case. Even if the Court does not think the circumstances warrant a downward departure, I respectfully submit that the nature and circumstances of the offense – which, without a doubt, involved the FBI's aggressive encouragement of wrongdoing – do not warrant a sentence in excess of 25 years, the mandatory minimum for Counts Five and Six.

Under these circumstances, a sentence of 25 years' imprisonment would certainly comply with all of the sentencing purposes set forth in Section 3553(a)(2). Mr. Cromitie did nothing on his own to further the plot in this case; the CI did everything for him. He was not engaged in any similar activity before he encountered the CI, and although he made hateful remarks, he never produced any recruits or came up with any concrete ideas or plans for any terrorist plot. Despite the CI's explicit offer of Paradise and extravagant financial rewards, Mr. Cromitie actually dropped out of sight and went to great lengths to avoid the CI for more than six weeks. He only got back involved when he was desperate for money and called the only person he thought could help him, and only after the CI re-offered the $250,000 cash payment he had made earlier. Even then, Mr. Cromitie expressed great reluctance and doubt about getting involved. Had it not been for the CI's aggressive encouragement of wrongdoing, no crime would or could have occurred.

For all the foregoing reasons, the Court is respectfully urged to sentence James Cromitie to 300 months' (25 years') imprisonment, which is the mandatory minimum sentence in this case The Court should also sentence Mr. Cromitie to 5 years' supervised release and a special assessment of $800 ($100 for each of the eight counts of conviction).

Honorable Colleen McMahon, U.S.D.J.
Re: <u>United States v. James Cromitie</u> - 09 Cr. 558 (CM)
May 25, 2011
Page 16

<u>Recommendation to Bureau of Prisons</u>

      Finally, the Court is urged to recommend to the Bureau of Prisons that Mr. Cromitie <u>not</u> be housed in a maximum security facility, particularly one reserved for terrorists and for those offenders who commit the most heinous crimes. Mr. Cromitie is lifelong, small-time criminal; despite his conviction in this case, he is not a terrorist.

      The Court's consideration of the foregoing is appreciated.

                                    Respectfully submitted,

                                    Kerry A. Lawrence

KAL/jlr

cc:    All counsel (by e-mail)