UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | 09 Cr. 558 (CM) |
| JAMES CROMITIE, | : | |
|     a/k/a "Abdul Rahman," | | |
|     a/k/a "Abdul Rehman," | : | |
| DAVID WILLIAMS, | | |
|     a/k/a "Daoud," | : | |
|     a/k/a "DL," | | |
| ONTA WILLIAMS, | : | |
|     a/k/a "Hamza," and | | |
| LAGUERRE PAYEN, | : | |
|     a/k/a "Amin," | | |
|     a/k/a "Almondo," | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

DAVID RASKIN
JASON P.W. HALPERIN
ADAM S. HICKEY
Assistant United States Attorneys
    - Of Counsel -



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 8, 2011

**BY HAND**

The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    <u>United States v. James Cromitie, et al.,</u>
              **09 Cr. 558 (CM)**

Dear Judge McMahon:

      The Government respectfully submits the following in anticipation of sentencing hearings for James Cromitie, David Williams and Onta Williams, which are currently scheduled for June 29, 2011, at 10 a.m. For the reasons that follow, Guidelines sentences of life imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing under Title 18, United States Code, Section 3553(a).

## I.    FACTUAL BACKGROUND

      For these purposes, the Government recommends that the Court adopt the factual description of the offense conduct contained in the Presentence Investigation Report ("PSR") prepared by the Probation Department for each defendant (*e.g.*, Cromitie PSR ¶¶ 19-41). The offense conduct sections honor the jury's rejection of the entrapment defense and its implicit conclusion that the defendants committed the crimes of which they were convicted without inducement and/or because they were predisposed.

      The Court should reject the defendants' objection to these sections and their requests to incorporate their own recitations, which are unbalanced and emphasize facts supporting inferences rejected by the jury. (*See, e.g.*, David Williams Sentencing Memorandum ("D. Williams Mem.") at 1). The Government does not object to leaving the defendants' proposed paragraphs where they currently reside in the PSRs. (*See* Cromitie PSR ¶ 44; D. Williams PSR ¶ 46). But they are too self-serving for the offense conduct sections. For example, the defense's second paragraph reads, "[f]rom the beginning, the CI told Cromitie that he (the CI) had a plan and that Cromitie would make money." (*Id.*). This is based on a comment

The Honorable Colleen McMahon
June 8, 2011
Page 2 of 16

Cromitie made late in the investigation, on May 8, 2009, but the recordings demonstrate that
much earlier it was Cromitie who first talked about "put[ting] a plan together." *See* GX
108-E4-T. The next paragraph asserts that "it was the CI, not Cromitie, who brought up the
subject of 'things happening' in Pakistan" (D. Williams Mem. at 2), but this leaves an incorrect
impression that the CI was goading Cromitie. What the defense omits is that Cromitie, by this
point, had already told the CI that he wanted "to die like a shahid, a martyr," Tr. 681, "do
something to America," Tr. 682, and kill President Bush "700 times," Tr. 686. The remainder of
those paragraphs are similarly cherry picked and out of context. (*See, e.g.*, D. Williams Mem. at
2-4).

## II.   GENERAL LEGAL PRINCIPLES APPLICABLE TO SENTENCING

The Guidelines still provide strong guidance to the Court in light of *United States* v.
*Booker*, 543 U.S. 220 (2005), although they are no longer mandatory. "[A] district court should
begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that
range "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S.
38, 49 (2007). As the Second Circuit remarked *en banc*, although the Guidelines do not dictate a
presumptively reasonable sentence, they are not merely a "body of casual advice." *United States*
v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal quotation marks omitted). The Guidelines'
relevance throughout the sentencing process stems in part from the fact that, while they are
advisory, "the sentencing statutes envision both the sentencing judge and the Commission as
carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348
(2007), and the Guidelines are "the product of careful study based on extensive empirical
evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552
U.S. at 46; *see also Rita* v. *United States*, 551 U.S. at 349-50. After making the initial
Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18,
United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than
necessary, to comply with the purposes" of sentencing outlined in Section 3553(a)(2). *Gall*, 552
U.S. at 49-51. To the extent a District Court imposes a sentence outside the range recommended
by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the
justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d
at 189 (quoting *Gall*, 552 U.S. at 50).

## III.   DISCUSSION

In their submissions, the defendants have objected to the Guidelines analysis by the
Probation Department. Probation rejected all of these objections, save for Onta Williams's
request for a mitigating-role reduction, which was not presented to Probation. For the following
reasons, Probation's Guidelines analysis is correct.

The Honorable Colleen McMahon
June 8, 2011
Page 3 of 16

### A.    Grouping Analysis

The Probation Department correctly determined that the eight counts of conviction (or seven, in the case of Onta Williams) are properly grouped in three distinct groups based on the three different targets of the offense.

Counts are not to be grouped together unless they "involve substantially the same harm," meaning that either they "involve the same victim and the same act or transaction," or "the same victim and two or more acts or transactions . . . constituting part of a common scheme or plan," or unless one count embodies conduct that is, essentially, a specific offense characteristic of another count (and therefore reflected in the Guidelines calculation for that count). U.S.S.G. § 3D1.2(a)-(c).[1]  For these purposes, attempts, conspiracies, and completed offenses "involving the *same victim*" or representing "one composite harm to the *same victim*" are grouped together, U.S.S.G. § 3D1.2, Application Notes 3-4, but crimes involving different victims — even when part of the same transaction, scheme, or plan — are not:

> A primary consideration in this section is whether the offenses involve different victims.  For example, a defendant may stab three prison guards in a single escape attempt.  Some would argue that all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims. Although such a proposal was considered, it was rejected because it probably would require departure in many cases in order to capture adequately the criminal behavior.  Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together. *Counts involving different victims* (or societal harms in the case of "victimless" crimes) *are grouped together only as provided in subsection (c) or (d).*

U.S.S.G. § 3D1.2, Background Section (2010) (emphasis added).

The defense contends that "the number of the targets was decided upon by the government," and that "[i]t could have been one target just as easily as it could have been twenty targets."  (Cromitie Sentencing Memorandum ("Cromitie Mem.") at 6).  This disregards the fact that it was the defendants (not the Government) who committed the crime and, per the jury's

---

[1] Section 3D1.2(d), which deals with quantitative measures of harm, obviously does not apply here.

The Honorable Colleen McMahon
June 8, 2011
Page 4 of 16

verdict, are subject to the same Guidelines analysis that would apply if the CI had been the terrorist recruiter he portrayed himself to be.

Essentially, the defense seeks to treat the crimes of conviction as so-called victimless crimes, akin to drug dealing or immigration offenses, that offend only general policy prescriptions, and therefore that a single societal interest comprises the sole harm, such that all eight counts of the Indictment should be grouped together. This is wrong. Terrorist attacks directed at specific institutions (if not specific individuals) have identifiable, intended victims. Indeed, the evidence in this case made that clear. *See, e.g.*, GX 113-E4-T, at 2 (Cromitie stating: "I don't give a fuck if a bunch of Jews are in there. I will let it [the bomb] off."), GX 115-E3-T, at 2 (Cromitie referring to the military planes at Stewart: "They bringing 'em [troops] over there [Afghanistan] to do damage to us. So, if they don't have the planes to carry 'em over there, you can't do too much damage."), GX 116-E1-T, at 4 (Cromitie stating: "I don't care if it's a whole synagogue of men."). "Crimes involving multiple victims, even if the offenses arose out of a single event, are properly grouped separately." *United States* v. *Vasco*, 564 F.3d 12, 23 (1st Cir. 2009) (defendant's plot to murder-for-hire his wife and daughter resulted in two groups for sentencing purposes, one for each victim, even though he was captured as part of a sting operation).

And, as the defense concedes (Cromitie Mem. at 6), the fact that the crimes were not completed is, of course, irrelevant: "[W]here a conspiracy involves multiple victims, the defendant should be deemed to have conspired to commit an equal number of substantive offenses, and the conspiracy count should be divided under § 3D1.2 into that same number of distinct crimes for sentencing purposes." *United States* v. *Torrealba*, 339 F.3d 1238, 1243 (11th Cir. 2003) (three kidnaping victims); *see also* U.S.S.G. §§ 1B1.2(d), 3D1.2, cmt. n.8 (treating conspiracies with multiple objects as separate, completed, substantive crimes for purposes of the Guidelines).

Because they were convicted of Count One (and other counts in the indictment relating to three separate institutional victims), the defendants should be treated as if they committed three substantive offenses: (1) a bombing of the Riverdale Temple at 4545 Independence Avenue, (2) a bombing of the Riverdale Jewish Center down the block, at 3700 Independence Avenue, and (3) an attack on the Air National Guard Base, in Newburgh, New York. The Guidelines properly distinguish this case from one where there was only one intended victim. *See* U.S.S.G. Pt. D, introductory commentary ("The rules in this Part seek to provide incremental punishment for significant additional criminal conduct."). Accordingly, the grouping analysis in the PSR is correct (although the PSR should probably identify the intended victims, instead of saying there were no identifiable victims, *e.g.*, Cromitie PSR ¶ 45).

The Honorable Colleen McMahon
June 8, 2011
Page 5 of 16

### B.    Base Offense Level Under U.S.S.G. § 2M6.1

The defendants challenge the application of U.S.S.G. § 2M6.1(a)(1), which calls for a
base offense level of 42 "if the offense was committed with intent (A) to injure the United States;
or (B) to aid a foreign nation or a foreign terrorist organization." They contend that this base
offense level is not justified by the evidence and, moreover, would result in impermissible
"double counting" if applied in conjunction with the terrorist enhancement (U.S.S.G § 3A1.4).
The defendants are wrong on both fronts.

First, there was ample evidence at trial supporting application of Section 2M6.1(a)(1).
There was evidence that the defendants intended to "injure the United States." This is not a close
call. They engaged in a plot to fire missiles at U.S. military airplanes, which involved, among
other things, their surveillance of those targets at Stewart Airport, acquisition of what they
believed to be real Stinger missiles, and selection of a precise location from which to fire those
weapons. Moreover, during the course of the plot, Cromitie and David Williams each made
crystal-clear statements confirming their intent to destroy the military planes and otherwise injure
the United States. *See, e.g.*, Tr. 682 (Cromitie stating that he wanted to "do something to
America"); GX 102-E3-T, at 2-3 (Cromitie stating that "if the Muslims want the United States
down, they can do it. . . . [W]e can do it. . . . [A]ll somebody has to do is give a good *fatwa* . . .
."); GX 105A-E3-T, at 2 (Cromitie stating: "I am an American soldier. . . . [B]ut not for
America."); GX 109-E2-T, at 3 (Cromitie stating that he personally wanted to "take[] out one of
these American planes"); GX 109-E3-T, at 9-11 (Cromitie stating that he wanted "to make some
type of noise" to make America "calm down"); GX 115-E2-T, at 2 (Cromitie stating: "Imagine if
we hit all the [military] planes in one spot. . . . [T]hey'll all blow because they close to each other
and they all got gasoline."); GX 120-E2-T, at 14 (David Williams stating: "We got the spot [to
fire the missile at Stewart]. Now we gotta find a way . . . outta here."); GX 125A-E1-T, at 9
(David Williams stating that the attacks would "be a hell of a story though. Tell your
grandkids."); GX 125A-E2-T, at 5; GX 126-E4-T, at 5 (Cromitie stating: "That's what I'm trying
to hit, the motherfucking [military] planes."); GX 126-E4-T, at 12 (David Williams stating: "As
long as it get blown up, that's all I care about."); GX 129-E3-T, at 8 (David Williams stating that
"[t]he ones that should be hit [are] . . . the [military] cargo planes.").

There was also evidence that the defendants intended to aid a foreign terrorist
organization — namely, Jaish-e-Mohammed, which since December 2001 has been designated as
such by the Secretary of State. Throughout the plot, each of the four defendants was aware of the
CI's stated affiliation with Jaish-e-Mohammed, and they believed that they were carrying out a
terrorist attack on behalf of that organization. *See, e.g.*, Tr. 691 (CI's explaining his affiliation
with Jaish-e-Mohammed to Cromitie); GX 107-E1-T, at 3-4, 8 (same); GX 121A-E1-T, at 15-16
(same as to all four defendants); GX 129-E1-T, at 5 (same as to Cromitie and David Williams).
As Cromitie told the CI at one point, on behalf of all of the defendants: "We doing everything we
supposed to do . . . . [I]t's not about the money. It's about Jaish-e-Mohammed." GX 125A-E5-

The Honorable Colleen McMahon
June 8, 2011
Page 6 of 16

T, at 1. Thus, the evidence at trial was more than sufficient to establish that the defendants intended *both* to injure the United States *and* to aid a foreign terrorist organization. In other words, application of a base offense level of 42, pursuant to Section 2M6.1(a)(1), is entirely justified.

Second, the defendants are mistaken about double counting with respect to the terrorism enhancement under Section 3A1.4(a) (applicable where an offense "involved, or was intended to promote, a federal crime of terrorism"). The law permits use of multiple guidelines adjustments based on the same underlying conduct, so long as the adjustments at issue "do not serve identical purposes, but rather address separate sentencing considerations." *United States* v. *Volpe*, 224 F.3d 72, 76 (2d Cir. 2000). For example, the Second Circuit has held that the terrorism enhancement, which covers "acts of terrorism," addresses separate sentencing considerations from both the hate crime enhancement (U.S.S.G. § 3A1.1), which "covers the selection of victims based on their national origin" or religion, and the government victim enhancement (U.S.S.G. § 3A1.2(b)), which "deals with the selection of victims based on their status as government employees." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 152 F.3d 93, 153 (2d Cir. 2008) (finding that application of all three enhancements did not result in "'double counting,' much less impermissible double counting"). This was so because the enhancements did not cover the same ground — for example, as the Court reasoned, a terrorist act "need not necessarily target government victims or select its victims on the basis of national origin; nor do all offenses that target [such] victims . . . constitute acts of terrorism." *Id.* By this logic, the same holds for the terrorism enhancement and Section 2M6.1(a)(1), because terrorist acts are not always intended to injure the United States or aid a foreign terrorist organization, and plots to injure the United States or aid a foreign terrorist organization are not always acts of terror. As a result, there is no impermissible double counting.

## C.   Base Offense Level and 15-Level Enhancement Under U.S.S.G. § 2K2.1

Next, the defendants contend that because the Stinger missiles at issue were rendered inoperable by the FBI for use in this case, they qualify neither as a "firearm" under U.S.S.G. 2K2.1(a)(1), which requires a base offense level of 26, nor as a "destructive device" under U.S.S.G. 2K2.1(b)(3)(A), requiring a 15-level increase. These objections should be rejected for two reasons.

First, because the defendants were convicted of conspiracy and attempt to acquire, possess, and use Stinger missiles, the applicable guideline is Section 2X1.1(a), which calls for the base offense level from the guideline for the substantive offense (*i.e.*, Section 2K2.1) "plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1; *see also id.* Application Note 2 ("base offense level will be the same as that for the substantive offense"; "specific offense characteristics from the guideline for the substantive offense that apply are those that are determined to have been

The Honorable Colleen McMahon
June 8, 2011
Page 7 of 16

specifically intended"). "Where a defendant is to be punished based on conduct that did not actually occur, it is enough that the defendant was aware that [the conduct] was part of the conspiratorial agreement." *United States* v. *Capanelli*, 479 F.3d 163, 167 (2d Cir. 2007) (upholding enhancement for brandishing a firearm where that was the object of the conspiracy, even though no firearm was actually brandished).

The fact that the missiles were inoperable is, therefore, of no consequence, because the evidence conclusively established that the defendants believed the missiles were real — that is, they intended to acquire, possess and use real missiles. There was no evidence, or argument from the defense to the contrary. Put another way, when viewed from the defendants' perspective, and what they intended — as Section 2X1.1 requires — the "missiles" in this case qualify as a "firearm" under the guideline for the substantive offense, *see* U.S.S.G. 2K2.1(a)(1)(A)(ii), and as a "destructive device" under the specific offense characteristics, *see* U.S.S.G. § 2K2.1(b)(3)(A) and Application Note 1 (defining "destructive device"), and 26 U.S.C. § 5845(f)(1)(C) & (D). The defendants' objection that the missiles they handled could not have actually fired "is essentially an argument of factual impossibility" and "is unavailing," because "[t]he Guidelines punish attempts as severely as completed offenses." *United States* v. *Weisser*, 417 F.3d 336, 352 (2d Cir. 2005) (upholding enhancement in a law enforcement sting case based on the facts the defendant believed to be true).

Second, separate and apart from what the defendants intended, the Stinger missiles qualify as a "destructive device" even in their inoperable state, because they could be "readily converted to" an operational state by loading the missile tubes with a live Stinger missile. *See* 26 U.S.C. § 5845(f)(2); Tr. 2748-49 (government's explosives expert testifying that the only difference between the inoperable devices in this case and live missiles was lack of live explosive components, and that the inoperable devices could be fitted to fire a missile). The Court need not resolve that factual issue, however, because, whatever the missiles could (or could not) have been altered to do, the defendants all clearly believed they were handling operable anti-aircraft missiles that qualify for the higher base offense level and enhancement contained in the PSR.

## D.    Other Enhancements

### 1.    Terrorism

The defendants challenge application of the terrorism enhancement, which applies to a felony that "involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). A "federal crime of terrorism" is an offense — including those of which the defendants were convicted — that is also "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C.

The Honorable Colleen McMahon
June 8, 2011
Page 8 of 16

§ 2332b(g)(5) (cross-referenced in U.S.S.G. § 3A1.4, Application Note 1).  The defendants'
objections to application of this enhancement are misguided.

     First, the defendants are wrong to suggest that a jury must find the facts supporting
application of the enhancement.  On the contrary, the underlying facts may be found by the
sentencing judge, and only by a preponderance of the evidence.  *See United States* v. *Awan*, 607
F.3d 306, 317 (2d Cir. 2010).

     Second, the defendants misunderstand how the enhancement works.  They claim that it
would apply only if their motive — or specific intent — was to "to influence or affect the
conduct of government by intimidation or coercion, or to retaliate against government conduct."
*See* Cromitie Mem. at 10.  But that is plainly wrong.  The Second Circuit has made perfectly
clear that the law requires a showing only of a specific intent "*to commit an offense* that was
calculated to influence or affect the conduct of government by intimidation or coercion, or to
retaliate against government conduct." *Id.* (emphasis added).  The defendant's "motive is simply
not relevant." *Id.*  Rather, the relevant question is whether the defendant *knew* that the offense
was so calculated.  *Id.* at 317-18 ("[I]f the evidence showed that Awan engaged in criminal
conduct with knowledge that confederates solicited his actions to effectuate politically motivated
bombings in India, or homicidal attacks on that country's security forces or its political leaders,
such proof could demonstrate that Awan's crimes were calculated to influence the conduct of
government even if he was not personally motivated by that object.").  The CI made the objective
of the attacks clear.  As he explained to all four defendants, his terrorist organization, Jaish-e-
Mohammed, was engaged in a "jihad" to, among other objectives, "tell the Americans. . . . [t]o
get out of Afghanistan and Saudi Arabia."  GX 121A-E1-T, at 15.  So there would be no doubt,
the CI added that "[t]his" — meaning the attacks they were planning — "is to send them [the
United States] a message." *Id.*  The defendants never questioned this objective.  They even made
assorted comments evincing their agreement with the objective.  *See, e.g.*, GX 125A-E5-T, at 1
("It's about Jaish-e-Mohammed"); *id.* at 4 (we are doing this "for Allah"); Tr. 2528 ("So if we
kill them here, it would all be equal").  And, most importantly, they carried out what they
believed was a real terrorist plot with knowledge of the stated objective.  In other words, the
defendants committed offenses they believed were "calculated to influence or affect the conduct
of government by intimidation or coercion, or to retaliate against government conduct."  The
terrorism enhancement clearly applies.

    **2.**    **Official Victim**

     The PSR properly applies the enhancement for targeting "official victims," under
U.S.S.G. § 3A1.2.  "[A]n individual need not be harmed, or even knowledgeable of the crime, to
be a victim." *United States* v. *Drapeau*, 188 F.3d 987, 991 (8th Cir. 1999).  "Just because federal
. . . employees . . . were not [actually] killed or injured or that [the defendants] did not know the
names of [their] intended victims does not preclude application of the three-level enhancement."

The Honorable Colleen McMahon
June 8, 2011
Page 9 of 16

*United States* v. *Polk*, 118 F.3d 286, 298 (5th Cir. 1997) (affirming imposition of enhancement in sting case where the defendant told a CI that he wanted to attack an IRS service center and prepared accordingly). There is no requirement that federal employees "be named for the three-level enhancement to apply." *Id.* at 298 n.1. Instead, for purposes of this enhancement, "'[a]ny attempt [or conspiracy] to cause injury or damage is basically the same crime as actually succeeding in causing the injury or damage.'" *United States* v. *Drapeau*, 121 F.3d 344, 348 (8th Cir. 1997) (quoting district court that applied the enhancement).[2]

Here, as in *Polk*, "there can be no doubt that [the defendants] intended to kill, injure, or maim federal employees [at the Air National Guard Base] solely because those persons worked for the [U.S. government]." 118 F.3d at 298. The jury's guilty verdict on Count Seven established beyond a reasonable doubt that all four defendants conspired to kill "officers and employees of the United States" "while such officers and employees were engaged in and on account of the performance of official duties." (Indictment ¶ 11). The Court instructed the jury that, to convict the defendants of Count Seven, it needed to find the existence of a conspiracy whose object was "to murder officers or employees of the United States or people assisting them, while those officers or employees or assisting persons were in the performance of their official duties." Tr. 3481. The jury's factual finding, in the form of its verdict, that the defendants were so motivated, extends to the related Counts, Five and Six, and provides the necessary predicate to impose the enhancement. *See, e.g.*, *United States* v. *Hunter*, 985 F.2d 1003, 1007-08 (where jury convicted defendant of threatening federal judges, in violation of 18 U.S.C. § 115, "[t]his finding meets the requirements of U.S.S.G. § 3A1.2 and mandates the application of a three-level enhancement"), *withdrawn as moot*, 1 F.3d 843 (9th Cir. 1993). Accordingly, the PSR properly includes the official-victim enhancement in calculating the range applicable to Group Three.

### 3.    Hate Crime

Although, as the defense correctly points out, in a case that goes to trial, the hate crime enhancement may be imposed only where the jury determines "beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the . . . religion [or] ethnicity . . . of any person," U.S.S.G. § 3A1.1(a), no special verdict is required to impose this enhancement. *See, e.g.*, *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 153 (2d Cir. 2008) (upholding hate crime enhancement after defendant was convicted by a jury of conspiring to murder U.S. nationals); *see also United States* v. *Pospisil*, 186 F.3d 1023, 1031 (8th Cir. 1999) (upholding enhancement based on jury instructions).

---

[2] This is consistent with the principle, discussed above, that the offense level for a conspiracy to commit a crime is determined by applying the Guideline for the completed, substantive offense, including "any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1(a).

The Honorable Colleen McMahon
June 8, 2011
Page 10 of 16

 The trial record established that the synagogues in Riverdale were specifically targeted. *See, e.g.,* GX 113-E4-T, at 2 (Cromitie stating: "I don't give a fuck if a bunch of Jews are in there. I will let it [the bomb] off."; "[Jews are] the most wickedest people that Allah has created."); GX 125A-E1-T, at 1-3 (David Williams identifying as a potential target for attack an area near a synagogue in Brooklyn: "Yeah. The whole strip. It's like man, it's all Jews."); GX 126-E1-T, at 4 (Cromitie stating: "These fucking Jews get me sick."). The guilty verdicts on Counts Two and Three established that all four defendants attempted to bomb two synagogues in the Bronx. Because the targets of those offenses were places of worship, and because the jury, in convicting the defendants on those counts, necessarily found that the defendants deliberately attacked those places (and rejected an entrapment defense that would have provided any alternative motivation besides religious animus) the jury's verdict implies the necessary factual finding. Here, as in *Terrorist Bombings*, where it was sufficient to establish that the defendants conspired to kill U.S. nationals, "it is the very fact that [the defendants were] convicted of these offenses that justifies the application of the hate crime . . . enhancement." *Id.* at 153.

### E. Defendant-Specific Issues

#### 1. James Cromitie

 Cromitie challenges application of the two-level role adjustment under U.S.S.G. § 3B1.1(c). He claims that the only "organizer, leader, manager, or supervisor" of the plot was the CI. It is true that the Government, through the CI, provided the defendants with weapons of mass destruction, transportation, money, and plenty of logistical direction. This, however, does not discount evidence that established Cromitie's leadership.

 First, the defendants selected Cromitie to be their leader. *See* GX 125-E1-T, at 2 (Payen's telling CI that the team needed a leader); GX 125A-E1, at 3-5 (all four defendants agreeing that, while everyone would have input, Cromitie would be the leader). Second, Cromitie was responsible for recruiting the three other defendants. *See* GX 240-T ("The brother Daoud said *salam alaykum* too"); GX 121-E1-T, at 1 ("We got two more brothers, Hak."). It is immaterial whether, as the defense contends, Cromitie was simply passing along the CI's "offer for cash": what matters is that Cromitie found the others and introduced them to the CI, and there is no debate about that. Third, Cromitie participated in the planning of the attacks to a far greater degree than the other defendants: he discussed the attacks with the CI for months and months before the others entered the scene. It was in November 2008 that Cromitie suggested the attacks, telling the CI for the first time that he personally wanted to "take[] out one of these American planes," GX 109-E2-T, at 3, and "to get a synagogue," GX 109-E4-T, at 2; David Williams did not show up until April 10, 2009; and Onta Williams and Payen showed up on April 28, 2009, less than a month before the attack date. Finally, Cromitie was tasked with the most prominent role in the attacks themselves. It was Cromitie who planted the bombs by their targets in the Bronx, while the others served as lookouts, and it was Cromitie who was supposed

The Honorable Colleen McMahon
June 8, 2011
Page 11 of 16

to fire the Stinger missiles at the military planes. Given all of these facts, a two-level role enhancement is certainly justified.

## 2.    David Williams

With respect to David Williams's criminal history calculation, the Government believes two points should be added, for a score of 12 (PSR ¶ 119), because David Williams committed the instant offense while on a conditional discharge from his December 6, 2008 sentence (PSR ¶ 114). *See* U.S.S.G. 4A1.1(d); *United States* v. *Labella-Szuba*, 92 F.3d 136, 138 (2d Cir. 1996). Because, however, David Williams was convicted of a federal crime of terrorism, for the reasons described above, his criminal history category is VI, as calculated by the PSR. *See* U.S.S.G. § 3A1.4(b).

With respect to the defendant's tattoo on his fists of "Allah Akbar," the evidence in the record established, as the PSR indicates (PSR ¶ 136), that it is a Muslim war cry, and based on the defendant's conduct in this case and the very location of the tattoos, there is a factual basis for inferring he intended the more violent reading. *See, e.g.,* GX 129-E2-T, at 2 (David Williams stating with respect to carrying out the attack plan: "It's for Allah, so there's nothing really I can say.").

## 3.    Onta Williams

Onta Williams seeks a downward adjustment of 4 levels for minimal participation, pursuant to U.S.S.G. § 3B1.2(a). (*See* Onta Williams Sentencing Memorandum ("O. Williams Mem.") at 3). The claim is frivolous.

A mitigating role adjustment under Section 3B1.2 is appropriate only when a defendant is "*substantially* less culpable than the average participant," that is, "less culpable than most other[s]" who are "criminally responsible for the commission of the offense," U.S.S.G. §§ 3B1.1, comment. (n.1), 3B1.2, comment. (nn. 1, 3(A), 5) (emphasis added), when compared to "'to the average participant in such a crime,'" not merely his co-conspirators, *United States* v. *Carpenter*, 252 F.3d at 235 (quoting *United States* v. *Rahman*, 189 F.3d 88, 159 (2d Cir. 1999)); *accord, e.g., United States* v. *Jeffers*, 329 F.3d 94, 103 (2d Cir. 2003); *United States* v. *Yu*, 285 F.3d 192, 200 (2d Cir. 2002). A defendant's role is "minimal" when he is "plainly among the least culpable of those involved in the conduct of the group," as indicated by his "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others." U.S.S.G. § 3B1.2 comment. (n.4). A defendant has a "minor" role when he "is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2(b) & comment. (n.5).

The Honorable Colleen McMahon
June 8, 2011
Page 12 of 16

Based on these standards, courts in the Second Circuit have routinely denied mitigating
role adjustments to defendants who, like this one, contend they were "merely" lookouts, finding
instead that their participation in the criminal venture was indispensable to its success. *See, e.g.,*
*United States* v. *Aponte*, 31 F.3d 86, 88 (2d Cir. 1994) ("Because there is evidence that
[defendant] was involved in the planning of the . . . robbery and served as a look-out, we sustain
the district court's conclusion that [defendant] did not play a minor or minimal role."); *United*
*States* v. *Pitre*, 960 F.2d 1112, 1127 (2d Cir. 1992) (affirming denial of mitigating role
adjustment where there was evidence that defendant "was aware of the full extent of the
transaction" and "acted as a look-out during the instant transaction and was present during at
least one prior narcotics transaction involving" his co-conspirators); *United States* v. *Vargas*, 170
Fed. Appx. 779, 780-81 (2d Cir. Mar. 17, 2006) (unpublished decision) (affirming denial of
adjustment to "lookout"); *United States* v. *White*, 113 F.3d 1230, 1997 WL 279972, at *3 (2d
Cir. May 23, 1997) (unpublished decision) ("[Defendant's] culpability in the attempted robbery
was not minor on any measure: the evidence showed that he originally suggested the robbery
plan, actively planned the robbery using inside knowledge of the plant, opened the plant door,
and served as a lookout for the police."); *United States* v. *Batista*, 732 F. Supp. 2d 82, 89
(E.D.N.Y. 2010) (denying role adjustment to defendant who "provided a valuable and unique
service to the conspiracy that helped the conspiracy avoid detection by law enforcement, and
[who] had knowledge of the scope and structure of the illicit enterprise"); *Delrosario* v. *United*
*States*, No. 00 CR. 121 (RCC), 03 Civ. 1654 (RCC), 2005 WL 1639420, at *3 (S.D.N.Y. July 12,
2005) (denying adjustment to "lookout"); *Rodriguez* v. *United States*, No. 91 Civ. 6724 (PNL),
1992 WL 183757, at *3 (S.D.N.Y. July 21, 1992) (denying adjustment to "lookout").

Measured against those cases, Onta Williams was not a minimal, or even minor,
participant in the offenses of conviction. The first thing Williams did when he met the CI was
offer to get him guns. *See* GX 121-E5-T, at 1 ("Yeah, I need like two of them ASAP."). He
carefully assessed the risks associated with each segment of the operation. *See* GX 125A-E1-T,
at 9 ("The shit in the Bronx, that's . . . like, adolescent. . . . Compared to [the planes, which is]
the major leagues."). It was Williams, on the night before the attacks, who was leading the
operational planning session at the Shipp Street house, describing the best getaway routes and
imploring the others to take care because there would be "top investigators on this." GX 127-E1-
T, at 2-4. He handled the bombs and the missiles, fully aware of what was at stake. *See* GX
125A-E2-T, at 5 (predicting that the twin attacks were "gonna be a double whammy"). And, on
the night of the planned attack, Williams helped move the weapons from storage to their intended
targets and then "provided a valuable and unique service to the conspiracy that helped the
conspiracy avoid detection by law enforcement" by standing on a corner, looking out for the
police. *United States* v. *Batista*, 732 F. Supp. 2d at 89. In short, Williams was far from being
just "along for the ride," as he now claims. (O. Williams Mem. at 3).

The Honorable Colleen McMahon
June 8, 2011
Page 13 of 16

### F.    Legitimate Purposes of Sentencing and Sentencing Entrapment

The defendants agreed to conduct a colossal bombing attack in the Bronx that would have killed innocent people; they agreed to conduct a missile strike on U.S. military planes at Stewart Air Force Base; and they agreed to murder officials of the U.S. Government. The defendants took steps to make all this happen, including helping to plan the attacks and conceal the weapons they believed would cause the damage and death. They went as far as to plant the bombs by their targets, knowing that within an hour or so, at the point of detonation, unsuspecting people would die. These are crimes of the most serious kind. The Guidelines naturally call for life sentences. And life sentences, we submit, would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing under Title 18, United States Code, Section 3553(a).

The circumstances of the investigation — namely, allegations of excessive government involvement, and the like — do not detract from the seriousness of the offense. *See* 18 U.S.C. § 3553(a)(1). The investigative techniques did not amount to entrapment; they did not deprive the defendants of due process; and they should not, we submit, mitigate the sentences called for under the Guidelines. The defendants readily agreed to participate in a spectacular terrorist attack. They had every chance to decline, notwithstanding the CI's influence, but they gave themselves to his plan. This freely given assent — irrespective of whether they wanted to make money — made each of the defendants supremely dangerous from the FBI's perspective and this investigation worthwhile. Few people in the world would agree to do such horrible things. Not for money. Not for anything. The defendants are career criminals; they have shown little respect for the law throughout their entire adult lives; but this investigation revealed what their rap sheets never could: that these defendants were among the handful of people in the country who would actually agree to join forces with a terrorist to bomb synagogues, fire missiles at planes, and kill innocent U.S. officials. It is irrelevant that the defendants were not themselves associated with a terrorist group or that they may have lacked the ability (or maybe even the inclination) to carry off something like this on their own: their dangerousness was their willingness to submit to a person they thought was a terrorist. Nor does it matter whether the defendants would ever have encountered a real terrorist recruiter: from the FBI's perspective, leaving people susceptible to such recruitment on the streets, like ticking time bombs, is unimaginable no matter how long the odds. The investigation went as far as it did because the defendants never said no. The one time Cromitie gave the FBI the comfort to pull back, he showed up again with a renewed vigor, recruited the others, and they all proceeded from there with enthusiasm, all the way to the Bronx on May 20th. In sum, this investigation incapacitated defendants who were predisposed to cause horrific damage with little regard for human life. The highly publicized case stands as a deterrent to others similarly willing to accept the advances of a smooth-talking outsider bent on bringing harm to the Nation. Nothing about this successful undercover investigation should mitigate the defendants' sentences.

The Honorable Colleen McMahon
June 8, 2011
Page 14 of 16

The defendants seek a downward departure for "sentencing manipulation" or "sentencing entrapment." "Sentencing manipulation has been described as occurring when the Government engages in improper conduct that has the effect of increasing the defendant's sentence." *United States* v. *Caban*, 173 F.3d 89, 93 n.1 (2d Cir. 1999). Sentencing entrapment "normally requires that a defendant convince the fact-finder that government agents induced her to commit an offense that she was not otherwise predisposed to commit." *United States* v. *Knecht*, 55 F.3d 54, 57 (2d Cir. 1995) (internal quotation marks omitted). *See also United States* v. *Oliveras*, 2010 WL 46872, at *3 & n.5 (2d Cir. Jan. 8, 2010) (summary order) (discussing the concepts of sentencing manipulation and entrapment, and the "widely different positions" that other courts of appeals have taken regarding the applicability of such doctrines). The Second Circuit "has not yet recognized the doctrine of sentencing manipulation," *United States* v. *Gagliardi*, 506 F.3d 140, 148 (2d Cir. 2007), and the status of sentencing entrapment claims is similarly "unclear," *United States* v. *Caban*, 173 F.3d at 93 n.1. *Accord United States* v. *Bala*, 236 F.3d 87, 93 (2d Cir. 2000); *see also, e.g., United States* v. *Oliveras*, 2010 WL 46872, at *3; *United States* v. *Lian*, 2010 WL 3467225, at *2 (2d Cir. Sept. 7, 2010) (summary order); *United States* v. *Floyd*, 2010 WL 1718725, at *1 (2d Cir. Apr. 29, 2010) (summary order). What is clear is that the doctrines have extremely limited, if any, viability. "The validity of the concept of 'sentencing entrapment' has not been determined in this Circuit but . . . even where it has been approved in theory, its potential application has been limited to outrageous official conduct which overcomes the defendant's will." *United States* v. *Gomez*, 103 F.3d 249, 256 (2d Cir. 1997) (internal quotation marks omitted); *see United States* v. *Gagliardi*, 506 F.3d at 148 (confirming that a manipulation claim "'would likely require a showing of 'outrageous' government conduct'") (quoting *Bala*, 236 F.3d at 93); *see also United States* v. *Montoya*, 62 F.3d 1, 4 (1st Cir. 1995) (observing that "garden variety manipulation claims are largely a waste of time" because defendants must meet the high standard of showing "extraordinary misconduct" by the government, which occurs only in the "extreme and unusual case").[3]

After the denial of their motions to dismiss for outrageous government conduct, the defendants point to nothing new particular to sentencing that could be considered "outrageous" or "shocking to the conscience." There was nothing outrageous about providing the defendants with bombs and missiles, given Cromitie's statements in October and November 2008 — for example, that he was contemplating some type of 9/11-style attack in the United States, *see* GX 102-E3-T, at 2-3; that he wanted to "tak[e] out one of these American planes," GX 109-E2-T, at 3, and "get a synagogue," GX 109-E4-T, at 2; that he had wanted to conduct such an attack "since [he] was 7," GX 109-E2-T, at 2; and that other targets he had considered were the White House and bridges between New York and New Jersey, GX 109-E3-T, at 2. Far from

---

[3] In jurisdictions that accept the doctrines of sentencing manipulation or entrapment, defendants bear the burden of establishing the factual bases for applying those doctrines. *See Caban*, 173 F.3d at 93 n.1; *United States* v. *Knecht*, 55 F.3d at 57; *United States* v. *Mejia*, 559 F.3d 1113, 1118 (9th Cir. 2009); *United States* v. *Montoya*, 62 F.3d at 4.

The Honorable Colleen McMahon
June 8, 2011
Page 15 of 16

"outrageous," it was reasonable for the FBI to respond to these statements by providing the defendants with the opportunity to use bombs and missiles.[4]  Similarly, it was not inappropriate to use the CI to encourage Cromitie to recruit others.  First, as the statements cited above made clear, Cromitie was contemplating a group operation.  He even said (many times) that he wanted to recruit a team.  *See, e.g.,* GX 108-E3-T, at 2 ("anybody can put a team together" but the key is "mak[ing] it work"); GX 108-E4-T, at 1 ("I'm gonna try to put a plan together").  Thus, it was hardly outrageous for the CI to encourage, even press, Cromitie to act on what he said he wanted to do.  But, more fundamentally, Cromitie's chilling statements justified, if not compelled, the FBI's efforts to ferret out anyone known to Cromitie who might be similarly predisposed to carrying out an act of terror.  In this sense, having the CI pressure Cromitie to recruit was a reasonable way to determine whether people of such predisposition existed in the community (they did), and to further evaluate the credibility of Cromitie's claims.  Under the circumstances, it would have been "outrageous" for the FBI *not to* employ this fairly basic law enforcement tactic to extend the investigation's scope.

On the same grounds, Onta Williams (joined by David Williams) has asked the Court to take the "bold step" of sentencing the defendants below the statutory minimum.  (O. Williams Mem. at 1).  Bold indeed, but also reversible error.  Notwithstanding the varying approaches that different courts of appeals have taken regarding the scope and applicability of sentencing entrapment and manipulation, no circuit has upheld a decision declining to impose a mandatory minimum sentence on these grounds.  *See United States* v. *Oliveras*, 2010 WL 46872, at *3-4 (holding that the record had not been developed adequately to determine whether a below-guidelines sentence was warranted based on the Government's "aggressive encouragement of wrongdoing," but overturning the sentence imposed because the district judge had "manifestly" erred, and had exceeded her authority, by imposing a sentence below applicable the mandatory minimum); *United States* v. *Pena*, 2008 WL 4772099, at *3 (2d Cir. Nov. 3, 2008) (rejecting the defendant's challenge to the sentence imposed, and concluding that the district court lacked the authority to impose a sentence below the mandatory minimum on the bases of sentencing manipulation or sentencing entrapment); *see generally United States* v. *Jimenez*, 451 F.3d 97, 102 (2d Cir. 2006) ("[M]andatory minimums have taken on increased significance after [*United States* v. *Booker*, 543 U.S. 220 (2005)] — in that they remain binding on the district courts and work to restrain their newly acquired discretion. . . ."); *United States* v. *Sharpley*, 399 F.3d 123, 127 (2d Cir. 2005) ("*Booker* makes the Guidelines advisory in nature, leaving sentences to the district court's discretion, guided by the Guidelines and the other factors of § 3553(a), and bounded by any applicable statutory minimum and maximum.").  There is no basis to take such a drastic step here.

---

[4] The defendants refer to reports reflecting the FBI's awareness during the investigation of the mandatory minimum sentence associated with missile offenses.  *See* 3501-313, -314 (referring to discussions with the AUSA).  There is nothing inappropriate, much less "outrageous," about the contents of these reports.

The Honorable Colleen McMahon
June 8, 2011
Page 16 of 16

## IV.    CONCLUSION

For the foregoing reasons, the Government respectfully submits that the sentence recommended by the Guidelines is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing under Title 18, United States Code, Section 3553(a).

Respectfully submitted,

PREET BHARARA
United States Attorney

By:    _____

David Raskin
Jason P.W. Halperin
Adam S. Hickey
Assistant United States Attorneys
(212) 637-2635,  (914) 993-1933, (212) 637-1039

cc:    All Defense Counsel (by email)